# CRANE, et al.

## vs.

## CORECIVIC, et al.

---

# LINDA THOMAS

## April 20, 2018



Celebrating 27 Years of Reporting Excellence!

Joy Kennedy, LCR, CCR, RPR
Associate Reporter

Chattanooga (423)266-2332    Jackson (731)425-1222
Knoxville (865)329-9919    Nashville (615)595-0073    Memphis (901)522-4477
www.elitereportingservices.com

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

_____

Adam Crane, David Johnson,
individually and on behalf
of all others similarly situated,

        Plaintiffs,

vs.                 Case No. 4:16-cv-00947 SRB

CoreCivic
and
Securus Technologies, Inc.,

        Defendants.

_____

Deposition of:

LINDA THOMAS

Taken on behalf of the Plaintiffs
April 20, 2018

_____

Elite Reporting Services
www.elitereportingservices.com
Joy Kennedy, LCR, CCR, RPR Associate Reporter
Post Office Box 292382
Nashville, Tennessee 37229
(615)595-0073

---

For Securus Technologies, Inc.:

    MR. JOSHUA MARTIN
    Assistant General Counsel
    & Chief Compliance Officer
    4000 International Parkway
    Carrollton, TX  75007
    (972)277-0335
    Joshuamartin@securustechnologies.com

    MR. R. RYAN HARDING
    Attorney at Law
    Husch Blackwell, LLP
    235 East High Street
    Post Office Box 1251
    Jefferson City, MO  65102-1251
    (573)761-1119
    Ryan.harding@huschblackwell.com

    MS. TAYLOR B. CONCANNON
    Attorney at Law
    Husch Blackwell, LLP
    4801 Main Street, Suite 1000
    Kansas City, MO  64112
    (816)983-8319
    Taylor.concannon@huschblackwell.com

Also Present:

    MR. STEVE CONRY

---

A P P E A R A N C E S

For the Plaintiffs:

    MR. MICHAEL HODGSON
    Attorney at Law
    The Hodgson Law Firm
    3699 SW Pryor Road
    Lee's Summit, MO  64082
    (816)600-0117
    Mike@thehodgsonlawfirm.com

    MR. LANCE SANDAGE
    Attorney at Law
    Sandage Law, LLC
    1600 Genessee Street, Suite 655
    Kansas City, MO  64102
    (816)753-0800
    Lance@sandagelaw.com

    MR. JOSEPH K. EISCHENS
    Attorney at Law
    Eischens Mediation Services, LLC
    1321 Burlington Street, Suite 202
    N. Kansas City, MO  64116
    (816)945-6393
    Joe@jkemediation.com

For CoreCivic:

    MR. HAL D. MELTZER
    Attorney at Law
    Baker, Sterchi, Cowden & Rice, LLC
    2400 Pershing Road, Suite 500
    Kansas City, MO  64108-2533
    (816)471-2121
    Meltzer@bscr-law.com

---

I N D E X

                                          Page

Examination
By Mr. Hodgson                              9
Examination
By Mr. Martin                             161

Examination
By Mr. Hodgson                            168
Examination
By Mr. Meltzer                            170

Examination
By Mr. Hodgson                            180

E X H I B I T S

                                          Page
Exhibit No. 25                             12
        Call Instructions

Exhibit No. 26                             12
        Call Instructions
Exhibit No. 27                             24
        Attorney Verification Form

Exhibit No. 28                             26
        Receiving and Discharge Checklist
Exhibit No. 29                             29
        Portions of Inmate Handbook

Exhibit No. 30                             29
        Portions of Inmate Handbook
Exhibit No. 31                             29
        Portions of Inmate Handbook

Exhibit No. 32                             29
        Portions of Inmate Handbook

Case 4:16-cv-00947-SRB  Document 79-1  Filed 05/31/18  Page 2 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com

| | | Page |
|---|---|---|
| Exhibit No. 33 | Portions of Inmate Handbook | 29 |
| Exhibit No. 34 | Information Request from the U.S. Marshals (Top Sheet) | 64 |
| Exhibit No. 35 | E-Mail from Kyle Twaddle to Wayne Bigelow (Top Sheet) | 64 |
| Exhibit No. 36 | Photocopies of Photographs Inside CCA Leavenworth | 80 |
| Exhibit No. 37 | Notice of Attorney Telephone Number Process | 83 |
| Exhibit No. 38 | Policy 16-100, November 11, 2011 | 86 |
| Exhibit No. 39 | Policy 16-100, July 1, 2016 | 86 |
| Exhibit No. 40 | E-Mail from Connie Phelps To Clayton Spears, Richard Shanks, and Toni Hall (Top Sheet) | 96 |
| Exhibit No. 41 | Morgan Pilate, LLC Letter to Chief Moore (Top Sheet) | 106 |
| Exhibit No. 42 | E-Mail from Cindy Johnson to Roger Moore, Jr. (Top Sheet) | 108 |
| Exhibit No. 43 | Attorney Verification Form, Inmate Anders (Top Sheet) | 112 |
| Exhibit No. 44 | Attorney Verification Form, Inmate Aita (Top Sheet) | 122 |

S T I P U L A T I O N S

The deposition of LINDA THOMAS was taken by counsel for the Plaintiffs, at 600 Marriott Drive, Nashville, Tennessee, on April 20, 2018, for all purposes under the Federal Rules of Civil Procedure.

All formalities as to caption, notice, statement of appearance, et cetera, are waived. All objections, except as to the form of the questions, are reserved to the hearing, and that said deposition may be read and used in evidence in said cause of action in any trial thereon or any proceeding herein.

It is agreed that JOY KENNEDY, LCR, CCR, RPR, Notary Public and Court Reporter for the State of Tennessee, may swear the witness, and that the reading and signing of the completed deposition by the witness are not waived.

| | | Page |
|---|---|---|
| Exhibit No. 45 | Bates Numbers Corecivic008268 Through Corecivic008284 | 122 |
| Exhibit No. 46 | CCA/LDC, KS DTN List of Entry Report (Total Number of Records 419) | 122 |
| Exhibit No. 47 | CCA/LDC, KS DTN List of Entry Report (Total Number of Records 199) | 122 |
| Exhibit No. 48 | CCA/LDC, KS DTN List of Entry Report (Total Number of Records 43) | 122 |
| Exhibit No. 49 | Bates Numbers Corecivic000375 Through Corecivic000383 | 122 |
| Exhibit No. 50 | Bates Number Corecivic000380A | 122 |
| Exhibit No. 51 | CoreCivic's Fourth Supplemental Responses to Plaintiffs' First Request for Production of Documents to Defendant CoreCivic | 143 |
| Exhibit No. 52 | Legal Visits, December 1, 2015 (Top Sheet) | 149 |
| Exhibit No. 53 | Visitor Log, December 1, 2015 (Top Sheet) | 150 |
| Exhibit No. 54 | Memorandum for All Concerned From Linda Thomas | 159 |

* * *

THE VIDEOGRAPHER:  We are now on the record.  Today is Friday, the 20th of April, 2018.  The time indicated on the video screen is 12:54 p.m.  This is the video deposition of Linda Thomas on behalf of CoreCivic in the matter of Crane et al. vs. CoreCivic et al., case number 4:16-cv-00947 SRB, filed in the United States District Court for the Western District of Missouri, Western Division.  The deposition is being held at 600 Marriott Drive, Nashville, Tennessee, 37214.  My name is Sophia Gordon, the videographer, the court reporter is Joy Kennedy, both in association with Elite Reporting Services of Tennessee.

Would counsel, please, introduce yourselves and state whom you represent.

MR. HODGSON:  Good afternoon.  Michael Hodgson, Lance Sandage, and Joseph Eischens for the plaintiffs.

MR. MARTIN:  Joshua Martin for defendants Securus Technologies.

MR. MELTZER:  Hal Meltzer of Baker, Sterchi, Cowden & Rice of Kansas City, Missouri, on behalf of defendant, CoreCivic.

Page 9

1      THE VIDEOGRAPHER:  Would Ms. Kennedy,
2  please, swear in the witness.
3
4           *  *  *
5      LINDA THOMAS,
6  was called as a witness, and having first been duly
7  sworn, testified as follows:
8
9           EXAMINATION
10  QUESTIONS BY MR. HODGSON:
11  Q.    Good afternoon, Ms. Thomas.
12  **A.    Good afternoon.**
13  Q.    Could you, please, state your full name for
14  the record.
15  **A.    Linda Thomas.**
16  Q.    And what is your current position,
17  Ms. Thomas?
18  **A.    Warden at the Leavenworth Detention Center.**
19  Q.    And how long have you had that position?
20  **A.    Just over two years.**
21  Q.    Who was your predecessor?
22  **A.    Isaac Johnston.**
23  Q.    And how long was Mr. Johnston warden of the
24  Leavenworth facility?
25  **A.    I don't know exactly.  I don't recall the**

Page 10

1  exact dates.
2  Q.    Was it more than five years?
3  **A.    I would say less than five years, but I could**
4  **be wrong.**
5  Q.    Who was the warden prior to Mr. Johnston?
6  **A.    Shelton Richardson.**
7  Q.    You are here today to testify on behalf of
8  CoreCivic, correct?
9  **A.    Correct.**
10  Q.    I'm going to hand you what's been previously
11  marked in this litigation as Exhibit 22.  (Exhibit
12  passed.)  Could you tell me what topics here -- first
13  of all, have you seen this document before?
14  **A.    Yes.**
15  Q.    And what is it?
16  **A.    The notice of the topics that would be**
17  **discussed during this deposition and the location and**
18  **time of the deposition.**
19  Q.    And what topics are you here -- are you
20  familiar with enough to discuss today?
21  **A.    I would say five, six, seven, eight, nine,**
22  **ten, 11, 12, 13, 14, 15, 24, I would say 25, 26, 27,**
23  **28, and 29.**
24  Q.    Okay.  Thank you.
25  **A.    You're welcome.**

Page 11



25           (WHEREUPON, conversation was had between

Page 12

1  Mr. Hodgson and the court reporter about exhibit
2  numbers.)
3           (WHEREUPON, the above-mentioned documents
4  were marked as Exhibit Number 25 and Exhibit Number
5  26.)
6  BY MR. HODGSON:
7  Q.    All right.  Ms. Thomas, the court reporter
8  has handed you Exhibits 25 and 26.  Do you know what
9  these documents are?
10  **A.    Yes.**
11  Q.    What are they?
12  **A.    It's a summary of the inmate side of the**
13  **phone calls that's provided by Securus.**
14  Q.    That's 25, right?
15  **A.    Yes.**
16  Q.    And what is 26?
17  **A.    The summary of the party side of the**
18  **telephone system.**
19  Q.    So to summarize or to paraphrase what you're
20  saying this is the language that, in 25, what the
21  detainee would hear when they pick up the phone to
22  make a call?
23           MR. MELTZER:  Object to the form of the
24  question.  You said the detainee -- I'm sorry, you're
25  right?

1      THE WITNESS:  Yes.
2  BY MR. HODGSON:
3  Q.    Okay.  And in 26 that's the language that the
4  called party, receiving the calls, would receive when
5  they pick up the phone to answer?
6      MR. MARTIN:  Objection to form, lack of
7  foundation.
8  BY MR. HODGSON:
9  Q.    Okay.  What is 26?
10 **A.    26 are the -- is the language -- the process**
11 **for the calls to be -- steps to be taken when the**
12 **calls are made and what the party hears on their**
13 **receiving end.**
14 Q.    So the party would hear the language that's
15 contained in 26?
16 **A.    Yes.**
17 Q.    All right.  And if you look at the first
18 section of both of those documents, line five reads,
19 this call is subject to recording and monitoring.
20     Do you see that?
21 **A.    In which one are you referring?**
22 Q.    In 25.
23 **A.    Yes.**
24 Q.    And line -- and on 26 on line two it says,
25 this call is subject to recording and monitoring.

1      Did I read that correct?
2  **A.    I'm sorry, repeat that.**
3  Q.    This call is subject to recording and
4  monitoring.
5  **A.    On?**
6  Q.    26.
7  **A.    26.**
8  Q.    On line two.
9  **A.    Two, yes.**
10     MR. MELTZER:  And just so that we're
11 clear are you talking about the very first paragraph
12 because --
13     MR. HODGSON:  Yes.
14     MR. MELTZER:  -- there's actually line
15 two --
16     **THE WITNESS:  Yes.**
17     MR. HODGSON:  For the record top section.
18     **THE WITNESS:  Yes.**
19     MR. MELTZER:  Okay.  And that was true on
20 Exhibit 25 because there are, again, four sections,
21 and each one of them have a line -- well, a line --
22 yeah, each one of them have a line two.
23     MR. HODGSON:  Yes.
24     MR. MELTZER:  In each of those four.
25 BY MR. HODGSON:

1  Q.    Yes, top section, line five of 25.  Top
2  section, line two, of 26.
3  **A.    Okay.**
4  Q.    Okay.  So that language, is that the language
5  that is designed to be compliant with the requirement
6  that the contractor shall provide notice to detainees
7  of the potential for monitoring?
8  **A.    No.**
9  Q.    What is it?
10 **A.    Well, let me ask you to rephrase the question**
11 **so I make sure I understand what you just asked.**
12 Q.    Okay.  Yes.  So we just went through contract
13 language on page 39 of exhibit -- what was that?
14 **A.    Yes.**
15 Q.    What exhibit was --
16 **A.    24.**
17 Q.    24.  Thank you.  And then we just went
18 through this admonition on the called -- call -- a
19 prerecorded message in both of the top sections that
20 contains the language, this call is subject to
21 monitoring -- or recording and monitoring, right?
22 **A.    Okay.**
23 Q.    Is this one of the notifications for the
24 potential for monitoring that's required of the
25 contract?

1      MR. MARTIN:  Objection to form.
2  BY MR. HODGSON:
3  Q.    You can answer.
4  **A.    One of the notices?**
5  Q.    Yes.
6  **A.    It is.**
7  Q.    Okay.  What is your understanding of the
8  allegations in this lawsuit?
9  **A.    That there were attorney-client calls being**
10 **recorded and there were concerns regarding the**
11 **videotaping of attorney-client visits.**
12 Q.    Okay.  Can you give me a -- I believe Mr.
13 Conry we talked in his deposition -- and you were
14 here for that --
15 **A.    Yeah.**
16 Q.    -- about how the Leavenworth facility -- for
17 the purposes of today let's just -- unless I say
18 otherwise we're just talking about Leavenworth, okay?
19 **A.    Understood.  Yes.**
20 Q.    We talked about the general layout of the
21 facility, and we talked about a pod, a unit, and then
22 we kind of went from there.  So how is Leavenworth
23 divided up?
24 **A.    There are four housing unit areas, four**
25 **housing unit areas with pods in those areas.**

Case 4:16-cv-00947-SRB  Document 179-1  Filed 05/31/18  Page 5 of 67
Elite Reporting Services
www.EliteReportingServices.com
13..16

1  Q.      Okay.  What are those housing units?  How are
2  they divided up?
3  **A.      So the first section we call it Center Court.**
4  **There are, I believe, eight pods in Center Court.**
5  **South End, there are four housing pods.  Q Building,**
6  **there are four housing pods.  S as in Sara pod or**
7  **housing area, there are -- there are three general**
8  **population housing pods and restrictive housing.**
9  Q.      So three total general and restrictive or ...
10  **A.      Exactly, yes.**
11  Q.      Okay.  How are detainees assigned to the
12  pods?
13  **A.      When the inmate first comes into -- or**
14  **detainee first comes in to enter the facility through**
15  **the intake process, once they complete -- or while**
16  **during the intake process there is a classification**
17  **process.  And there are a number of factors that are**
18  **looked at in that process.  And then once those**
19  **factors are considered then a housing pod is**
20  **assigned.**
21  Q.      Okay.  And what are those classification
22  factors?
23  **A.      We look at things such as separation**
24  **assignments.**
25  Q.      What is a separation assignment?

1  **A.      A need to house individuals separate from**
2  **others.  We look at things like security level, any**
3  **type of special medical needs, obviously gender is an**
4  **issue that we look at, we look at their adjudication**
5  **status.**
6  Q.      Meaning pretrial versus post conviction?
7  **A.      Yes.**
8  Q.      Anything else?
9  **A.      There may be other things that I don't recall**
10  **at the moment.**
11  Q.      Is one of the things based on whether or not
12  they're a county versus United States Marshal
13  detainee?
14  **A.      During the relevant period, yes.**
15  Q.      Are preconviction detainees housed in a
16  separate part of Leavenworth from the post
17  conviction?





20 Q. Okay. So we were -- how are the phones
21 divided up? Are they based on a unit, or are they
22 based on a pod?
23 A. Pods.
24 Q. So each pod has a set of phones?
25 A. That's correct.

1 Q. Do you ever mix preconviction and post
2 conviction detainees in the same pod?
3 A. Yes.
4 Q. Okay. The whole prison system is a little
5 new to me. I'm a civil court guy.
6 A. No problem, no problem.
7 Q. So if I -- if I ask silly questions or what
8 appear to be silly questions, I'm either trying to
9 make a record or I just don't get it. So I
10 apologize.
11 A. No problem.
12 Q. I think you had mentioned that previously
13 during the relevant period that inmates were divided
14 up based on their conviction -- or based on their --
15 who they were involved with, the U.S. Marshals or
16 county or things like that?
17 A. Yes.
18 Q. Tell me about that.
19 A. Well, when I arrived at the Leavenworth
20 Detention Center, we were housing Wyandotte County
21 individuals. And they were housed in, I believe, two
22 housing pods in Q Building. And then all the others
23 were inmates, either U.S. marshals or the Bureau of
24 Prisons.
25 Q. Did CoreCivic ever have U.S. marshals'

1 detainees in the county pods?
2 A. During my tenure, no.
3 Q. Do you know about before?
4 A. I don't believe so. They were separate.
5 Q. I want to transition out of this and talk a
6 little bit about the intake process when a detainee
7 comes into Leavenworth.
8 A. Okay.
9 Q. Okay. So what are the first things that
10 happen when a detainee comes into Leavenworth?
11 A. So they come in through receiving and
12 discharge, and they're housed in what we call holding
13 cells. They are visually searched. They come out --
14 once they're visually searched staff bring them out
15 and they -- we go through an interview process, a
16 private interview process. And we go through a
17 couple of things with them like their personal
18 property, whatever personal property they have with
19 them that -- we take inventory of the personal
20 property. We go over -- we look at -- they sign for
21 their handbook during that time, orientation
22 handbook. They are placed on notice about the
23 telephone monitoring at that time, and the notice is
24 by way of a signature notifying them of monitoring
25 and recording. We do a like medical -- we have some

1 medical forms. We ask inmates questions about is
2 there any reason why they can't be housed in the
3 general population, if they know of any reason why
4 they can't be housed in the general population. We
5 do fingerprinting, we do picture taking, we put them
6 in institution clothing. And then that's, I believe,
7 generally the process for intake.
8 (WHEREUPON, the above-mentioned document
9 was marked as Exhibit Number 27.)
10 BY MR. HODGSON:
11 Q. All right. You have just been handed what's
12 been marked as Exhibit 27. Have you seen this set of
13 documents before?
14 MR. MELTZER: I object to the form of the
15 question, use of the term "set" since you've included
16 the 196 with the others that -- I object to that
17 since that is not an inclusive.
18 MR. HODGSON: It is -- for the record
19 this is Bates number 8196 through 8218. And this was
20 produced by you guys as a packet.
21 MR. MELTZER: Well ...
22 MR. HODGSON: By CoreCivic and their
23 counsel.
24 MR. MELTZER: Okay. Well, 8196 to the
25 best of my knowledge is not part of that packet. You

1  can certainly ask her, but it is not part of that
2  packet.
3  BY MR. HODGSON:
4  Q.     Okay.  For clarity's sake is 81 -- is the
5  first page of that exhibit that I handed you part of
6  the intake documents that a detainee receives when
7  they enter Leavenworth?
8  **A.     No.**
9  Q.     Okay.  Where do -- what -- where do that --
10 do those documents start then, the first set of
11 documents that are given to a detainee?  In that --
12 let me back up.  That's a terrible question.  When is
13 8196 given to detainees?
14 **A.     In orientation in housing pods.**
15 Q.     Okay.  When does that happen?
16 **A.     When is this form available?**
17 Q.     Yes, the first page, 8196.
18 **A.     They -- they get it -- they're assigned a**
19 **housing pod on day one.**
20 Q.     Okay.  So they would get that the first day?
21 **A.     The form is available in the housing pod on**
22 **day one.**
23 Q.     What do you mean by "available"?
24 **A.     Because they're -- we have slots in each**
25 **housing unit with a set of forms, this being one of**

1  them (indicating).
2  Q.     Okay.  And so these are not forms -- is 8196
3  physically handed to each detainee that comes into
4  the Leavenworth facility?
5  **A.     No.**
6  Q.     You can separate that off.  We'll use that as
7  Exhibit 27.  And then I'll just mark the rest of it
8  as 28.
9  **A.     Take it off?**
10 Q.     Yeah.  Go ahead.  We're going to -- she's
11 going to -- I'm going to have the court reporter mark
12 the rest of that as Exhibit 28.
13         (WHEREUPON, the above-mentioned document
14 was marked as Exhibit Number 28.)
15 BY MR. HODGSON:
16 Q.     So you've been handed what's Exhibit 8 (sic).
17 Is this the intake packet the detainees are given
18 when they enter the CCA Leavenworth facility?
19         MR. MELTZER:  And I'm going to object to
20 the form of the question, use of the term "given" as
21 because --
22         MR. HODGSON:  Withdrawn.
23 BY MR. HODGSON:
24 Q.     What is this document?
25 **A.     So these forms are forms that staff complete**

1  during the intake process with the inmate.
2  Q.     If you could turn to page -- the Bates
3  numbering is a little messed up on this one because
4  it goes over the page numbers, but 8205.
5  **A.     May I ask if it's allowable personal**
6  **property?**
7  Q.     No.  It is -- it's titled monitoring of
8  inmate slash detainee telephone calls.
9  **A.     I probably should have brought my glasses.**
10 Q.     Yeah, I'm not trying to trip you up with
11 numbers.
12 **A.     That's fine.  It's not your fault.**
13 Q.     Are you familiar with that document?
14 **A.     I am.**
15 Q.     Is that the document we were talking about
16 earlier that are given to detainees regarding the
17 CoreCivic or the CCA Leavenworth telephone policies?
18 **A.     That we put them on notice.  We don't give**
19 **the form to the inmate.**
20 Q.     But they're -- you're -- they're expected to
21 sign that, right?
22 **A.     Yes.**
23 Q.     Okay.  Is there a meeting regarding that?
24 **A.     Yes.**
25 Q.     And tell me about that.

1  **A.     So this process is a one-on-one private**
2  **process with the staff member and an inmate during**
3  **the intake screening.  So, again, we pull the inmate**
4  **out of the holding cell, and then we go through this**
5  **set of forms with the inmate.  In this case the**
6  **inmate -- this form, staff will go over the form with**
7  **the inmate and read the form to the inmate and**
8  **explain to the inmate that this form serves as notice**
9  **that our phones are monitored and the telephone calls**
10 **will be recorded.  And then here in this same form it**
11 **indicates -- it references a properly placed call to**
12 **an attorney is not monitored.  You must contact your**
13 **unit team to get a properly placed unmonitored**
14 **attorney call.  And then the inmate -- you've read**
15 **this, then we ask the inmate to sign the form and**
16 **then a staff member sign it and date it.**
17 Q.     And I've seen some of those forms signed.
18 **A.     Yes.**
19 Q.     We may see them later today, I don't know.
20 **A.     That's fine.**
21 Q.     But so is that form provided in multiple
22 languages?
23 **A.     I don't want to say with a degree of**
24 **certainty that it is.**
25 Q.     So it's possible that they're not?

Case 4:16-cv-00947-SRB Document 179-1  Filed 05/31/18  Page 8 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com                          25..28

1  A.    It is possible that they're not.
2  Q.    Okay.  How -- is there any sort of process
3  that -- all right.  Is a detainee given an option of
4  not signing that document?
5  A.    They can refuse.
6  Q.    And what happens if they refuse?
7  A.    And then you have a second witness sign the
8  form, a staff witness.
9  Q.    Has that happened?
10  A.    Not that I'm aware of.
11  Q.    Is there sanctions if they refuse to sign?
12  A.    No.
13  Q.    Are they restricted from phone access if they
14  refuse to sign?
15  A.    No.
16  Q.    I think we talked about the handbooks as
17  well.  I'm going to give you a series of documents.
18  I'm trying to make this as efficient as possible.
19        (WHEREUPON, the above-mentioned documents
20  were marked as Exhibit Number 29, Exhibit Number 30,
21  Exhibit Number 31, Exhibit Number 32, and Exhibit
22  Number 33.)
23  BY MR. HODGSON:
24  Q.    I have -- you've been handed what's been
25  marked as Exhibits 29 through 33.  Have you seen

1  these documents before?
2  A.    I have.
3  Q.    Okay.  And what are they?
4  A.    Portions of the inmate handbook.
5  Q.    It's not the full handbook, though, right?
6  A.    Right.  Portions of.
7  Q.    Okay.  Are these documents given to the
8  detainees upon entry at Leavenworth?
9  A.    They are.
10  Q.    All right.  And how are they given it?  Like
11  hard copy?
12  A.    Hard copy during the intake process.
13  Q.    Is there a -- are the handbooks written in
14  multiple languages, or is it just English?
15  A.    English and Spanish.
16  Q.    How do you verify that a detainee has the
17  ability to read, write, and understand the handbooks
18  and its contents?
19  A.    During the orientation process we -- or let's
20  take a step back.  During intake screening we have
21  Spanish speaking staff that -- for people who are --
22  their first language is Spanish then we have Spanish
23  speaking staff.  If there's inmates or detainees that
24  speak a different language, we use a service called
25  LanguageLine that we inform the inmate what the

1  handbook is.  And then when the inmate goes into the
2  orientation pod, we have Spanish speaking staff.  But
3  if there's an inmate who needs a different language,
4  we use the LanguageLine.  If there's an inmate who --
5  again, we do these in private -- at a private
6  setting.  So if the inmate -- we'll ask the inmate do
7  they understand.  If the inmate says they don't
8  understand, we'll try to narrow it down to whether or
9  not it's a learning issue, can they read.  If so,
10  then staff will be assigned to go through the
11  handbook with the inmate.  And that's generally the
12  unit management staff.
13  Q.    Unit management staff.  What -- what employee
14  classifications are in the unit management staff?
15  A.    The unit manager, the case manager, and the
16  case counselor.
17  Q.    Okay.  If you could turn to Exhibit 29.  That
18  was the first one I gave you.
19  A.    Okay.
20  Q.    Okay.  So that is the 2011 handbook, right?
21  A.    Yes.
22  Q.    And this -- I'm not hiding the ball.  It
23  looks to me we have the -- 29 is the 2011 handbook,
24  30 is the 2012.
25        MR. HODGSON:  Oh, and if I go too fast --

1        THE COURT REPORTER:  You're fast.
2  BY MR. HODGSON:
3  Q.    31 is the 2014 handbook, 32 is the 2015
4  handbook, and 33 is the 2016 handbook.  Would you
5  agree?
6  A.    I agree.  Or portions of those.
7  Q.    Portions.  Is there a handbook that has been
8  published since the 2016 handbook?
9  A.    Published, no.
10  Q.    Okay.  Explain.  It sounded qualified.
11  A.    Because we are revising that particular
12  handbook.  This -- updating the handbook is a better
13  way of saying that.
14  Q.    Is there a new handbook or a different
15  handbook that detainees receive today that is
16  different than the 2016 handbook?
17  A.    No.
18  Q.    All right.  So I want to direct your
19  attention on Exhibit 29 to Corecivic000100.  Are you
20  there?
21  A.    Yes.
22  Q.    Okay.  Line eight reads, telephone
23  conversations may be monitored and are recorded for
24  security reasons.
25        Did I read that correct?

Case 4:16-cv-00947-SRB Document 170-1 Filed 05/31/18 Page 9 of 67
Elite Reporting Services  *  (605)359-0080
www.EliteReportingServices.com
29..32

1  A.    Yes.
2  Q.    And if you want to turn to Exhibit 30, I want
3  refer you to page 103.
4  A.    (Witness complies.)
5  Q.    Paragraph 8 says, again, telephone call
6  conversations may be monitored and are recorded for
7  security reasons.
8     Did I read that correctly?
9  A.    Yes.
10 Q.    Okay.  With respect to Exhibit 31 through 33
11 can you take a look at that and tell me whether or
12 not that language is in those handbooks?
13 A.    Which language are you referring to?
14 Q.    Telephone conversations may be monitored and
15 are recorded for security purposes.
16    MR. MELTZER:  That exact language?
17    MR. HODGSON:  Yes.
18    THE WITNESS:  The exact language, no.
19 BY MR. HODGSON:
20 Q.    Do you know why that language does no longer
21 appear in the handbook?
22 A.    No.
23 Q.    Do you know who would?
24 A.    Well, during revisions of the handbooks the
25 language -- the particular language that's in 2016 is

1  language from the facility policy.
2  Q.    Okay.  Do you know who would know why that
3  language was changed between 2012 and '14?
4  A.    I -- generally speaking I know who is
5  responsible for update -- who is responsible for
6  updating the handbook --
7  Q.    Who is that?
8  A.    -- during that time.  The quality assurance
9  manager.
10 Q.    And who is the quality assurance manager?
11 A.    Ms. Tammy Reid.
12 Q.    Tammy Reid?
13 A.    Reid, R-E --
14 Q.    R-E-E-D?
15 A.    -- I-D.
16 Q.    R-E-I-D?
17 A.    Yes.
18 Q.    Is she currently employed with CoreCivic?
19 A.    At the Leavenworth Detention Center, yes.
20 Q.    And how long has she been in that position?
21 A.    Estimate, about 15 years.
22 Q.    She's been there a while then?
23 A.    Yes.
24 Q.    Who does she work with in developing
25 revisions to the detainee handbook?

1  A.    Institution staff.  And -- and if necessary,
2  the facility support center staff.
3  Q.    Okay.  Specifically with respect to
4  institution staff who does she work with?
5  A.    Well, the practice is any staff member that
6  has a vested interest in the subject matter or it is
7  their area of expertise, then she works with those
8  staff so ...
9  Q.    So in this case with respect to the
10 modifications of the language between 2012 and 2014
11 who would you have expected that she worked with?
12 A.    Specifically related to telephones?
13 Q.    Yes.
14 A.    I would say the -- the information technology
15 person.
16 Q.    Who is that?
17 A.    During which period?
18 Q.    Who is it now we'll say?
19 A.    That would be -- I don't have anybody right
20 now.  That position is vacant, but it was Charlie
21 Atkins (phonetic).  I just selected someone that will
22 be starting next week.
23 Q.    Okay.  How long was Charlie Atkins in that
24 role?
25 A.    I would say two years or less.

1  Q.    Okay.  And who was Atkins predecessor?
2  A.    Kenneth Lajiness.
3  Q.    And --
4  A.    L-A-J-I-N-E-S-S.
5  Q.    Is he currently employed by CoreCivic?
6  A.    No.
7  Q.    Why did he leave?
8  A.    What he shared with me is for greater
9  opportunities in the IT field.
10 Q.    He left voluntarily then?
11 A.    Sure.  Yes.
12 Q.    How long was he in that role?
13 A.    I don't know.
14 Q.    Prior to your beginning?
15 A.    Yes.
16 Q.    Had he been there for sometime before that?
17 A.    He had been with the company, I believe, more
18 than five maybe less than nine years if my memory
19 serves me correctly.
20 Q.    Was he always at Leavenworth during that
21 time?
22 A.    Yes.
23 Q.    Okay.  Other than the IT people who would
24 have been involved in modifying this language with
25 Ms. Reid?

Case 4:16-cv-00947-SBB  Document 170-4  Filed 05/31/96  Page 10 of 67
Elite Reporting Services  *  (615) 595-0073
www.EliteReportingServices.com                    33..36

1  A.   IT, the security threat group coordinator.
2  Q.   Who is that?
3  A.   Now it would be Wayne Bigelow.
4  Q.   How long has he been in that role?
5  A.   As a security threat group coordinator?
6  Q.   Yes.
7  A.   Estimate, about three to four years.
8  Q.   What was his -- was he working for CCA before
9  that?
10 A.   Yes.
11 Q.   And what was his role then?
12 A.   Case counselor.
13 Q.   And how long did he do that?
14 A.   I don't recall without looking at the
15 specific dates.
16 Q.   Who was the security threat coordinator prior
17 to Mr. Bigelow?
18 A.   I believe it was Collins, Wayne Collins, I
19 believe is the name.  But don't quote me on it.
20 Q.   Yeah.
21 A.   I think it was.
22 Q.   So how long was Mr. Collins in that role?
23 A.   That I don't know.
24 Q.   How long have you been working at the CCA
25 Leavenworth facility?

1  A.   Two years.  Just over two years.
2  Q.   Okay.  I was just trying to figure out
3  whether or not you had another role before you became
4  warden?
5  A.   Not at CCA -- or CoreCivic.  I've only been
6  with the company -- company in total just over two
7  years.
8  Q.   Anybody else that Ms. Reid would have worked
9  with in mod -- in changing the language between 2012
10 and 2014 in the handbook with respect to the staff
11 we're talking about?
12 A.   Possibly the investigator, the warden,
13 unit --
14 Q.   What -- who was the warden during that period
15 again?
16 A.   Which period are we ...
17 Q.   Between 2012 and '14.
18 A.   I believe that's Johnston.
19 Q.   Johnston, okay.  Sorry, I cut you off.  You
20 were going to say somebody else.
21 A.   Unit managers.
22 Q.   Unit managers.  Who is the investigator for
23 CCA?
24 A.   At the current time it's --
25 Q.   Currently.

1  A.   Robert Quinn, Q-U-I-N-N.
2  Q.   And how long has Mr. Quinn been in that role?
3  A.   Just less than one year.
4  Q.   And who was his predecessor?
5  A.   Deborah Kenny (phonetic).
6  Q.   And how long was Ms. Kenny in that role?
7  A.   Eight years.
8  Q.   What does an investigator do at CCA
9  Leavenworth?
10 A.   The investigator oversees staff, inmate
11 investigations.  The investigator also supervises
12 mailroom staff, the STG coordinator, and the IT
13 specialist.
14 Q.   What is STG?
15 A.   Security threat group.
16 Q.   Before I forget were you involved in the
17 review process for the 2016 handbook?
18 A.   I was.
19 Q.   What else does the investigator do other than
20 what we've previously discussed?
21 A.   The investigator is our liaison for law
22 enforcement.  The investigator serves as a facility
23 duty officer.  The investigator makes rounds
24 throughout the facility.  The investigator trains
25 staff in certain areas.  Those are the primary

1  functions that come to mind.
2  Q.   You mentioned liaison officer with law
3  enforcement.  What does the investigation officer do
4  with respect to being a liaison with law enforcement?
5  A.   The investigator refers cases to law
6  enforcement for possible prosecution.  The
7  investigator is also the person who takes phone calls
8  from law enforcement, sets up law enforcement visits
9  with inmates or detainees.
10 Q.   Anything else?
11 A.   Currently they process -- the current
12 investigator processes subpoenas.
13 Q.   Anything else?
14 A.   Those are the things.
15 Q.   Okay.  Does the investigator have like a
16 staff of people that reports to him?
17 A.   Yes.
18 Q.   What are those -- what do those people do?
19 A.   The security threat group coordinator, the
20 mailroom -- she supervises -- he now supervises the
21 mailroom person and the IT person.
22 Q.   And those are just individuals at
23 Leavenworth?
24 A.   Yes.
25 Q.   I just want to make sure we don't have like a

Case 4:16-cv-00947-SRB  Document 170-4  Filed 05/31/19  Page 11 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
37..40

1  whole call center group of --
2  A.   No.
3  Q.   Okay.  So the security threat coordinator and
4  you said the mailroom?
5  A.   Yes.
6  Q.   And then what was the third one?
7  A.   Information technology.
8  Q.   Okay.  Is the investigator also responsible
9  for responding to informal requests for law
10 enforcement for information that wouldn't necessarily
11 be a subpoena?
12 A.   Is there a specific time frame we're asking
13 about?
14 Q.   Let's start with current, and we can work our
15 way back.
16 A.   Okay.  So currently, yes.
17 Q.   And has that always been the case?
18 A.   No.
19 Q.   Okay.  How so?
20 A.   Because before a lot of that -- the
21 subpoenas, the formal requests as you referenced,
22 were processed through the IT person and/or the
23 security threat group person.
24 Q.   What about through the mailroom person?
25 A.   No.

1  Q.   Okay.  Does the investigator have the ability
2  to listen to detainee phone calls?
3  A.   Yes.
4  Q.   Both live and already recorded?
5  A.   Yes.
6  Q.   Same thing with IT?
7  A.   Yes.
8  Q.   Same thing with security threat coordinator?
9  A.   Yes.
10 Q.   What about the mailroom?
11 A.   No.
12 Q.   When did the investigator take over that role
13 that we were talking about, about interacting with
14 law enforcement?
15 A.   When did the investigator take over that
16 role?
17 Q.   Well, you said -- okay.  I don't want to -- I
18 don't want to like mischaracterize anything you're
19 saying.
20 A.   Okay.
21 Q.   I thought I understood you to say that the
22 investigator is currently responsible for responding
23 to law enforcement formal and informal requests for
24 information?
25 A.   Yes, I did.

1  Q.   Okay.  When -- when did that change from?
2  A.   It changed under Mr. Quinn's tenure, and he's
3  been in the job, I believe, since -- I want to say
4  like October of last year.  And so the change --
5  there were a number of changes that occurred, but
6  they didn't all happen at the same time.  The process
7  for processing the subpoenas is probably a process
8  that's changed in the last probably -- this is
9  April -- probably since the beginning of the year,
10 maybe end of December of last year.
11 Q.   Is that a documented process?
12 A.   What do you mean "is that a documented
13 process"?
14 Q.   The process by which you respond to
15 subpoenas.  Is that a -- is there a documentation
16 about how the investigator or whoever the person is
17 responsible goes about doing that?  Like what kind of
18 records they need to make about it, what kind of --
19 I'm just giving you some examples -- when the request
20 came in, how it was responded to, what form it was
21 responded to.  Is that a documented policy and
22 procedure?
23 A.   Not that I'm aware of.
24 Q.   Why did it change from the investigator to --
25 or to the investigator from the previous people that

1  we were talking about?
2  A.   I changed it because the current
3  investigator, I know him, and I know him from a prior
4  career and I know he did investigations before.  And
5  so that's why I changed it.
6  Q.   Any other reasons?
7  A.   No.
8  Q.   Okay.  Oh, yeah.  So you mentioned multiple
9  changes have been going on with respect to all of the
10 phone and investigation stuff.  So you talked
11 about -- I think you had mentioned -- well, you
12 mentioned that the person responding to law
13 enforcement agencies, that process has changed.  What
14 other types of changes have been happening?
15 A.   Well, the -- the security threat group
16 coordinator is being tasked with dealing with
17 security threat group issues more and working with
18 the investigator to conduct inmate investigations
19 within the facility.
20 Q.   So you said that they're involved in the
21 security threat more?
22 A.   Group process.
23 Q.   Group process.  How is that?  How so?
24 A.   Security threat group is a process by which
25 certain groups are typically identified in a

Case 4:16-cv-00047-SBB  Document 170-4  Filed 05/31/16  Page 12 of 67
Elite Reporting Services * (651)596-0085
www.EliteReportingServices.com
41..44

1  correctional setting as posing a threat to the
2  security and good order of the facility.  A lot of
3  those people are -- some of the examples of those
4  categories would be people who are suspected of
5  terrorist activity, people suspected of having
6  involvement -- documented involvement -- in gangs,
7  people who have committed certain types of offenses
8  while in prison.  And so we have a validation
9  process, what we call a validation process for
10 placing those people in those categories.
11 Q.     Any other changes from the security
12 coordinator's role that we haven't discussed?
13 A.     Not that I'm aware of, no.
14 Q.     Are there sort of big picture changes about
15 what's going on?
16        MR. MELTZER:  I'm going to object to the
17 form of the question.  It's overbroad, it's vague,
18 ambiguous.
19 BY MR. HODGSON:
20 Q.     Okay.  You can answer.  I mean, we were
21 talking -- this is based on your telling me that
22 there's been some changes of how things are being
23 handled.
24 A.     Uh-huh.
25 Q.     I'm focused in mostly related to the calls

1  and videos and things like that.  So any other
2  changes?
3  A.     Related to the security threat group
4  coordinator?
5  Q.     Well, related to the management.  We talked
6  about the investigator is now the primary liaison
7  with law enforcement.
8  A.     Okay.
9  Q.     The security threat group guy is doing more
10 security threat stuff.
11        THE COURT REPORTER:  Slow down just a
12 little.
13        MR. HODGSON:  Sorry.  I get
14 conversational sometimes.
15        (WHEREUPON, the court reporter asks for
16 clarification.)
17 BY MR. HODGSON:
18 Q.     And we talked about the security threat
19 group.
20 A.     Yes.
21 Q.     Other changes of that nature?  Oh, I'm sorry.
22 A.     I don't believe so to try and be honest in
23 answering your question.  As I understand your
24 question in the general sense, are there changes
25 related to their duties.

1  Q.     Right.
2  A.     Generally speaking based on what I've
3  indicated I think that's a fair assessment of what's
4  changed.
5  Q.     Okay.  So I think you mentioned the
6  investigator works with training staff?
7  A.     Uh-huh.
8  Q.     What are they training staff on?
9  A.     Well, the investigator does investigations,
10 just regular investigations, but also things like
11 PREA investigations, Prison Rape Elimination Act
12 investigations.  They've been trained -- that person
13 has been trained through the company to conduct PREA
14 related investigations.  And the investigator also
15 provides certain training sessions with volunteers,
16 contractors and volunteers.
17 Q.     What type of volunteers?
18 A.     Community volunteers, community based
19 volunteers.
20 Q.     And what type of contractors?
21 A.     Same.
22 Q.     Can you give me some examples?
23 A.     Of?
24 Q.     Of types of contractors that the investigator
25 would train on.

1  A.     For example, we have people like the
2  electrical company that we use to come in to do
3  repairs.  Those are contract workers.
4  Q.     How about contractors that would help respond
5  to subpoenas for -- from law enforcement agencies?
6  A.     We don't have contractors that help respond
7  to subpoenas that I'm aware of.
8  Q.     Would you consider Praeses in that category?
9  A.     As a contractor.
10 Q.     Uh-huh.
11 A.     Sure.
12 Q.     So is the investigator responsible for
13 helping Praeses maintain the access to the secure
14 call platform as it sits today?
15        MR. MARTIN:  Objection to form.
16        THE WITNESS:  No.
17 BY MR. HODGSON:
18 Q.     What about with respect to the time period
19 CoreCivic used Securus' services?
20 A.     Can you --
21 Q.     Is the -- is the -- is the investigator
22 responsible for training contract personnel such as
23 Praeses for the use of the Securus call platform or
24 was it at the time?
25 A.     No.

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/16 Page 13 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
45..48

1  Q.    Who was?
2         MR. MELTZER:  Object to the form of the
3  question.
4         MR. MARTIN:  Join.
5         MR. MELTZER:  Assumes fact not in
6  evidence that --
7         MR. HODGSON:  Okay.
8         MR. MELTZER:  -- CoreCivic is training
9  Praeses to use the secure platform.
10        MR. HODGSON:  We're getting into a
11 speaking objection again.
12        MR. MELTZER:  Well, your question was --
13        MR. HODGSON:  The witness can tell me
14 that.
15        MR. MELTZER:  Okay.
16        MR. HODGSON:  I don't need counsel to.
17 Thank you.
18 BY MR. HODGSON:
19 Q.    So did CoreCivic train Praeses on how to use
20 and access the Securus platform?
21 A.    Not that I'm aware of.
22 Q.    Who did?
23 A.    If it's -- if it's security -- if it's
24 Securus' platform, we wouldn't train them.  They
25 would train us.

1  Q.    So does -- did Securus train CoreCivic
2  employees on how to use the call platform?
3         MR. MARTIN:  Objection to form.
4  BY MR. HODGSON:
5  Q.    Go ahead.
6         MR. MARTIN:  Lacks foundation.
7         THE WITNESS:  There is a web-based
8  program, there was at least, that people -- staff
9  could use to navigate the system.  And I do recall
10 Charlie Atkins using that system.  It's a web based
11 like a training to navigate the system.
12 BY MR. HODGSON:
13 Q.    How did Mr. Atkins use that internet
14 interface that you were talking about?  What was the
15 language you used?
16 A.    It's a web based.
17 Q.    What types of information is kept on that?
18 A.    I can't tell you what's kept on it because I
19 didn't take it myself.  I just know that Charlie told
20 me that he had -- he was taking the class when he
21 first took responsibility of IT.
22 Q.    It was a class then?
23 A.    Well, I called it a class.  It's a web-based
24 training class.
25 Q.    Okay.  Do you know who trained Praeses on the

1  use of the Securus platform?
2  A.    I don't.
3  Q.    Do you know who would?
4         (Interruption.)
5  BY MR. HODGSON:
6  Q.    Do you know who would know that?
7  A.    I would imagine Praeses.
8  Q.    Okay.  Do you know whether anybody at
9  CoreCivic would know that?
10 A.    I don't.
11 Q.    Have you dealt specifically with Praeses?
12 A.    I've dealt with a person at Praeses.
13 Q.    Who is that?
14 A.    Jason Shadicus (phonetic) if I'm pronouncing
15 his name correctly.  And, please, don't ask me to
16 spell it.
17 Q.    I think we'll have it --
18 A.    Okay.
19       -- somewhere in all of the paperwork we've
20 got.
21 A.    Okay.
22 Q.    What is -- what was your role in working with
23 him?
24 A.    Well, if I have a question, I ask.  If --
25 there had been situations where, say, inmates will

1  tell us that their -- we can't get their account up
2  for recognition.  It was a voice recognition system.
3  And if my IT folk were gone home or if my --
4  oftentimes my financial staff may call them.  But if
5  not, I'll call them myself directly.
6  Q.    So does -- it sounds like Praeses is -- is
7  useful in helping CoreCivic manage the secure call
8  platform.
9  A.    Serves as a liaison for us, yes.
10 Q.    Did you have direct interaction with Securus
11 as well, Securus staff and employees?
12 A.    No.
13 Q.    Why does CoreCivic record phone calls from
14 detainees?
15 A.    Well, the phone calls are recorded as a
16 supervision tool.  It is also for the safety of the
17 people that are either visiting our facilities or
18 housed in our facilities.  And so that if there is
19 any type of situation or incident that may be
20 documented on phone calls, it certainly can be
21 referenced.  But safety and security.
22 Q.    Any other reasons?
23 A.    That we record?  I would say the only other
24 reason that I can think of is because of Code of
25 Federal Regulations prescribes that we do.

Case 4:16-cv-00947-SBB  Document 170-4  Filed 05/31/19  Page 14 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com
49..52

1 Q.    Is that also to help with investigation with
2 law enforcement?
3 **A.    It's a tool.**
4 Q.    So yeah?
5 **A.    Yes.**
6 Q.    Okay.  Since 2011, which CoreCivic employees
7 were responsible for the policies and execution of
8 recording meetings and phone calls between detainees
9 and the people they called?
10 **A.    Can you, please, rephrase that.**
11 Q.    I guess we've established this was a
12 department.  It was either part of the IT group or
13 the investigator or the security threat group?
14 **A.    Okay.**
15 Q.    So who were the people that would have been
16 involved in the recording -- in making sure that the
17 system is operational in recording detainee phone
18 calls from CoreCivic -- from CoreCivic's side?
19 **A.    When you say "CoreCivic's side", you mean**
20 **locally?**
21 Q.    I mean as opposed to Securus employees.  So
22 at the Leavenworth facility who was responsible for
23 making sure the system was operational?
24 **A.    All of us if we're making rounds.  So from**
25 **the correctional officer, if the inmate says, hey,**

1 **phone number four is not working, it travels up so**
2 **that we can get -- make contact with the contractor**
3 **to try to get the phones up and operational.  So**
4 **whether it's me, the correction officer, the unit**
5 **manager, all of us.**
6 Q.    Who is Heather Clem (phonetic)?  Do you know
7 that name?
8 **A.    Heather Clem?**
9 Q.    Yes.  Is that a name that's familiar to you?
10 **A.    Not Heather Clem.**
11 Q.    Is there another Clem that's familiar to you?
12 **A.    Yes.**
13 Q.    Did I get that name wrong?
14 **A.    I know a Cathy Clem who is a member of my**
15 **staff.**
16 Q.    Okay.  And who is that?  What is her
17 position?
18 **A.    She currently is a case manager.  Caseworker,**
19 **case manager.**
20 Q.    And has that always been her role?
21 **A.    No.**
22 Q.    What was her role prior to that?
23 **A.    Immediately prior to this job she was a**
24 **correctional officer.**
25 Q.    And how long was she in that capacity?

1 **A.    Years, a number of years.  Certainly a while.**
2 Q.    When did she transition out to a case
3 manager?
4 **A.    About four months ago.**
5 Q.    How are recorded calls used as an
6 investigative tool?
7       MR. MELTZER:  I'd just say object to the
8 form of the question.  By CoreCivic or --
9       MR. HODGSON:  By CoreCivic.
10       MR. MELTZER:  Okay.  Fine.
11       **THE WITNESS:  Well, the telephone calls,**
12 **because they are recorded, if there is information**
13 **that we receive, we can certainly go back and listen**
14 **to that phone call to either prove or disprove**
15 **whatever information that we have received.**
16 BY MR. HODGSON:
17 Q.    What about for law enforcement?  How are
18 the -- how are the calls used as an investigative
19 tool for law enforcement?
20 **A.    I really can't answer that because we don't**
21 **do law enforcement investigations for outside law**
22 **enforcement.  We're only doing investigations inside**
23 **the facility.**
24 Q.    So you wouldn't know because you're just
25 responding to law enforcement requests?

1 **A.    That is correct.**
2 Q.    I think you -- do you recall Mr. Conry's
3 testimony earlier than if a staff is engaged in an
4 investigation and they identify that it's a call
5 between an attorney and a detainee they're to stop
6 listening to the call at that point?
7 **A.    I do recall that.**
8 Q.    Is that -- is that a -- is that a policy
9 that's in place at Leavenworth?
10 **A.    It is our general practice.**
11 Q.    Is that a documented policy?
12 **A.    No.**
13 Q.    How are staff informed that that's the
14 policy?
15 **A.    There is a select group of staff that have**
16 **access to the telephones, a very select group.  And**
17 **those staff -- the investigator, for one, reports**
18 **directly to me.  So he and his staff, we've had that**
19 **-- that conversation.  With department heads and**
20 **department heads -- at department head meetings that**
21 **subject has come up.  I've actually raised the issue.**
22 **And department head meetings consist of department**
23 **heads and what we -- what was earlier referenced as**
24 **ADO staff or administrative duty officer staff.  And**
25 **so it's discussed -- it was discussed during those**

Case 4:16-cv-00947-SBB  Document 170-4  Filed 05/31/06  Page 15 of 67
*Elite Reporting Services* (850)595-6123
www.EliteReportingServices.com
53..56

1  meetings as well.
2  Q.    Do the staff that has access to listening of
3  those recordings also have access to have the
4  privatization settings within the secure call
5  platform as it was with Securus?
6        THE COURT REPORTER:  Slow down.
7        MR. HODGSON:  Sorry.
8  BY MR. HODGSON:
9  Q.    Do the staff that have access to listen to
10  those recordings have the ability to change the
11  privatization settings for the phone numbers?
12       MR. MARTIN:  Objection to the form.
13  Lacks foundation.
14  BY MR. HODGSON:
15  Q.    For the Securus call platform.
16       MR. MARTIN:  Same objection.
17       MR. MELTZER:  Lacks -- objection.  Lacks
18  foundation, calls for speculation, assumes facts not
19  in evidence.
20       You can go ahead and answer.
21       THE WITNESS:  What period of time?
22  BY MR. HODGSON:
23  Q.    Let's start with 2011.
24  A.    All staff that have access to the phones did
25  not have privatization capabilities.

1  Q.    Okay.  Did some staff?
2  A.    Yes.
3  Q.    Which staff?
4  A.    The STG and IT --
5  Q.    The investigator?
6  A.    -- persons.  I don't believe so, but I can't
7  be certain.
8  Q.    Any others?
9  A.    Not that I'm aware of.
10  Q.    You had mentioned that in general the policy
11  is to stop listening to a call once it is identified
12  as an attorney-detainee call, right?
13  A.    I did.
14  Q.    Are there exceptions to that?
15  A.    No.  When I -- the word "general" suggests
16  that the people that I communicated to, which are my
17  department heads, the people that are in the meeting,
18  and the direct reports to me.  So generally we don't
19  have a formal policy, written policy, but that is the
20  general practice.  If you hear or recognize or know
21  it to be an attorney-client call, back off.
22  Q.    So is -- is there an expectation that that
23  number will be set to private once it's identified?
24  A.    Expectation from whom?
25  Q.    From CoreCivic.  In other words, in that

1  situation whether you -- the detainee -- there's been
2  an attorney call with a detainee and the -- or the IT
3  person or the investigator or whoever was listening
4  to that call identifies it as an attorney call --
5  A.    Okay.
6  Q.    -- do they take that number to the
7  appropriate person and get it privatized?
8  A.    No.
9  Q.    Why not?
10  A.    Well, just because a detainee is talking to
11  an attorney doesn't mean it's a privileged call, or
12  it doesn't mean that it is their attorney.  Examples
13  of that, I can tell you one right off the top of my
14  head, an inmate is dating an attorney.  But that is
15  not his attorney, it is his girlfriend.  And she
16  doesn't represent him.  And he's -- and but we know
17  that she's an attorney because --
18  Q.    But they would listen to that call, right?
19  A.    Well, it depends.  It depends on whether or
20  not they can determine whether or not that is an
21  attorney-client call.
22  Q.    So are your staff expected to understand what
23  constitutes attorney-client privilege?
24  A.    Are they expected to understand it?
25  Q.    Yes.

1  A.    To the extent that they can, sure.
2  Q.    Are they specifically trained on that?
3  A.    No.
4  Q.    Okay.  How are they expected to understand it
5  then?
6  A.    If -- if a call is placed or if you hear
7  during a call that when the call is -- if you get the
8  call at the beginning of the call and you say law
9  office of Hal Meltzer, that's clear.  And to err on
10  the side of caution it is best practice to back off.
11  However if I'm in the midst of a phone call and if
12  the phone call is in the middle of the call and the
13  call or there's reference made to when we were in
14  court the other day you advised me, those are terms
15  that would suggest to -- that's a likely
16  attorney-client call.
17  Q.    Is there a specific training that happens
18  about this?
19  A.    About attorney-client calls?
20  Q.    About what you were just talking about.
21  A.    Well, there is a training for all staff that
22  talks -- that speaks to privilege and inmates' rights
23  to have attorney-client privilege and visitation.
24  Q.    Is that documented?
25  A.    Sure, it is.

Case 4:16-cv-00947-SBB  Document 179-4  Filed 05/31/19  Page 16 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com                    57..60

1  Q.    Okay.  And is that -- how often does that --
2  does an employee undergo that training?
3  A.    **It's at least when they first come into the**
4  **company.**
5  Q.    Is there subsequent training?
6  A.    **On that specific issue annually I don't**
7  **believe so.**
8  Q.    And who is the trainer responsible for
9  training employees about that?
10 A.    **The learning and development manager.**
11 Q.    Is the learning and development manager a
12 lawyer?
13 A.    **No.**
14 Q.    Do you know what -- who is the learning
15 development manager?
16 A.    **Her name is Sandra Elliott.**
17 Q.    Okay.  And how long has she been in that
18 position?  Prior to 2011?
19 A.    **I can tell you she's been with the company**
20 **for more than 20 years.  In her role as the training**
21 **manager I would say about that time.**
22 Q.    All right.  I need to use the rest room, so
23 let's take a break.
24 A.    **I do, too.**
25       THE VIDEOGRAPHER:  We are going off the

1  record at 2:12 p.m.
2       (Short break.)
3       THE VIDEOGRAPHER:  We are back on the
4  regard at 2:24 p.m.
5  BY MR. HODGSON:
6  Q.    Ms. Thomas, do you understand you're still
7  under oath?
8  A.    **Yes.**
9  Q.    So before the break we were talking in
10 general about law enforcement requests for records
11 related to phone calls.  Do you recall that?
12 A.    **Okay.**
13 Q.    What types and in what form does CoreCivic
14 receive from law enforcement for requests for phone
15 calls?
16 A.    **Largely subpoenas.**
17 Q.    Okay.  What kind of subpoenas?
18 A.    **Administrative subpoenas.  We've received**
19 **grand jury subpoenas.**
20 Q.    Trial subpoenas?
21 A.    **Yes.**
22 Q.    Civil subpoenas?
23 A.    **Maybe.  Those are -- the ones that I'm**
24 **speaking to are the ones that I've seen firsthand.**
25 Q.    Okay.  Is there a difference between a grand

1  jury subpoena and an administrative subpoena?
2  A.    **I believe so.**
3  Q.    What is the difference?
4  A.    **Administrative is generally law enforcement**
5  **purposes.  Grand jury, as I understand it, is secret.**
6  Q.    What about -- what about trial subpoenas?  Is
7  there -- what is the difference between a trial
8  subpoena and an administrative subpoena?
9  A.    **I believe an administrative is for**
10 **investigative purposes.  A trial is just that, for**
11 **the trial.**
12 Q.    Do you know whether a judge needs to sign off
13 on an administrative subpoena before it can be
14 issued?
15 A.    **A judge does not have to sign off on an**
16 **administrative subpoena.**
17 Q.    And you said generally you get subpoenas.
18 Are there other ways that law enforcement will
19 request information from CoreCivic?
20 A.    **I mean, there have been.  The contractor may**
21 **ask for information or request the marshal service.**
22 Q.    And how would they go about doing that other
23 than through an administrative subpoena or what we've
24 previously talked about?
25 A.    **They would send written requests.  They had a**

1  form that they used, or in some cases they were
2  e-mails.
3  Q.    Phone calls?
4  A.    **For phone calls?**
5  Q.    No, I mean, would -- would law enforcement
6  call over and ask for information?
7  A.    **No.**
8  Q.    Other types of informal requests that we
9  haven't talked about?
10 A.    **I'm not aware of any other informal requests.**
11       (WHEREUPON, the above-mentioned documents
12 were marked as Exhibit Number 34 and Exhibit Number
13 35.)
14       MR. MELTZER:  What numbers?
15       MR. HODGSON:  34 and 35.
16 BY MR. HODGSON:
17 Q.    Ms. Thomas, you have been handed what's been
18 marked as Exhibits 34 and 35.  Have you seen
19 documents like these before?
20 A.    **I have.**
21 Q.    What are they?
22 A.    **The -- in 34 the top copy is an information**
23 **request from under the United States Marshal Service.**
24 Q.    And you can take a minute to peruse them if
25 you want.

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/96 Page 17 of 67
*Elite Reporting Services* (555) 555-5555
www.EliteReportingServices.com
61..64

1    A.    Okay.
2    Q.    Is this an administrative -- is the top copy
3    an administrative subpoena?
4    A.    No.
5    Q.    What is it?
6    A.    It's an information request, informational
7    request, from the marshal service.
8    Q.    Okay.  And what is 17, Exhibit 17?  Are you
9    familiar with some of the documents in there?
10   A.    17 is the same as one or the first page.
11   Q.    Oh, I'm sorry, I have 17 here.  Exhibits 34
12   and 35.
13   A.    Oh, I was going through --
14   Q.    That was really -- yeah.
15   A.    Okay.  So 35, the first -- the top page one
16   is a -- it's an e-mail request.  And then there are
17   receipts for records.  Page --
18   Q.    So just so we're clear, you're referencing
19   page 438 as the --
20   A.    I'm sorry.
21   Q.    -- as the --
22   A.    That's right.  Yes.
23   Q.    Kyle Twaddle received this request from --
24   A.    Yes.
25   Q.    -- whoever the asking party was?

1    A.    Right.
2    Q.    439 appears to be a fax record --
3    A.    Yes.
4    Q.    -- from the Department of Justice and the
5    DEA?
6    A.    Yes.
7    Q.    And 440 is the actual request?
8    A.    Right.
9    Q.    And what is 440?
10   A.    That's an administrative subpoena.
11   Q.    And what is 441?
12   A.    Same.
13   Q.    441 has some handwriting on the bottom of it,
14   and it appears to be handwriting from Wayne Bigelow
15   indicating that he answered the request and e-mailed
16   phone and call list and recording -- phone call list
17   and recordings, right?
18   A.    That's what I would say this indicates, yes.
19   Q.    Okay.  Is that the only way that CoreCivic
20   employees record that they responded to these
21   requests?
22   A.    No.
23   Q.    How else would that be recorded?
24   A.    We have a log where we -- that we document.
25   There are -- most of them in my experience has been

1    they're provided in CDs.
2    Q.    The recordings?
3    A.    The recordings, the data that's being
4    requested.  And then we are documenting the -- on a
5    log that we provided.
6    Q.    And how is that log maintained?
7    A.    Electronically.
8    Q.    What type of a -- what type of a log is it?
9    Is it like an Excel spreadsheet?
10   A.    I think it is, but I don't want to
11   be certain.  I believe it is.  Mr. -- if my memory
12   serves me correctly, Mr. Lajiness created it.
13   Q.    And is the information in that log maintained
14   forever essentially?
15   A.    I don't know about forever but ...
16   Q.    How long is it typically maintained?
17   A.    The one he created we still have.
18   Q.    How far does it go back?
19   A.    A few years.
20   Q.    Prior to 2011?
21   A.    I don't think so, no.
22   Q.    Was there another version of that log that
23   was in existence prior to the current version?
24   A.    I'm trying to think.  Log, I would say not
25   that I'm aware of.  I think the records were being

1    maintained electronically -- or they're now
2    maintained electronically.  We were maintaining them
3    in hard copy form this -- like as an example, this
4    particular document would be maintained in hard copy
5    form.
6    Q.    Do you keep a log for those informal requests
7    that we're talking about, like e-mails and things
8    like that?
9    A.    I don't believe so.  Just the hard copies.
10   Q.    Where are those hard copies maintained?
11   A.    I believe -- the hard copies of which ones?
12   Q.    Of what we've just been talking about.
13   A.    I believe in the security threat group
14   coordinator's office, in Mr. Bigelow's office, the
15   hard copies.
16   Q.    How many administrative subpoenas do you
17   receive on a weekly basis?
18   A.    A couple.  Maybe two to three a week, I
19   believe.
20   Q.    If the amount of space that Mr. Bigelow
21   has -- is it Mr. Bigelow you said has the copy of the
22   subpoenas -- or has the copies of the records that
23   we've been talking about?
24   A.    So Mr. Bigelow was, during the period in
25   question, maintaining these copies.

Case 4:16-cv-00947-SBB  Document 170-4  Filed 06/03/19  Page 18 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
65..68

1  Q.    In his office?
2  A.    Yes.
3  Q.    If he ran out of room, do you know what he
4  would do?
5  A.    We have an underground storage. We have the
6  ability to store items underground.
7  Q.    Is that what happens then? He would store
8  those in the underground storage?
9  A.    I don't have firsthand knowledge of that
10 because I don't believe we ran out of space.
11 Q.    Okay. So if you want to turn back to 34.
12 A.    (Witness complies.) Okay.
13 Q.    We can just talk about the first page. Do
14 you see at the bottom where it says, note,
15 attorney-client conversations will not be included in
16 these recordings?
17 A.    Okay.
18 Q.    How does CoreCivic make sure that doesn't
19 happen?
20 A.    Well, when -- well, we notify the inmate, of
21 course, of what a properly placed legal call is, how
22 to go about doing that, telling -- informing the
23 attorney. And so if the call -- if the procedures
24 are followed as they're intended to be, that call
25 would not -- we would not be able to receive the call

1  because there is no call for us to download in the
2  database.
3  Q.    Understood. But we spent some time talking
4  about a situation where an investigator or the --
5  A.    Public defender's?
6  Q.    No, the ...
7  MR. MARTIN: STG?
8  BY MR. HODGSON:
9  Q.    STG.
10 A.    Okay.
11 Q.    I'm terrible with that acronym. I apologize.
12 A.    Okay.
13 Q.    Where the STG or somebody might have listened
14 in on a phone call and identified that it was an
15 attorney phone call and they needed to stop recording
16 or stop listening.
17 A.    Okay.
18 Q.    Does CoreCivic do anything like that to
19 verify that they're not turning over attorney-client
20 calls in responding to Exhibit 34?
21 A.    When you say "do anything like that" ...
22 Q.    In responding to the United States marshals'
23 requests, like we have in Exhibit 34 --
24 A.    Okay.
25 Q.    -- are there any steps that CoreCivic

1  employees take to identify whether or not an attorney
2  call is contained in the batch of information that
3  the USMS is recording -- is requesting?
4  A.    Well, the steps that we would take is we go
5  -- when we go into the database, we go into the
6  database and download the -- either the specific
7  calls because there are a number of ways that's done.
8  They're either by PIN number, it could be by
9  telephone number, or it could be by inmate account.
10 And so if there is -- if staff have knowledge of a
11 call as we discussed earlier, we talked about how we
12 would back off the call, if we believe it to be
13 attorney call. But we haven't confirmed it. And we
14 have a confirmation process by verifying either the
15 attorney sends the information in in a fax verifying
16 this is my information and I would like this call to
17 be privatized or currently the inmate does it. We
18 can do it by inmate. So to answer the question, if
19 it's not verified as an attorney-client call, we give
20 the calls that are being asked because we don't know.
21 Q.    So it's a fair statement that CoreCivic
22 doesn't take any additional efforts to identify
23 whether or not there's an attorney call --
24 attorney-client phone call that may be contained in
25 the requested information?

1  A.    I don't agree with that characterization.
2  Q.    Okay. Then tell me about that.
3  A.    Because, again, the steps that we take are
4  when the inmate first come in we tell them, if you
5  use this phone and don't go through the proper steps,
6  the call will be recorded. And so those that are --
7  that's the first step. We put the inmate on notice.
8  So when the inmate makes the call, you have consented
9  to having this phone call on a recorded line, meaning
10 the inmate has. The other thing is that there is
11 a message that's played to the inmate in that there's
12 a message that's on the party line. So if those
13 messages -- if you hear that message, it is fair to
14 say you know the call is being recorded.
15 Q.    Okay. Well, then let's talk -- I'll just ask
16 the question a little bit more broadly. Does
17 CoreCivic review the phone calls that have been
18 requested from the United States Marshal Service
19 prior to handling -- handing them over?
20 A.    Oh, my God, no.
21 Q.    Why not?
22 A.    That's a voluminous -- that could be a
23 voluminous -- it can be burdensome. There are a lot
24 of phone calls oftentimes being requested and we just
25 don't -- we don't do that. We're not asked to review

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/19 Page 19 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com
69..72

1  the phone calls.  We're asked to produce the phone
2  calls, not review them.  And that's what we do.
3  Q.     So you -- in responding -- in verifying that
4  no attorney calls are being turned over you rely on
5  the privatization of the phone numbers that have
6  already occurred?
7  A.     Yes.
8  Q.     And if you want to turn to Exhibit 35.
9  A.     (Witness complies.)
10  Q.     Before I ask -- before I ask this next
11  question is there anything else you rely on to verify
12  that the calls -- attorney calls have not been turned
13  over other than the privatization events?
14  A.     If they tell us to exclude certain numbers,
15  if they request --
16  Q.     Okay.  So, for example in 35, if you turn to
17  page 485.
18  A.     (Witness complies.)  Okay.
19  Q.     Is this an example of what you're talking
20  about where the U.S. Department of Justice requests
21  all calls except for the numbers listed?
22  A.     Yes.
23  Q.     How do you go about excluding those calls
24  from the requests?
25  A.     Because this specific telephone number is

1  identified then we can exclude that number out of the
2  information that we download.
3  Q.     And that's currently -- you can currently do
4  that on the ICS platform?
5  A.     Yes.
6  Q.     And you could do that previously on the
7  Securus platform?
8  A.     Yes.
9  Q.     How does that work?  Is there like an
10  interface that says I want all calls?  Tell me --
11  just tell me generally how it works.
12  A.     So the -- we pull up the inmate's account.
13  And we can see the phone numbers -- we can go through
14  and see the phone numbers that the inmate is dialing.
15  You can see the phone numbers.
16  Q.     Uh-huh.
17  A.     And so in an identified phone number, there,
18  when you download the calls, you don't download --
19  you highlight them and download.  And that's one that
20  you wouldn't download because it's specifically a
21  phone number that's been identified.
22       MR. MARTIN:  I have a very belated form
23  objection as to whether or not he was asking about
24  the ICS platform or the Securus platform.  Sorry, it
25  came way too late.

1       MR. HODGSON:  That's okay.  It gets a
2  little mind numbing.
3  BY MR. HODGSON:
4  Q.     So is there differences in how ICS interface
5  works in that process than Securus?
6  A.     I really can't say.  With regard to
7  downloading?
8  Q.     Yeah, that process for downloading.
9       MR. MELTZER:  Just so -- downloading
10  itself or the selection of what is downloaded?
11       MR. HODGSON:  Thank you.  The selection
12  of what's downloaded.
13       THE WITNESS:  Generally the same.
14  BY MR. HODGSON:
15  Q.     Okay.  Is there a system functionality that
16  can say -- you can say I want all calls except, or is
17  it a manual click by click for the Securus platform?
18  A.     I think you have to click by click.
19  Q.     Can you sort the numbers numerically?
20  A.     Yes.
21  Q.     So in the example of page 485 we have two
22  numbers that have been identified as attorney phone
23  numbers, right?
24  A.     Uh-huh, yes.
25  Q.     Does CoreCivic then go in and privatize those

1  numbers onto the secured call platform?
2  A.     It is not our practice to go in and privatize
3  the phone numbers as identified in here (indicating).
4  Q.     Has it -- has -- that's not your current
5  practice.  Has it ever been the practice?
6  A.     No.
7  Q.     So once the request is received how is that
8  typically -- you had mentioned a CD of recordings
9  that's turned over in response to the request?
10  A.     Yes.
11  Q.     Is there other ways in which those recordings
12  are turned over, other formats?
13  A.     Here was referenced an e-mail.
14  Q.     FTP links, do you guys do that?
15  A.     Not that I'm aware of.
16  Q.     Do you give law enforcement direct access for
17  them to obtain that information themselves?
18  A.     No.
19  Q.     Does CoreCivic maintain the -- the CDs as
20  well?  Do they make a copy for themselves?
21  A.     No.
22  Q.     At Leavenworth other than Securus, CoreCivic,
23  and Praeses employees does anyone else have access to
24  the Securus call platform?
25  A.     Not that I'm aware of.

Case 4:16-cv-00947-SRB  Document 170-4  Filed 05/31/19  Page 20 of 67
Elite Reporting Services * (855)596-6003
www.EliteReportingServices.com
73..76

1    Q.    Do you know whether or not CoreCivic has
2    given direct access to the Securus call platform to
3    law enforcement?
4    **A.    I don't believe so.**
5    Q.    Do you know who would know that just as --
6    **A.    I'm pretty certain we don't.**
7    Q.    What about the U.S. Attorney's Office?
8    **A.    No.**
9    Q.    U.S. marshals?
10   **A.    No.**
11   Q.    Do you give -- do you maintain records of who
12   got system access at Leavenworth?
13   **A.    Yes.**
14   Q.    How do those -- how so?
15   **A.    The system access for the telephone system,**
16   **we go through a process by which the IT person sends**
17   **what I will call an ECARF -- and don't ask me what**
18   **ECARF stands for. I really don't know. It's ECARF.**
19   **And it's like a service ticket.**
20   Q.    Okay.
21   **A.    It's an electronic ticket that they would**
22   **send to me to approve for certain people to have**
23   **access.**
24   Q.    So you have to -- you as the warden have to
25   grant access to any third parties to the system?

1         MR. MELTZER:  Object to the form of the
2    question.  I don't think she's conceded or agreed
3    that she's given third party access.  I object to the
4    form of the question.  It assumes facts not in
5    evidence.
6    BY MR. HODGSON:
7    Q.    Do you have to approve user access to the
8    Securus call platform?
9    **A.    Yes.**
10   Q.    Okay.  Have you ever approved access to
11   anyone other than CoreCivic employees?
12   **A.    No.**
13   Q.    What about Praeses?
14   **A.    No.**
15   Q.    And are those records maintained in a log
16   file similar to what we were talking about?
17   **A.    It's sent to me in an email.  And, again,**
18   **it's -- I would call it like an electronic email**
19   **ticket.  So once the -- it comes to me, I look to see**
20   **what -- who the person is, what is being asked that**
21   **they have access to, and then I would have to hit**
22   **approve and send it -- and send.  And then it goes**
23   **back authorizing them to ...**
24   Q.    Do you know whether or not the Securus system
25   maintains a record of those tickets?

1    **A.    It's not --**
2         MR. MARTIN:  Object to the form.
3    BY MR. HODGSON:
4    Q.    Did Securus' platform used to send the same
5    kind of tickets?
6    **A.    Not that I'm -- I don't ...**
7    Q.    Okay.  So this is an ICS?
8    **A.    This is an e-mail system of CoreCivic the way**
9    **I do it, through the Microsoft e-mail system.  I get**
10   **it through an e-mail.**
11   Q.    And so you respond and say yes --
12   **A.    And then send.**
13   Q.    -- or no and then hit send?
14   **A.    Yes.**
15   Q.    And then another employee gives that access?
16   **A.    Yes.**
17   Q.    Okay.  Which employee is that?
18   **A.    The IT person for telephones.**
19   Q.    Does the IT person maintain records of who he
20   has given system access to the Securus call platform?
21   **A.    I don't know if the IT person maintains.**
22   **Because it's electronic I don't think -- I think it**
23   **can easily -- easily be obtained because it's an**
24   **electronic e-mail.**
25        MR. MELTZER:  What number is that?

1         MR. HODGSON:  36.
2         (WHEREUPON, the above-mentioned
3    photographs were marked as Exhibit Number 36.)
4    BY MR. HODGSON:
5    Q.    Ms. Thomas, have you seen these pictures
6    before?
7    **A.    Yes.**
8    Q.    What are they?
9    **A.    Well, the first picture is the**
10   **attorney-client visiting room in the sally port at**
11   **Leavenworth, visiting room one.**
12   Q.    And where is that located in the facility?
13   **A.    This is upside down.  This is not -- it is**
14   **upside down in the sally port.**
15   Q.    What is a sally port?
16   **A.    The sally port is a -- a sally port is an**
17   **area that has two secured points, an entrance and an**
18   **exit for a person to pass through.  So you have an**
19   **entrance and an exit, and they're generally**
20   **controlled by electronic doors.**
21   Q.    So on one side you might have the attorney
22   coming in?
23   **A.    No.**
24   Q.    Okay.
25   **A.    No.  It just has two -- two points of entry.**

Case 4:16-cv-00947-SBB  Document 179-4  Filed 05/31/19  Page 21 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
77..80

1   Q.      Gotcha.  Where is it physically located in
2   the Leavenworth facility?
3   A.      **At the front of the facility, just past the**
4   **front lobby.**
5   Q.      All right.  If you could turn to page 174 for
6   me.
7   A.      **(Witness complies.)  7-4?**
8   Q.      Yes, 1-7-4.
9   A.      **Okay.**
10  Q.      What is that a picture of?
11  A.      **Signs in the housing pods near the**
12  **telephones.**
13  Q.      Where are these physically located with
14  respect to the telephones?
15  A.      **Near the telephones.  This particular one**
16  **without -- I believe this is (indicating) -- I**
17  **believe it's the telephone to the left, but I'm not**
18  **-- I can't really tell what that is.  No, that's a**
19  **slot with forms.  So the phones would be to the right**
20  **of this sign (indicating).**
21  Q.      Do you speak -- do you read Spanish?
22  A.      **I do not.**
23  Q.      Okay.  Do you know what the word pueden
24  means?
25          (WHEREUPON, the court reporter asks for

1   clarification.)
2           MR. HODGSON:  Pueden, P-U-E-D-E-N.
3           **THE WITNESS:  I don't.**
4   BY MR. HODGSON:
5   Q.      Back to 121, what is that?
6   A.      **Is that the first picture?**
7   Q.      Yeah, that's the first picture.  Can you tell
8   me what that picture -- what that -- I'm just going
9   to point here so I can show you.
10  A.      **Uh-huh.**
11  Q.      This bottom form -- this bottom sign, what is
12  that (indicating)?
13  A.      **Without having a close-up it's -- it's ...**
14  Q.      I think I know what it is.
15  A.      **It's -- they were placed to notify that there**
16  **was no video monitoring, but without looking at it at**
17  **a close-up --**
18  Q.      I think maybe 132 might be helpful in this
19  regard.
20  A.      **(Witness complies.)  I still can't read it.**
21  **132?**
22  Q.      I don't think that's 132.
23  A.      **22.  Okay.**
24  Q.      132.
25  A.      **Okay.**

1   Q.      Does that help you recognize what that
2   document is?  You can see it a little more clearly.
3   A.      **Okay.  Now, that's better.**
4           MR. HODGSON:  This will be 39.
5           THE COURT REPORTER:  37.
6           (WHEREUPON, the above-mentioned document
7   was marked as Exhibit Number 37.)
8   BY MR. HODGSON:
9   Q.      Are you familiar with that document?
10  A.      **Yes.**
11  Q.      You say that laughingly.  Why -- it sounds
12  like you're very familiar with the document.  How
13  come?
14  A.      **Well, I do -- I was at the facility when we**
15  **posted these signs, and I believe my secretary was**
16  **the one that posted them.**
17  Q.      Who is responsible for creating the content?
18  A.      **I believe it was -- I don't know.  I don't**
19  **know.  I got it from -- I think the company assisted**
20  **with it.  I believe that e-mail came to me from Jason**
21  **Shadicus.**
22  Q.      So when you say "the company", you mean
23  CoreCivic?
24  A.      **Yes.**
25  Q.      And did it come from CoreCivic's corporate

1   office?
2   A.      **When I say come from, we receive -- my**
3   **recollection is that we received an e-mail -- or I**
4   **received an e-mail notifying us that there would be a**
5   **change and this -- or in addition to our current**
6   **procedures.  And this was the e-mail (indicating) or**
7   **the -- among the documents that I received.**
8   Q.      Were there more than one documents?
9   A.      **There was a form.**
10  Q.      Okay.  Anything else?
11  A.      **No, that I recall.**
12  Q.      Were you -- were there any other individuals
13  that work at other locations in the Leavenworth
14  facility copied on that e-mail?
15  A.      **I really can't speak to that today without**
16  **looking at the e-mail.**
17  Q.      Let's take a timeout.  She needs to change
18  the tape.  So give her five minutes.
19          THE VIDEOGRAPHER:  We are going off the
20  record at 2:58 p.m.
21          (Short break.)
22          THE VIDEOGRAPHER:  We are going back on
23  the record at 3:12 p.m.
24  BY MR. HODGSON:
25  Q.      Ms. Thomas, do you understand you're still

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/19 Page 22 of 67
*Elite Reporting Services* • (615) 595-0073
www.EliteReportingServices.com                                    81..84

1  under oath?
2  **A.   Yes.**
3  Q.     Before the break we were talking about 37.
4  What is that?  We were talking about how it had
5  gotten to your office.  I think -- so what is this
6  document?
7  **A.     Just a notice to the inmate population that**
8  **they can initiate a privatization request for their**
9  **attorney phone numbers.**
10 Q.     Is that a new process?
11 **A.     Define "new" for me, please.**
12 Q.     Has it always been the case that detainees
13 could request privatization of their attorney phone
14 number?
15 **A.     Not that I'm aware of.**
16 Q.     Okay.  When did that process change?
17 **A.     I believe it was late 2016.**
18 Q.     Okay.  And is this the document that reflects
19 that change in policy that is communicated to
20 detainees?
21 **A.     This document communicates to the inmate**
22 **population.  The policy language would be separate.**
23 Q.     Is the policy a written policy?
24 **A.     Yes.**
25        MR. HODGSON:  And, Josh, I apologize.  I

1  don't have an extra.  For some reason I've only got
2  two copies.
3        MR. MARTIN:  Okay.  That's fine.
4        (WHEREUPON, the above-mentioned documents
5  were marked as Exhibit Number 38 and Exhibit Number
6  39.)
7  BY MR. HODGSON:
8  Q.     Ms. Thomas, you've been handed what's been
9  marked as Exhibits 38 and 39.
10 **A.     Okay.**
11 Q.     Are these the policies that reflect that
12 change?
13 **A.     No.**
14 Q.     Do you know what policy number that is?
15 **A.     The policy is on my desk right now as we**
16 **speak being revised.**
17 Q.     Okay.  And so what revisions are being made
18 to it?
19 **A.     To add this (indicating), that we -- the**
20 **process for the detainee to privatize a phone number.**
21 Q.     What changes are being made to that process?
22        MR. MELTZER:  I'm going to object to the
23 form of the questions, vague, overbroad, ambiguous.
24 BY MR. HODGSON:
25 Q.     You can answer.

1  **A.     I would need to rephrase.  What policies?**
2  Q.     So you just referenced 8267.  There's a
3  policy related to that, right?
4  **A.     If I referenced it as being -- suggesting**
5  **that it's current, that's not correct.  It's on my**
6  **desk as we speak being revised.**
7  Q.     Yes.
8  **A.     Okay.**
9  Q.     I think we're on the same page.
10 **A.     Okay.**
11 Q.     What I'm trying to understand is what changes
12 to the policy are -- what is being revised with
13 respect to that policy?
14 **A.     The process for the detainees is being**
15 **included and the -- I'm trying to remember.  I**
16 **believe the -- in -- in -- the style is changing from**
17 **just stylistic preferences where -- under the section**
18 **where it says telephone equipment we're kind of**
19 **moving, for example, the bullet or A3 is being pushed**
20 **down to usage.  And I believe there may be some**
21 **language changes, I think.**
22 Q.     What kind of language changes?
23 **A.     Well, when we talk about the bullet three**
24 **being moved into telephone use, we will change the --**
25 **actually I think the language will say -- extract**

1  **some of the language from the handbook and put it**
2  **directly into the policy.**
3  Q.     What language are you talking about?
4  **A.     Like the language where we reference the**
5  **inmate's responsibility to notify the attorney, and**
6  **then we're going to put this particular language in**
7  **section B.  And without referencing or having the**
8  **document right in front of me because I was working**
9  **with the investigator and so I don't want to say**
10 **something that I'm not sure of, but I know the policy**
11 **is being revised.  That I know for sure.  During the**
12 **annual revision process.**
13 Q.     Turning back to Exhibit 37, where are these
14 notices posted?
15 **A.     In the housing pods.**
16 Q.     Where specifically in the housing pods?
17 **A.     It's in the -- over by the phones.**
18 Q.     Anywhere else?
19 **A.     I'm trying to remember.  And it may be on the**
20 **inmate bulletin board.**
21 Q.     Is it also on the attorney meeting room
22 doors?
23 **A.     Yes, of course.  Sorry.**
24 Q.     Is there anywhere else?  Is it at the
25 beginning when you enter the facility?

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/19 Page 23 of 67
*Elite Reporting Services* * (850)596-Duda
www.EliteReportingServices.com
85..88

1    A.    I don't believe so.  I don't believe so.
2    Q.    Anywhere else?
3    A.    It may be in intake, but I can't be certain.
4    Q.    Is this form written in multiple languages?
5    A.    Yes.
6    Q.    What languages?
7    A.    Spanish is the only other.
8          (WHEREUPON, the court reporter asks for
9    clarification.)
10   BY MR. HODGSON:
11   Q.    If you could turn back to Exhibit 27, which
12   was -- that was the set of documents where I had you
13   remove the first page.
14   A.    Okay.  The forms?
15   Q.    Yes.  And for the record we're looking at
16   CoreCivic 8196.
17   A.    Okay.
18   Q.    Is this the form the detainee fills out by
19   which he can designate his attorney's number -- his
20   or her attorney's number private?
21   A.    Yes.
22   Q.    Is there another form that is different than
23   this out there for the Leavenworth facility?
24   A.    Another form --
25   Q.    I just want to know if this is the only way a

1    detainee can designate his or her attorney private by
2    filling out that form.
3    A.    There is no other form that I'm aware of.
4    Q.    Is there any other way that a detainee can
5    designate his number private?
6    A.    I don't believe so.  The inmate can
7    communicate information to the attorney.
8    Q.    Uh-huh.
9          MR. MELTZER:  And just for -- I'm going
10   to object to the form of the question.  In terms of
11   designating the number private you mean request that
12   the number be privatized?  Is that what you're
13   referring to?
14         MR. HODGSON:  Yes, yes.
15         MR. MELTZER:  Because the inmate doesn't
16   control that process.
17         MR. HODGSON:  Yes, I understand.
18   BY MR. HODGSON:
19   Q.    So the inmate doesn't control the
20   privatization process?
21   A.    Correct.
22   Q.    This is -- this is the form that the inmate
23   or detainee would give to the appropriate person to
24   have CoreCivic designate that number as private?
25   A.    Yes.

1    Q.    Why did that process start?
2    A.    As an additional layer to the process.
3    Q.    Prior to this change in policy could
4    detainees request that their attorney numbers be
5    designated private?
6    A.    Could they request it?  Yes, they could
7    request it.
8    Q.    Would CoreCivic designate those numbers
9    private based on the attorney's -- or based on the
10   detainee's request at that point?
11   A.    I don't see why not as long as we can verify
12   it.
13   Q.    Are you aware of instances where that
14   happened?
15   A.    I don't believe so.
16   Q.    Does the handbook -- did we talk about
17   whether or not there are changes to the handbook
18   being currently made?
19   A.    I believe we did.
20   Q.    Okay.  I just can't remember.
21   A.    I believe we did.
22   Q.    Are the -- are there -- is the handbook going
23   to identify this process by which a detainee can
24   request?
25   A.    Yes.

1    Q.    But as it sits now, that is not in the
2    handbook?
3    A.    That's correct.
4    Q.    Are there other ways that a detainee can have
5    an unmonitored or unrecorded phone call with his or
6    her attorney short of having that number privatized?
7          MR. MARTIN:  Objection to form, vague as
8    to which platform we're talking about.
9          MR. HODGSON:  I'm not talking about a
10   platform.
11         MR. MARTIN:  Oh, fair enough.
12         THE WITNESS:  The detainee can submit a
13   request to staff.  The unit staff primarily is who
14   covers that and seek an unmonitored or the attorneys
15   fax in requests asking for the detainee to be able to
16   make an unmonitored call.  And in cases there have
17   been circumstances.  For example, a conference where
18   they'll ask to use the staff lines, inmates --
19   BY MR. HODGSON:
20   Q.    Oh, so we're talking about staff lines then?
21   A.    Yes.
22   Q.    As opposed to the public phone bank?
23   A.    Yes.
24   Q.    Okay.  So in -- how does that work?  Once --
25   once the detainee request -- or the attorney requests

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/25 Page 24 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com                    89..92

1  that private phone call from a staff line --
2  A.      Uh-huh.
3  Q.      -- where -- where does that happen?
4  A.      In the staff office.  The -- the request
5  comes in generally by email.  Sometimes they come
6  e-mail.  The -- a receptionist will, depending on
7  when the request is being made or what date is being
8  sought, date and time is being sought, either it will
9  be placed in the staff member's mailbox or if it's in
10 eminent, if you will, time, the receptionist will
11 call and e-mail the unit staff indicating this
12 request.  I have this request that's being made for
13 this date and time for this inmate.
14 Q.      Can the detainee make that request on his or
15 her own?
16 A.      Yes.
17 Q.      And where is the -- so when you talk about
18 staff, are you talking about the case manager?
19 A.      It can be the case manager.  It could be the
20 case manager, it could be the counselor, it could be
21 the captain.  There are a number of staff who can do
22 it.
23 Q.      Does CoreCivic have a policy about whether or
24 not CoreCivic employees need to be in the room when
25 those calls occur?

1  A.      Does CoreCivic have a policy whether staff
2  needs to be in the room?  Not that I'm aware of.
3  Q.      Are staff typically in the room for those
4  calls?
5  A.      They are sometimes, and they aren't -- they
6  are not sometimes.
7  Q.      What would be the reason they would be needed
8  to be in the room?
9  A.      There are situations where the request may be
10 made at a time that staff are in the midst of doing
11 things and they're -- I've seen it myself personally
12 where papers are all over their desk and the
13 attorney -- one situation comes to mind where the
14 attorney -- the -- it was a caseworker said, hey, I'm
15 in my office, and I've got papers all over my office.
16 I can give him the phone call, but I have to stay in
17 the room with all these -- the information that I
18 have out.
19 Q.      Are there other reasons?
20 A.      That the staff will stay in -- for
21 supervision purposes.  Again, if there is an
22 inability to supervise that space from outside
23 then ...
24 Q.      What do you mean by supervise the space?
25 A.      Because it's a staff space.  So if I can't

1  see inside, the inmate can have free range of dialing
2  phone numbers.  They can have free range of accessing
3  information.  So if I can look from the outside in...
4  Q.      Are there cameras in the staff offices?
5  A.      No.
6  Q.      Okay.  Are the staff offices -- do the staff
7  offices typically have a window to the out door?
8  A.      Some.
9  Q.      Not all?
10 A.      Not all.
11 Q.      What staff offices have a window?  We may get
12 a little specific here, but to the best of your
13 ability.
14        MR. MELTZER:  I'm going to object to the
15 form.  By window you mean window to the outside of
16 the facility or a window that someone could be seeing
17 inside from being inside the facility and supervised
18 from outside the room?  I object to the form of the
19 question since window is vague.
20 BY MR. HODGSON:
21 Q.      The windows that we were discussing that
22 enable the staff member to observe what's happening.
23 A.      So the question is?
24 Q.      Yeah.  What staff members have that window?
25 A.      There are some unit management staff that

1  have it, meaning some case managers.  I believe some
2  unit managers.
3  Q.      Can you give me an example of one of the case
4  managers that has a window that can be observed?
5  A.      Currently Ms. Amy Fate, F-A-T-E.
6  Q.      The first reasonable spelling I've heard all
7  day.  So the detainee can request a private call from
8  the case manager's office?
9  A.      Yes.
10 Q.      And an attorney can request a private call
11 from the case manager's office?
12 A.      Yes.
13        (WHEREUPON, the above-mentioned document
14 was marked as Exhibit Number 40.)
15 BY MR. HODGSON:
16 Q.      You've been handed what's been marked as
17 Exhibit 40.  Are you generally familiar with this
18 type of document?
19 A.      Yes.
20 Q.      What is this?
21 A.      This is a request for a teleconference on an
22 unrecorded line.
23 Q.      Is this another -- is this an instance of
24 what we were talking about where you would have a
25 designated call perhaps out of a case manager's

1 office?
2 A.    Yes.
3 Q.    Once you've received that request does
4 CoreCivic take any efforts to privatize the numbers
5 requested on those -- in the Securus call platform?
6 A.    Teleconferences can't be made, as I'm aware
7 of, through the Securus telephone system.  We do
8 those from staff phones.
9 Q.    Right.  But we have is an identified attorney
10 phone number, right?
11 A.    Am I missing something?
12 Q.    For example, page 384.
13 A.    Oh, I'm looking at -- 384.  And so it says an
14 unrecorded teleconference.
15 Q.    Yes.
16 A.    And the inmate telephone system I don't
17 believe has the ability to make a teleconference.
18 Q.    Yes.
19 A.    So those are done on staff phone lines.
20 Q.    I understand.  My question is:  Do you see
21 where it says, Adam Fein, attorney?
22 A.    Yes.
23 Q.    Once that number has been received does
24 CoreCivic go in and privatize that number globally on
25 the secured call platform?

1 A.    No.
2 Q.    If you could turn to page 391.
3 A.    (Witness complies.)
4 Q.    Same question.
5 A.    Okay.
6 Q.    Same question.  In that situation would
7 CoreCivic go in and privatize that phone number if it
8 wasn't already private?
9 A.    Honestly this is a federal public defender's
10 office.  Those numbers are private.  I've looked at
11 them myself.  Throughout the country they're private.
12 And they're free.
13 Q.    I understand.  In a hypothetical --
14 A.    So in a hypothetical situation, again, this
15 is letterhead.  Can we do it?
16 Q.    Sure.  Can you?
17 A.    Yes, we can.
18 Q.    Do you?
19 A.    No.
20 Q.    Why -- okay.  So you had mentioned -- you
21 just mentioned that the federal public defenders have
22 been private and free, right?
23 A.    Yes.
24 Q.    Why?  Is it based on a contract requirement?
25 A.    I really don't know.  I've -- I've personally

1 been in this business for a number of years, but in
2 my prior career I remember this process being
3 implemented as having free phone calls to the federal
4 public defender's office.
5 Q.    What was your prior career?
6 A.    In the Federal Bureau of Prisons.
7 Q.    When were you at the Federal Bureau of
8 Prisons?
9 A.    When?
10 Q.    Yes.
11 A.    19 --
12 Q.    When did you stop let's say.
13 A.    1986 through 2016.
14 Q.    And you left the Federal Bureau of Prisons to
15 join CoreCivic?
16 A.    I retired from the Federal Bureau of Prisons
17 and came over.
18 Q.    Congratulations.
19 A.    Thank you.
20 Q.    How did CoreCivic go about identifying the
21 federal public defender numbers to privatize?
22 A.    There is a list -- we have a list of the
23 phone numbers.  And all the numbers -- not all but a
24 list of federal public defenders' offices are posted
25 in inmate housing units.  And I don't know how we

1 went about confirming the numbers.  I just know that
2 the numbers are there.  I personally looked at them.
3 I've even talked to inmates and assisted them in --
4 walked them through the process of how to do it in
5 different states other than Kansas and Missouri.
6 Q.    Did -- where did CoreCivic get the list of
7 numbers?
8 A.    I would imagine the federal public defenders'
9 offices.  But usually they have office -- numbers of
10 all of their offices across the country.
11 Q.    Does CoreCivic take any steps to make sure
12 that the numbers are updated?
13 A.    To the extent there is a need or it's been
14 brought to our attention.
15 Q.    So it's not done on a regular basis, just as
16 necessary?
17 A.    I would say not on a regular basis, but the
18 current system, meaning ICS, those numbers are put in
19 the system by Praeses.  So that would be their role
20 in the process today.  In the past if I had
21 information that would suggest that the number needed
22 to be updated or there are some numbers that are
23 often added that may not have been the original
24 number but if we can verify that it is the federal
25 public defender's office, we can request that it be

Case 4:16-cv-00947-SRB  Document 179-4  Filed 05/31/19  Page 26 of 67
Elite Reporting Services * (651) 595-0203
www.EliteReportingServices.com
97..100

1 added.
2 Q. From Securus? I mean, you said in the past.
3 We're -- you just mentioned ICS so --
4 A. Okay. In the past if it needed to be added,
5 that process included local staff adding numbers.
6 Q. Anybody else?
7 A. Adding numbers?
8 Q. Uh-huh. Yes. Sorry, I did the ...
9 A. Let me say this. The contractor obviously
10 developed the software that can add numbers. That's
11 -- that's a realistic assumption on my part, I
12 believe, because they are developing the software.
13 So Securus, I would suggest they could.
14 Q. Do you know whether they did?
15 A. I don't.
16 Q. What about Praeses?
17 A. I don't know definitively. I really don't
18 know.
19 Q. So we've talked about having a private phone
20 call out of a case manager's office, and we've talked
21 about situations where detainees will request
22 privatization.
23 A. Okay.
24 Q. How else can an attorney number get
25 privatized on the system?

1 MR. MARTIN: Objection to form as to
2 which system.
3 MR. HODGSON: I'm talking about
4 CoreCivic's policies and procedures, not any of the
5 individual systems themselves.
6 MR. MARTIN: Understood. I withdraw the
7 objection.
8 BY MR. HODGSON:
9 Q. I'm not going to -- we're also talking about
10 attorneys can send in their numbers, right?
11 A. Right.
12 Q. Okay. Any other ways?
13 A. I'm just processing it. And the inmates
14 obviously.
15 Q. Yeah.
16 A. I don't -- another method doesn't come to
17 mind. But certainly if someone asks for a number to
18 be added, someone meaning if I ran into an attorney
19 and they ask me, hey, or called, we can work through
20 that process to, one, get the number, confirm that
21 they are the attorney and do it. There are always
22 other ways to do it. Are we currently doing other
23 ways? No.
24 Q. Okay. So you said "confirm". That's like a
25 verification process?

1 A. Yes.
2 Q. So how long does the verification process
3 take to verify that an attorney number is, in fact,
4 an attorney number?
5 A. Now or then?
6 Q. Let's talk about now.
7 A. Okay. Now it's about three business days.
8 Q. What was it then?
9 A. Then I would say probably about the same.
10 Q. Okay. And what time period? When you say
11 now and then, what time periods are we referring to?
12 A. Now meaning since we have the ICS. And
13 that's the process which is, I believe, since like
14 was it last year, maybe summer of last year I believe
15 it was.
16 Q. (Nods head affirmatively.)
17 A. And then prior to it would be Securus.
18 Q. So tell me about the verification process.
19 How do you go about verifying that number to be an
20 attorney number?
21 A. Now?
22 Q. Now.
23 A. The information -- when this form -- the form
24 is filled out.
25 Q. For the record we're referring to Exhibit 37?

1 A. The inmate form.
2 Q. Yeah, the inmate form. Not 37, 27.
3 A. Yes. So the inmate fills the form out or the
4 detainee fills the form out. And that form, once it
5 gets to staff to Mr. Bigelow, he sends the form
6 electronically to Praeses. Praeses has taken on the
7 responsibility of the verification process.
8 Q. Okay. And what about then?
9 A. Prior Mr. -- because it was only -- it was
10 inmate -- or attorney driven. The letterhead, the
11 statement from -- obviously from the attorney
12 indicating that they're an attorney and they have
13 their letterhead and they ask these numbers be
14 privatized. And we'll do it.
15 Q. So other than the information contained on
16 the letterhead there's no other steps that CoreCivic
17 would take to verify an attorney number?
18 A. They would call.
19 Q. They call?
20 A. Call to check.
21 Q. Was that -- do they do that with every
22 request?
23 A. I would say not. I would say no.
24 Q. Why not?
25 A. Well, there are certain banks of numbers that

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/19 Page 27 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
101..104

1  are associated with certain areas, like the federal
2  defender's office.  You can look at a certain bank of
3  numbers, and in some cases staff just recognizes the
4  numbers as being those of the federal public
5  defender's office.
6  Q.    Or other attorneys that would frequently --
7  A.    Right.  Or others -- yes, or other attorneys
8  that may be sharing the same -- multiple clients in
9  the facilities -- in the facility.
10  Q.    So who was involved in the verification
11  process before Praeses took over?
12  A.    Mr. Bigelow.
13  Q.    Anybody else?
14  A.    Probably in his absence it would have been
15  Mr. -- the IT person, whoever was in that position at
16  the time.
17  Q.    Okay.  Were there logs kept about the
18  privatization of attorney numbers based on the
19  requests of attorneys?
20  A.    Logs?
21  Q.    Like Mr. Bigelow says I got this letter from
22  an attorney privatizing his number, I verified it as
23  an attorney number.  Did he keep a log of when he did
24  that?
25  A.    Not that I'm aware of.

1  Q.    Did Mr. Bigelow keep all of the attorney
2  requests for privatization?
3  A.    I believe so.  To the extent that he was
4  organized.
5  Q.    So it's possible he didn't keep all requests
6  historically?
7  A.    I'm not suggesting that at all, but I'm
8  suggesting he's human and humans make mistakes.
9  Q.    Before Mr. Bigelow took over in the role that
10  put him in that responsibility did CoreCivic keep
11  attorney requests for privatization?
12  A.    I believe so.
13  Q.    Do they still have them today?
14  A.    Possibly, yes.
15  Q.    How far back do they go?
16  A.    I can't answer that honestly.  I've seen
17  requests back years in preparation for this process,
18  but I can't give you a definitive date.
19  Q.    Just out of curiosity what is the longest you
20  recall going back?
21  A.    I believe it was 2010.
22         (WHEREUPON, the above-mentioned document
23  was marked as Exhibit Number 41.)
24  BY MR. HODGSON:
25  Q.    Ms. Thomas, you've been handed what's been

1  marked as Exhibit 41.  Do you know what this document
2  is?
3  A.    Yes, it's a request to have these phone
4  numbers.
5  Q.    So an attorney can -- we've established that
6  an attorney can request to have his or her phone
7  number privatized, right?
8  A.    (Nods head affirmatively.)
9  Q.    And this is a document that reflects those
10  requests?
11  A.    Yes.
12  Q.    My first question is:  Is this all of the
13  requests for privatization that CoreCivic has for the
14  CCA Leavenworth facility?
15  A.    I would suggest not.
16  Q.    Okay.  And who has -- who would be in
17  possession of the remainder of the requests?
18  A.    Mr. Bigelow's office would have requests
19  because he was processing those requests and perhaps
20  the receptionist, Ms. Connie Phelps.
21  Q.    Connie Phelps.  Any stored in the long-term
22  storage in the basement?
23  A.    It's possible.
24  Q.    Do you know whether or not there's been any
25  attempts to find them in the basement?

1  A.    Uh-huh, yes.
2  Q.    Okay.  And when did that happen?
3  A.    A few months ago.
4  Q.    A couple of months ago?
5  A.    I wouldn't say a couple, but it's give or
6  take.
7  Q.    Within the last six months or so?
8  A.    I believe.
9  Q.    Was that the first time that people went down
10  to look in the basement to see if those numbers were
11  -- or those -- there might be other forms like that?
12  A.    Yes, that I'm aware of.
13         (WHEREUPON, the above-mentioned document
14  was marked as Exhibit Number 42.)
15  BY MR. HODGSON:
16  Q.    You've been handed what's been marked as
17  Exhibit 42.  Do you know what this document is?
18  A.    It's an electronic e-mail request to have --
19  this is a request to have telephone numbers
20  privatized.
21  Q.    A couple of them actually?
22  A.    Yes, two.
23  Q.    But, again, since these are 2016 and you know
24  you saw some from 2010, this wouldn't be all of the
25  attorney requests?

Case 4:16-cv-00047-SBB  Document 170-4  Filed 05/31/16  Page 28 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
105..108

1  A.    No, no.
2  Q.    Once the request is made is the attorney's
3  phone number privatized to just that inmate, or is it
4  privatized on the entire system for Securus?
5  A.    The entire system.
6  Q.    And same thing with ICS?
7  A.    Yes.
8  Q.    Can you privatize a number based on different
9  settings, for example, based on different site
10  levels?
11        MR. MARTIN:  Objection to form as to
12  which system.
13  BY MR. HODGSON:
14  Q.    On the ICS system?
15  A.    I don't believe so.
16  Q.    What about on the Securus system?
17  A.    There was different settings on the Securus
18  system.
19  Q.    So, for example, you could privatize a number
20  based on the U.S. marshal's system or site -- level?
21  On the county level?
22  A.    I recall seeing like a global setting.  And
23  then without looking at it -- but I do remember we
24  did have inmates in different parts of the building
25  obviously, the U.S. marshals versus the private.  And

1  I do remember there were different settings, but it's
2  been a while and I can't really tell you
3  definitively.  But I remember there were a number of
4  different settings in that system.
5  Q.    Were there policies and procedures in place
6  that dictated the settings that you would use based
7  on the circumstances?
8  A.    Were there policies and procedures?  I don't
9  believe so.
10  Q.    How was staff instructed to set the privacy
11  settings once an attorney request was made -- or
12  received, excuse me?
13  A.    I believe it was through training.
14  Q.    Were they trained to set the settings up for
15  privatization on a site level or on a global level or
16  both or a facility level?
17  A.    Now, when you say a "facility level", what
18  does that mean?
19  Q.    Setting it private for the entire Leavenworth
20  facility, phone banks, every phone bank in the
21  Leavenworth facility.
22  A.    I believe that is what I understand to be
23  global.
24  Q.    Okay.  So we're talking apples to apples
25  then?

1  A.    Uh-huh.
2  Q.    Were there instructions about the parameters
3  in which you set the privacy settings?
4        MR. MARTIN:  Objection to form.  Vague as
5  to instructions from whom.
6  BY MR. HODGSON:
7  Q.    Does CoreCivic provide instructions to the
8  people providing privatizing these attorney phone
9  numbers?
10  A.    So how I would respond is the -- the practice
11  was the STG would train their -- the person that they
12  are -- would -- if those two people are in the
13  facility at the same time, they would receive
14  training from the person who they are -- the incoming
15  person would receive training from the person they
16  are succeeding and likewise with the IT.  In most of
17  the cases that wasn't the case.  So you may have the
18  IT person receiving training or training the STG
19  coordinator.  But as I previously testified, there
20  was also a web-based training program.  And there was
21  an assigned person to the facility that can provide
22  guidance and/or training if needed.
23  Q.    More specifically, once an attorney request
24  was received for privatization were there
25  instructions about the parameters in which the

1  privacy setting would be set, either facility level
2  or site level?
3  A.    I believe so.
4  Q.    Okay.  Tell me about that.
5  A.    Well, I believe that if an attorney request
6  for privatization was made, it was a global setting.
7  Attorneys are attorneys.  And the intent is to -- or
8  the intent was and it remains our intent is to
9  obviously not record attorney-client calls.  And so
10  in that database whether it would be section -- the
11  goal is for it to be a global setting always.  The
12  intent was for it to be a global setting.
13  Q.    So it's not -- it's not CoreCivic's intent to
14  record attorney calls?
15  A.    Absolutely not.
16  Q.    So the current platform, ICS Solutions, does
17  it have multiple settings of privatization like the
18  Securus call platform did?
19  A.    I don't believe so.
20  Q.    Do you know why?
21  A.    I don't.
22  Q.    That would be a question for them probably?
23  A.    Exactly.
24        (WHEREUPON, the above-mentioned document
25  was marked as Exhibit Number 43.)

Case 4:16-cv-00947-SRB  Document 172-4  Filed 06/03/19  Page 29 of 67
Elite Reporting Services * (655)1596-6008
www.EliteReportingServices.com
109..112

BY MR. HODGSON:

Q.   Ms. Thomas, I've handed you what's been
marked as Exhibit 43.  Can you identify this
document?

A.   **So this -- the top form is the form that the
inmate sends.  And then 203 is the notice from the
staff back to the inmate.**

Q.   Gotcha.  So once a privatization request has
come in from a detainee --

A.   **Yes.**

Q.   -- the staff will send a notice back to the
detainee verifying that their call has been -- that
the number has been privatized?

     MR. MELTZER:  You're assuming -- you're
assuming that the number was verified?

     MR. HODGSON:  Right, right.

BY MR. HODGSON:

Q.   Assuming the number was verified --

A.   **Yes.**

Q.   -- the process is the detainee sends a notice
or it sends this -- fills out this form, it's
verified?

A.   **Yes.**

Q.   And once it's verified do they -- do they
receive a notice that that number has been

privatized?

A.   **Yes.**

Q.   Okay.  Just for example if you'd turn to
pages 316 and 317.

A.   **(Witness complies.)  316, okay.**

Q.   So this is an example of that, right?

     MR. MELTZER:  Object to the form.  This
is -- object to the form.  That's not what --

BY MR. HODGSON:

Q.   This is an example of Gregory Rapp who at the
time of his request on December 13th, 2016, was a
detainee?

A.   **Okay.**

Q.   Right?  Do you agree?

A.   **It's possible.  Without looking I obviously
don't know the exact dates of his incarceration at
this --**

Q.   Right.

A.   **Sure.**

Q.   But if you look at the top of his request, I
think it's probably safe to assume that he was in
Leavenworth on December 13th?

A.   **Agreed, agreed.**

Q.   And then on page 316, which is the page
previous to that, this is the verification form -- so

we were looking at 317, right?

A.   **Okay.  I was looking at 316, but I'm with you
now.**

Q.   Okay.

A.   **I'm with you now.**

Q.   So at the top then you can see on December
13th, 2016, Gregory Rapp filled out that form on page
317?

A.   **Yes.**

Q.   Okay.  And then on December 15th, 2016, on
page 316?

A.   **Yes.**

Q.   I'm sorry, there's a lot of numbers going on
right now.

A.   **Uh-huh.**

Q.   Gregory Rapp received this notice that that
number had been processed, and the phone number had
been restricted to private attorney-client
privileged?

A.   **That's what this form says.**

Q.   And that was given to Mr. Rapp?  It would
have been given through the normal process?

A.   **Yes, yes.**

Q.   Was Securus the call platform in effect at
that point, December of 2016?

A.   **I believe so.**

Q.   Okay.  So with respects to -- with respect to
Exhibits 43 and 44, the two documents that we've been
looking at, the detainee requests --

A.   **Uh-huh.**

Q.   -- is this the entire set of detainee
requests that have been received by CoreCivic from
detainees requesting that their attorney numbers be
private?

     MR. MELTZER:  You mean as of the date?  I
mean --

     MR. HODGSON:  Yeah, as of the date of
production.  There may be supplement but ...

     MR. MELTZER:  Well, because, I mean,
obviously we haven't -- we haven't gone back and
given additional ones at least since that time.  I
mean, there was a certain point in time that we
stopped.  If you want more, you've got to tell me you
want more.  I don't have a duty to supplement once we
give you what we had at the time.  This is not
ongoing --

     MR. SANDAGE:  Is this an objection?  I'm
sorry.  Hal?

BY MR. HODGSON:

Q.   Okay.  So at the -- were you involved in the

Case 4:16-cv-00947-SBB  Document 170-4  Filed 05/31/19  Page 30 of 67
Elite Reporting Services * (559)596-6909
www.EliteReportingServices.com     113..116

1  gathering of these documents?
2  A.    To a limited extent.
3  Q.    It was under your supervision?
4  A.    Yes.
5  Q.    Was there -- at the time that you were
6  supervising this was this the entire set of detainee
7  privatization requests?
8  A.    I believe so.
9  Q.    Who was responsible for actually gathering
10  the documents?
11  A.    It was probably my secretary.
12  Q.    Where would she have gone to get that?
13  A.    The inmate files or to Mr. -- it could have
14  been to Mr. Bigelow.
15  Q.    Does Mr. Bigelow maintain a log file of when
16  he would have entered a number to be private based on
17  the detainee requests?
18  A.    A log file?  I don't believe he -- I believe
19  he keeps copies of the records.
20  Q.    Does he keep any sort of summary about when
21  he would have completed those requests?
22  A.    I don't believe so.
23  Q    Is there any reason you can think of that a
24  CoreCivic employee would have privatized an attorney
25  number on a site level versus a global level?

1  A.    Human error.
2  Q.    Any others?
3  A.    Not that I can think of.
4  Q.    Once a number has been set to private in the
5  system does it remain private?
6  A.    Yes.
7  Q.    Okay.  Can a number be deprivatized once it's
8  been privatized on the Securus call platform?
9  A.    I suppose so.
10  Q.    Can that be done by CoreCivic employees?
11  A.    Deprivatize a number?  I don't believe so,
12  but it's possible.
13  Q.    CoreCivic employees can't uncheck --
14  A.    I'm -- that's possible.
15  Q.    What about Praeses employees?
16  A.    I would suggest yes.
17  Q.    Securus employees?
18  A.    I would suggest yes.
19          MR. MARTIN:  Objection to the form.
20  BY MR. HODGSON:
21  Q.    Do you know -- are the people that would
22  have -- the CoreCivic employees that would have had
23  the ability to deprivatize telephone numbers on the
24  Securus call platform are generally the people we've
25  spoken of already today?

1  A.    Yes.
2  Q.    Are there others?
3  A.    Not that I'm aware of.
4  Q.    Are you aware of any instances of
5  deprivatization?
6  A.    I don't believe so, no.
7  Q.    Are you aware of any system upgrades or
8  modifications that would have affected the privacy
9  settings for phone numbers for the Securus call
10  platform?
11  A.    I am not.
12  Q.    Does CoreCivic go -- once a number has been
13  privatized does CoreCivic have any -- undertake any
14  efforts to periodically check to make sure that those
15  numbers remain private?
16  A.    Repeat that question for me, please.
17          MR. HODGSON:  If you could read back it
18  back to her, I would appreciate it.
19          THE WITNESS:  Yes, please.
20          (WHEREUPON, the court reporter reads back
21  the last question.)
22          THE WITNESS:  To the extent that we look
23  in the system, meaning if I am filling or staff are
24  filling a subpoena, you would -- you can -- you can
25  see if the number is private.  You can see in the

1  system when you pull it up because there's an
2  indication of it being -- it's like a -- like the
3  current system has a red dot that shows to me that's
4  a legal call.  So other than that I'm not aware of
5  any routine verification process.
6  BY MR. HODGSON:
7  Q.    So there's not like a spot check like every
8  six months to say --
9  A.    No.
10  Q.    -- this is our privatized list then, it's the
11  same now or ...
12  A.    Here is what I will say is when we get
13  subpoenas and we do send them to counsel to review
14  for the accuracy of the subpoena, she will respond
15  back and say the numbers are fine.
16  Q.    Who is "she"?
17  A.    Alissa Brockert (phonetic).
18  Q.    And who is Alissa Brockert?
19  A.    An attorney that -- a local attorney that we
20  use for legal help.
21  Q.    Does she have a law firm?
22  A.    I believe so.
23  Q.    What law firm?
24  A.    Oh, don't.  I know she was working out of a
25  firm in Leavenworth, Kansas.  Then she went to a firm

Case 4:16-cv-00947-SRB  Document 170-4  Filed 05/31/19  Page 31 of 67
Elite Reporting Services * (855)596-6003
www.EliteReportingServices.com
117..120

1  over in Overland Park.  But I'm not real sure where
2  she is currently because we primarily communicate
3  with her either through phone or through e-mail.
4      Q.      So does Alissa or Ms. Brockert take steps to
5  cross-reference the calls that are going to be turned
6  over based on attorney numbers?
7      A.      I believe so.
8      Q.      And what -- what information does she use to
9  check that?  What list?  Like what attorney --
10     A.      The privatized list.
11     Q.      And does she have an electronic copy of that
12  list?  Is it like a spreadsheet; do you know?
13     A.      I don't.
14     Q.      How long has she been doing that?
15     A.      Since -- since probably sometime early last
16  -- year or two maybe.
17     Q.      Was there somebody that did that before?
18     A.      Not that I'm aware of.
19     Q.      Why did CoreCivic start doing this?
20     A.      When we implemented the -- when the process
21  of filling subpoenas went to -- was changed to Mr.
22  Quinn, this was a process that our counsel
23  recommended and we do.  One of our attorneys
24  recommended it, and we do it.  We send the subpoenas
25  to them.

1      Q.      Which attorney?
2          MR. MELTZER:  Wait just a second.
3  Getting into that -- that's getting into the
4  attorney-client privilege when you're asking about
5  that.  I'm going to instruct her not to answer
6  anymore about that particular -- the details of that.
7  BY MR. HODGSON:
8      Q.      Do you accept your counsel's instruction?
9      A.      Yes.
10     Q.      I just want to say mark.
11         Does Ms. Brockert have direct access to the
12  ICS platform?
13     A.      Not that I'm aware of.
14         (WHEREUPON, the above-mentioned documents
15  were marked as Exhibit Number 44, Exhibit Number 45,
16  Exhibit Number 46, Exhibit Number 47, Exhibit Number
17  48, Exhibit Number 49, and Exhibit Number 50.)
18         MR. HODGSON:  Hal, just so you know these
19  were natives, so they don't have a Bates stamp.  But
20  this was, I believe, 7198.
21         MR. MARTIN:  Just to clarify, that's out
22  of CoreCivic's production?
23         MR. HODGSON:  Correct.  This is 7199, and
24  this is 7200.
25         (WHEREUPON, there was numerical

1  clarification of documents.)
2  BY MR. HODGSON:
3      Q.      Have you seen these documents before?
4      A.      I have.
5      Q.      What are they?  Let's start with --
6          MR. HODGSON:  What exhibits are we at
7  now?
8          THE COURT REPORTER:  50 is the last one
9  that we marked, but the first one at the time was 45,
10  the first one that you gave to me in this series.
11         MR. HODGSON:  Okay.
12  BY MR. HODGSON:
13     Q.      You've been handed what's been marked
14  Exhibits 45 through 50.  Let's start with Exhibit 49.
15  What is that?
16         MR. HODGSON:  And for the record it's
17  Bates numbers Corecivic375 through 383.
18         THE WITNESS:  You said Bates number which
19  one?
20  BY MR. HODGSON:
21     Q.      375 through 383 on Exhibit 49.
22     A.      Okay.  Yes.  So this is the -- the data from
23  the -- the database that shows the phone numbers that
24  were -- the date and the phone numbers and the status
25  of whether or not they were privatized or not.

1      Q.      And what does -- what does the date
2  represent?
3          MR. MARTIN:  Objection to form.
4  BY MR. HODGSON:
5      Q.      Do you know?
6          MR. MELTZER:  If you know.
7          THE WITNESS:  We believe it to be the
8  date that it was initiated and created.
9  BY MR. HODGSON:
10     Q.      How was this document created?
11     A.      I believe it was pulled by CoreCivic.
12     Q.      And how did CoreCivic go about pulling this
13  document?
14     A.      I believe from the database.
15     Q.      From the Securus platform?
16     A.      Platform.  Platform, yes.
17     Q.      Do you know who was responsible for pulling
18  these documents?
19         (WHEREUPON, the court reporter asks for
20  clarification.)
21  BY MR. HODGSON:
22     Q.      For pulling this document.
23     A.      I don't.
24     Q.      Do you know who would?
25     A.      It's possible Jason Shadicus.

Case 4:16-cv-00947-SRB  Document 170-4  Filed 05/31/19  Page 32 of 67
Elite Reporting Services * (655)596-2213
www.EliteReportingServices.com
121..124

1  Q.    He might know who pulled the document?
2  A.    Likely.  Or counsel might know.
3  Q.    Was the document originally pulled in like
4  database format and then printed to its current
5  production?
6  A.    I only know it from this format here.
7  Q.    Okay.  Have you seen a document like this
8  before this litigation?
9  A.    No.
10  Q.    All right.  Now, I want to turn your
11  attention to Exhibits 46, 47, and 48.
12  A.    (Witness complies.)  46, 47, and 48, okay.
13  Q.    What are these documents?
14       MR. MARTIN:  Objection to form, lack of
15  foundation.
16       MR. HODGSON:  She's already said that she
17  knows what these documents are.  She's familiar with
18  them.
19       MR. MARTIN:  Thank you.
20       THE WITNESS:  It's a database search.
21  BY MR. HODGSON:
22  Q.    Okay.  And do you know whether or not -- the
23  first question I have is on Exhibit 46.
24  A.    Okay.
25  Q.    Which I believe is 7198 for the record.  The

1  first page, it represents 419 results, correct?
2  A.    You said Exhibit 46?
3  Q.    Yes.  I don't think that's 46.  Well, that
4  may be 46 as it sits now, but it wasn't necessarily.
5  Let's see, those three in your hand, that's what
6  we're looking at.  Yes, Exhibit 46 (indicating).
7  A.    Oh, I'm sorry.
8  Q.    So do you know why despite it saying 419
9  results there's actually only 352 results on that?
10       THE COURT REPORTER:  I'm having a problem
11  hearing you.
12       THE WITNESS:  I didn't hear you either.
13       MR. HODGSON:  I'm sorry.
14  BY MR. HODGSON:
15  Q.    Do you have any knowledge as to why there
16  would only be 352 results that appear on the
17  subsequent pages?  I mean, I counted.  It was a
18  native format.  It is what it is.  But there are only
19  352 numbers on that list.
20  A.    It could be duplication, but I'm not sure.
21  Q.    Do these -- do 46, 47, and 48 represent
22  different types of privatization on the Securus call
23  platform?
24       MR. MARTIN:  Objection to form.
25       THE WITNESS:  I would suggest that

1  they're just different types of reports.
2  BY MR. HODGSON:
3  Q.    Do you have a -- for example, on 46 is that a
4  report of the privatization -- a global privatization
5  or a site wide privatization?
6       MR. MARTIN:  Objection to form.
7       MR. HODGSON:  You can answer.
8  BY MR. HODGSON:
9  A.    It appears to be.
10  Q.    Do you know which one it is?  Is it global or
11  site?
12  A.    It looks global but -- my belief is it's
13  global.
14  Q.    Okay.  What about 47?
15       MR. MARTIN:  Same objection.
16       MR. HODGSON:  Okay.
17       THE WITNESS:  47 looks like federal
18  defenders or all the free calls contact numbers is
19  what I believe it is.
20  BY MR. HODGSON:
21  Q.    Well, in that column where it says free
22  there's a blank.
23  A.    Right.
24  Q.    And it says friend or family request?
25  A.    Right.

1  Q.    So it's not just federal public defenders?
2  A.    But I believe that's the only one -- well,
3  no, there are a couple of others.
4  Q.    Do you know whether or not these were a --
5  this was a report run for a privatization on a
6  facility level or a site level?
7  A.    I don't.
8  Q.    Do you know who would know that?
9  A.    Securus or -- Praeses or Securus or counsel.
10  Q.    Or the person that pulled it?
11  A.    Or the person that pulled it.
12  Q.    Same thing with 48, do you know whether
13  this is privatization at a site or facility level or
14  site or a global level as we've been saying?
15  A.    Same response.
16  Q.    Okay.
17       (WHEREUPON, the court reporter asks for
18  clarification.)
19  BY MR. HODGSON:
20  Q.    Just so we have a clear record you don't
21  know?
22  A.    I don't know.
23  Q.    But somebody at Securus or Praeses or the
24  person that pulled this might?
25  A.    Yes.

1 Q. And then with respect to Exhibit 45 what is
2 that? And I'll represent this is the document that
3 we received from your counsel approximately two weeks
4 ago.
5 **A. I believe this is a global list of all the**
6 **private numbers.**
7 MR. MARTIN: I'm sorry, would you speak
8 up, please.
9 **THE WITNESS: I'm sorry. I believe it's**
10 **a global list of all of the privatized numbers.**
11 BY MR. HODGSON:
12 Q. And what is your -- what is your belief --
13 what is your knowledge based on?
14 **A. Because to the extent that I can see them it**
15 **looks like all attorney numbers or names and numbers.**
16 Q. So at least these are known attorney phone
17 numbers at a very minimum, right?
18 **A. It appears. The print is so small.**
19 Q. And they have various dates associated with
20 them, right?
21 **A. Yes.**
22 Q. Okay. If you could turn to I guess the back
23 half of -- let's go to 8275.
24 **A. Okay.**
25 Q. Do you know who D. Medlin is? Does the last

1 name Medlin --
2 MR. MELTZER: I'm sorry, what?
3 BY MR. HODGSON:
4 Q. Do you recognize the last name Medlin?
5 **A. Medlin?**
6 Q. M-E-D-L-I-N.
7 MR. HODGSON: I'm sorry, what page?
8 MR. HODGSON: 8245 -- or 8275, excuse me.
9 **THE WITNESS: 75.**
10 BY MR. HODGSON:
11 Q. 8275.
12 **A. I don't.**
13 Q. Do you know why the vast majority of dates
14 under the updated category reflect the same date,
15 8-1-2017?
16 **A. I don't. I don't know.**
17 Q. Do you know why -- do you know who would?
18 **A. The person who pulled the report.**
19 Q. Fair enough. Do you know who pulled this
20 report?
21 **A. I don't.**
22 Q. Okay. Do you know when this report was
23 pulled?
24 **A. I don't think it's dated. I don't.**
25 Q. Do you know who would know that information?

1 **A. The person who pulled it.**
2 Q. Anybody else?
3 **A. Counsel, Praeses.**
4 Q. Fair enough. Do you know why numbers
5 appearing on Exhibits 46, 47, 48 and 49 and 50 might
6 not necessarily appear on Exhibit 45?
7 **A. I'm certain it has to do with how the report**
8 **was retrieved and who it was retrieved by.**
9 Q. But these are all requests -- these are all
10 privatization reports, right?
11 **A. Yes.**
12 Q. So is there a different process by which you
13 can obtain a privatization report on the current call
14 platform? Are there different processes?
15 **A. Well, you can -- I can -- I'm sure I can pull**
16 **a report of all free attorney calls, which we've**
17 **established that was -- in my belief that's what that**
18 **was intended to be. And then I think that there is**
19 **an ability by the software maker to pull any report**
20 **that the system is designed to retrieve.**
21 Q. Right. What about privatized -- I mean, you
22 mentioned free?
23 **A. Yes.**
24 Q. Same thing with private numbers?
25 **A. Same thing as do I believe that a report can**

1 be pulled?
2 Q. Yes.
3 **A. Yes.**
4 Q. And is that true for the Securus call
5 platform?
6 MR. MARTIN: Objection to form.
7 BY MR. HODGSON:
8 Q. Go ahead.
9 **A. I would say yes.**
10 Q. Okay. Is Mr. Bigelow one of the people that
11 would have been involved in pulling these numbers?
12 **A. I don't believe so, but I don't know.**
13 Q. All right. Let's take a break.
14 **A. Yes.**
15 THE VIDEOGRAPHER: We are going off the
16 record at 4:27 p.m.
17 (Short break.)
18 THE VIDEOGRAPHER: We are back on the
19 record at 4:38 p.m.
20 BY MR. HODGSON:
21 Q. If you could refer back -- Ms. Thomas, we're
22 coming off from break. Do you understand you're
23 still under oath?
24 **A. Yes.**
25 Q. Okay. If we could refer back to Exhibit 23,

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/18 Page 34 of 67
**Elite Reporting Services** (850)595-6029
www.EliteReportingServices.com
129..132

1  which was the original notice of deposition. We
2  talked about it a long time ago it seems like.
3  Strike that. Exhibit 22. If you can turn to the
4  second page of that document.
5  A.    Okay.
6  Q.    I believe you testified earlier that you are
7  capable of testifying as to number 14, correct?
8  A.    Yes.
9  Q.    All right. With respect to Exhibits 46, 47,
10  and 48 I want to walk you through those a little more
11  specifically.
12  A.    Okay.
13  Q.    On the second page of Exhibit 46 --
14  A.    Okay.
15  Q.    -- I want to go through the various fields in
16  these columns.
17  A.    Okay.
18  Q.    On the left side it says CTRY. Do you know
19  what that means?
20  A.    CTRY, I don't.
21  Q.    Create date?
22  A.    It's the date that -- if it's a lot of
23  medicine, I probably can't use them. But I might try
24  it.
25  Q.    (Glasses passed.)

1  A.    Thank you. I can use them. Okay. That's
2  fine. Create date is believed to be the date that
3  the entry was made for the last -- could be the last
4  update of the entry.
5  Q.    Okay. How do you have that knowledge?
6  A.    Because I have gone into the system.
7  Q.    Do you have that knowledge in any other ways
8  beyond going into the system?
9  A.    No.
10  Q.    Do you know how to tell the difference
11  between whether it was created or last entered as you
12  said?
13  A.    Not by this report.
14  Q.    Are you able to do that in other ways?
15  A.    Well --
16  MR. MARTIN: Objection to form.
17  THE WITNESS: I would suggest that if
18  someone go in the system -- if I go in the system and
19  I update or change -- make a change, then that would
20  be the new date because I'm saving new data.
21  BY MR. HODGSON:
22  Q.    Okay. What about dialed number, the next
23  column?
24  A.    The phone number that is being blocked.
25  Q.    Do you know what the field active means?

1  A.    If the telephone number is active.
2  Q.    What does that mean by "active"?
3  A.    Being utilized.
4  Q.    What about the field blocked?
5  A.    Blocked is a feature that if we -- that a
6  person on the other end can prevent a call from
7  coming through to their number.
8  Q.    Is that also a feature that you can set in
9  the Securus call platform to block that number from
10  being dialed?
11  A.    The caller -- the receiver can.
12  Q.    What about the person working with the
13  Securus call platform?
14  A.    May I -- you mean my staff or are we
15  talking --
16  Q.    Sure, your staff.
17  A.    I'm trying to remember. I believe so.
18  Q.    And the next field is private?
19  A.    Yes.
20  Q.    Do you know what that means?
21  A.    That call has -- that's a privatized number
22  meaning no recording.
23  Q.    And the next field says -- well, it looks
24  like it's cut off. It says TE. Do you know what's
25  in there?

1  A.    No, I believe it's -- I don't.
2  Q.    The next field is start. Do you know what
3  that means?
4  MR. MARTIN: Objection to form.
5  BY MR. HODGSON:
6  Q.    Do you know what that field represents?
7  MR. MARTIN: Same objection. And just
8  for the record I think it's cut off. It's actually a
9  longer field than that. It's truncated in this
10  production version.
11  THE WITNESS: Uh-huh. Right. Not
12  without seeing all the characters.
13  BY MR. HODGSON:
14  Q.    Okay. The next field looks like it's cut off
15  and says TE or ITE -- ATE?
16  A.    It could be I. Because I now have glasses,
17  so I can see it a lot better.
18  Q.    Do you know what that field represents?
19  A.    I don't without seeing all of the -- the
20  entire line (indicating). Uh-huh.
21  Q.    Yeah. What about end?
22  A.    They scrambled the information, so you don't
23  have the full picture.
24  Q.    Sure. What about description? Do you know
25  what that field means?

1 A.    The -- the agency or -- the attorney or
2 agency being represented.
3 Q.    Okay.  And who enters that?
4      MR. MARTIN:  Objection to form.
5 BY MR. HODGSON:
6 Q.    How is that field generated in the system; do
7 you know?
8 A.    We enter it.  It's entered by the person who
9 is entering the number.
10 Q.    So that's like a note field in it?
11 A.    Well, if it's already -- the number is
12 matched with that particular office.  So if it is --
13 as an example, the description and the number
14 coincide or the -- yeah, the number dialed and this
15 last category coincide with each other, meaning that
16 number is for that office.
17 Q.    So do you know if -- do you know why a number
18 might appear on this document but not on Exhibit 45?
19 A.    Exhibit 45 is --
20 Q.    45 for the record is Bates number 8268.
21 There is 45.  (Document passed.)
22 BY MR. HODGSON:
23 Q.    I'm just asking in general.
24 A.    45 is the global of the entire system.  And
25 the -- and these others are specific reports being

1 requested.
2 Q.    Okay.  So the numbers on Exhibit 46 should
3 also be on Exhibit 45, right, as I understand your
4 testimony.
5      MR. MARTIN:  Objection to form.
6      THE WITNESS:  Should be.
7 BY MR. HODGSON:
8 Q.    Okay.  If you could turn to the third page of
9 Exhibit 46.
10 A.    Okay.
11 Q.    These are all in numerical order, so I'll
12 help you out a little bit.  I'm not going to ...
13 A.    Okay.
14 Q.    If you scroll down about three quarters of
15 the way, it says 785-246-6016.  Do you see that?
16      MR. MELTZER:  What -- which page are you
17 on?
18      MR. HODGSON:  The third page of Exhibit
19 46.
20      MR. MARTIN:  Counsel, can you repeat that
21 number, please.
22      MR. HODGSON:  785-246-6016.
23      THE WITNESS:  I see it.
24 BY MR. HODGSON:
25 Q.    Okay.  Could you find that number on Exhibit

1 45, please.
2 A.    I'll just check something real quick.  Okay.
3 (Witness complies.)
4 Q.    And there's a couple of series of numbers in
5 Exhibit 45 just to kind of help you out, but they're
6 all numerical and they start over.
7 A.    Right.
8      MR. MELTZER:  Can you give me the number
9 again, Counsel?  I'm sorry.  785?
10      MR. HODGSON:  Let me -- 785-246-6016.
11      THE WITNESS:  I see it.
12 BY MR. HODGSON:
13 Q.    On Exhibit 45?
14 A.    Yes, it's towards the bottom, Kansas Federal
15 Defender.
16 Q.    Maybe we have missed it.
17 A.    If you look at one, two, three, four, five,
18 six, seven -- the eighth one from the bottom on 270.
19 Q.    If you could look a little closer for me.  I
20 think that's actually 015.
21 A.    Okay.  (Witness complies.)  It could be.
22 Q.    The glasses issue ...
23 A.    I mean, I trust that it's a five.
24 Q.    Okay.  So why would 016 not appear on Exhibit
25 45?

1      MR. MARTIN:  Objection to form.
2      THE WITNESS:  It could be because of an
3 error.  Because the -- the series of numbers I think
4 I've testified that it blocks of numbers are
5 generally associated with the particular office.  It
6 could be an error.
7 BY MR. HODGSON:
8 Q.    User error?
9 A.    Could be.
10 Q.    Any other reasons?
11      MR. MARTIN:  Objection to form.
12      THE WITNESS:  Unless someone requested it
13 be taken off.  I'm not aware of that.
14 BY MR. HODGSON:
15 Q.    Any over reasons?
16      MR. MARTIN:  Same objection.
17      THE WITNESS:  Not that I can think of.
18 BY MR. HODGSON:
19 Q.    Going back to seven -- Exhibits 49 and 50.
20 A.    Okay.
21 Q.    Do you know what those lists are?
22 A.    49.  I believe they're global listings that
23 are pulled by certain people.
24 Q.    Do you know which people?
25 A.    I'm going to suggest the one with the blue

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/19 Page 36 of 67
Elite Reporting Services (555)515-5555
www.EliteReportingServices.com
137..140

1  here or this one is probably pulled by
2  (indicating) -- not blue. Is this the one? This one
3  with the bigger print. I said blue but with the
4  bigger print, which is 45.
5  Q.     Okay. So you're referring to Exhibit 45?
6  A.     Yes, because I have some pages that are not
7  marked, so I'm a little bit -- does this go with
8  something?
9  Q.     That may have been the copy I handed to
10  counsel.
11  A.     375 is an extra copy?
12  Q.     This should be Exhibit 49.
13  A.     So it goes with 49? Okay. So it's the same
14  -- it's just a duplicate.
15         MR. MELTZER: I got my copy right here.
16         MR. HODGSON: Okay.
17         THE WITNESS: Okay.
18  BY MR. HODGSON:
19  Q.     Well, we have four copies of that one.
20  A.     So the bigger -- the 45, I'm suggesting that
21  it was likely pulled by someone with greater access
22  or knowledge because it's -- it's a more
23  comprehensive document. And this here --
24  Q.     Do you know which person that would be?
25  A.     That would pull --

1  Q.     That pulled 45.
2  A.     One would be pulled by -- I'm thinking 45 is
3  probably pulled by Praeses is my guess.
4  Q.     Okay.
5  A.     Or suggestion.
6  Q.     Do you know whether the numbers in Exhibit 45
7  represent privatization of phone numbers for both the
8  ICS call platform and the Securus call platform?
9  A.     It looks like it because of print changes and
10  dates. It looks like it, the font changes. So it's
11  different (indicating).
12  Q.     Were you involved in the direction of pulling
13  these reports?
14  A.     No.
15  Q.     Do you know who was?
16  A.     The direction of pulling the reports?
17  Q.     Yeah. Who instructed these reports to be
18  pulled at the corporate level?
19  A.     I would suggest the legal department.
20  Q.     Is that the legal department at corporate?
21  A.     Yes.
22  Q.     Okay. Anybody else?
23  A.     That's all that I can think of. Counsel,
24  legal.
25  Q.     Okay. And then if you could refer to the

1  next document that we've got teed up. That's Exhibit
2  51.
3         (WHEREUPON, the above-mentioned document
4  was marked as Exhibit Number 51.)
5  BY MR. HODGSON:
6  Q.     I will represent to you -- do you know what
7  this document is first of all?
8  A.     It appears to be a supplemental request.
9  Q.     Yeah, it's --
10  A.     -- for documents --
11  Q.     It's CoreCivic's responses, supplemental
12  responses, to our request -- to plaintiffs' request
13  for production of documents.
14  A.     Okay.
15  Q.     Were you involved in the -- did you review
16  this document before it was sent?
17  A.     No.
18  Q.     Okay. Was anybody at CoreCivic to your
19  knowledge involved in the review of that document
20  before it was given to counsel?
21  A.     To my knowledge I don't know. I can't answer
22  that one.
23  Q.     That's fair. If you could refer to page four
24  of that document.
25  A.     (Witness complies.) Okay.

1  Q.     And request number nine.
2  A.     Okay.
3  Q.     It says, produce any and all documents which
4  reflect any requests received by defendant from
5  attorneys for the non recording of attorney client
6  phone calls at the CCA Leavenworth facility.
7         Did I read that correctly?
8  A.     Yes.
9  Q.     Okay. And through the series of supplements
10  I want to direct your attention specifically to the
11  third supplemental response contained on page six.
12  A.     (Witness complies.)
13  Q.     Do you see that?
14  A.     Yes.
15  Q.     It reads, see Excel spreadsheets in native
16  format produced herewith as Bates number 7198, 7199,
17  and 7200, which lists the attorney numbers that have
18  been submitted to Securus designated telephone calls
19  to such numbers not to be recorded by the Securus
20  telephone system for outgoing telephone calls from
21  cell pods at the CCA -- at CCA Leavenworth. These
22  were previously produced in PDF format as Bates
23  numbers CoreCivic 375 through CoreCivic 383. See
24  also Bates number CoreCivic 380, an additional page
25  of listings in PDF that due to clerical error was

Case 4:16-cv-00947-SRB Document 170-4 Filed 05/31/19 Page 37 of 67
Elite Reporting Services * (615) 595-0073
www.EliteReportingServices.com
141..144

1  inadvertently not included in the original
2  production.
3      Okay.  Did I read that correctly?
4  **A.    Yes.**
5  Q.    All right.  So my question is:  Why would
6  numbers appear on Exhibits 46, 47, and 48, which in
7  turn are for the record CoreCivic 7198, CoreCivic
8  7199, and CoreCivic 7200, but not appear on Exhibit
9  49 and 50?
10      MR. MARTIN:  Objection to form.
11      **THE WITNESS:  Why would the telephone**
12  **numbers not appear?**
13  BY MR. HODGSON:
14  Q.    Correct.
15  **A.    I believe it's because of the types of**
16  **reports that were pulled and the people that pulled**
17  **the reports.**
18  Q.    But your response was that these were
19  previously produced as 375 to 383.  So the numbers
20  should be coextensive.
21  **A.    Okay.**
22  Q.    So why would numbers not appear on 7198, 99
23  -- or why would numbers appear on 7198, 99, and 200
24  that don't appear on 375 to 383 and --
25  **A.    Now, you're referring --**

1      MR. MARTIN:  Objection to form.
2      **THE WITNESS:  -- to telephone numbers?**
3      (WHEREUPON, the court reporter indicates
4  for one speaker at a time.)
5      **THE WITNESS:  I'm sorry.**
6  BY MR. HODGSON:
7  Q.    Yes, telephone numbers.
8  **A.    And we're referring to the one single number**
9  **that we talked about?**
10  Q.    No, I'm not.
11  **A.    Okay.**
12  Q.    And that's why he's objecting form because I
13  haven't laid a foundation for it.  Right?
14      MR. MARTIN:  That's part of the form
15  objection, yeah.
16      MR. MELTZER:  And I'll join in that.
17  BY MR. HODGSON:
18  Q.    We can go through a couple of examples if we
19  need to lay some foundation, but I'll wait for your
20  answer first.
21  **A.    So in the -- again, I think I referenced the**
22  **type of reports being pulled.  And at a particular**
23  **period of time I know that there were -- we discussed**
24  **earlier or testimony was discussed about the**
25  **Wyandotte County inmates versus the U.S. marshals**

1  inmates.  But other than errors I don't -- I'm not
2  able to answer that question.
3  Q.    Do you know who would be able to answer that
4  question?
5  **A.    Our Praeses liaison.**
6  Q.    Anyone else?
7  **A.    The people who pulled the reports, which I**
8  **can't tell you who they are at this point.**
9  Q.    Okay.  Anyone else?
10  **A.    No.**
11  Q.    All right.  So today we've talked about how
12  the parties are generally notified that the call is
13  subject to recording and monitoring, right?
14  **A.    Yes.**
15  Q.    We've talked about the phone acknowledgment
16  that they hear on the phone, right?
17  **A.    Yes.**
18  Q.    We talked about the detainees'
19  acknowledgement of the phone policies, right?
20  **A.    Yes.**
21  Q.    We've talked about the request for
22  privatization that both -- that a detainee can
23  initiate, right?
24  **A.    Yes.**
25  Q.    We've talked about the signs on the -- on the

1  phone banks, right?
2  **A.    Yes.**
3  Q.    We talked about the notification of the
4  ability for the detainee to request privatization,
5  right?
6  **A.    Yes.**
7  Q.    Are there any other ways that a party can be
8  aware that their calls are -- are subject to
9  recording and monitoring?
10  **A.    During the actual orientation process.**
11  Q.    And they're told that their calls are subject
12  to recording and monitoring?
13  **A.    Yes.**
14  Q.    Has CoreCivic ever tried to reach out to
15  attorneys to let them know that they can privatize
16  their number?
17  **A.    Not that I'm aware of.**
18  Q.    Is it advertised on any of the informational
19  packets that CoreCivic has available for like a
20  website or brochures or anything like that?
21  **A.    Not that I'm aware of.**
22  Q.    Is it advertised on the entrance of the
23  facility?
24  **A.    No, not that I'm aware of.**
25  Q.    All right.  So at some point CoreCivic was

Case 4:16-cv-00947-SRB  Document 170-4  Filed 05/31/19  Page 38 of 67
*Elite Reporting Services* (660)595-0003
www.EliteReportingServices.com
145..148

1  videotaping attorney conference rooms, right?  At the
2  Leavenworth facility.
3  **A.       There's video equipment in some of the**
4  **attorney-client rooms.**
5  Q.    Okay.  Are you familiar with that?
6  **A.       Am I familiar with?**
7  Q.    With the videotaping of the attorney client
8  meeting rooms?
9  **A.    Yes.**
10         (WHEREUPON, the above-mentioned document
11  was marked as Exhibit Number 52.)
12  BY MR. HODGSON:
13  Q.    All right.  Ms. Thomas, you've been handed
14  Exhibit 52.  Do you know what this document -- do you
15  know what this document is?
16  **A.    Yes.**
17  Q.    What is it?
18  **A.       It is the appointment log where the staff --**
19  **one sets the appointments and place the attorneys in**
20  **the attorney client visiting room.**
21  Q.    Is this an Excel spreadsheet in native --
22  when it's originally created?
23  **A.    I don't know.**
24  Q.    Is it in electronic format?
25  **A.    Yes, I believe so.**

1  Q.    So something -- somebody is typing it in on a
2  computer?
3  **A.    Right.**
4  Q.    Are those -- who is the individual
5  responsible for typing that up?
6  **A.       There are a couple -- well, typing is**
7  **generally the receptionist, Ms. Connie Phelps.**
8  Q.    Does Ms. Phelps maintain separate copies of
9  these calendars or does she -- do you know -- or does
10  she -- yeah, let's just stop there and not make it
11  compound.  Does she maintain individual copies for
12  these dates?
13  **A.       When you say "individual copies" --**
14  Q.    As opposed to saving over a previous version,
15  does she create a new document for each day?
16  **A.    I believe so.**
17         (WHEREUPON, the above-mentioned document
18  was marked as Exhibit Number 53.)
19  BY MR. HODGSON:
20  Q.    How -- has -- has Ms. Connie always
21  maintained separate copies of those -- of the
22  calendars that are Exhibit 52 to your knowledge?
23  **A.       Separate calendars?**
24  Q.    Like we were just talking, she saves it as a
25  new file for each date?

1  **A.       Right.**
2  Q.    Has that always been the case?
3  **A.       I -- I suppose so, yes.**
4  Q.    I want to walk you through the top of --
5  actually let's start with does CoreCivic currently
6  employ video recording of the attorney conference
7  rooms?
8  **A.    No.**
9  Q.    When did that stop?
10  **A.       When we were ordered to do so.  Or prior to**
11  **the order, 2016, August, somewhere around there.**
12  Q.    Is that a date that you could find out for
13  me?
14  **A.       Oh, absolutely.  Uh-huh.**
15  Q.    I would like to have that.
16         MR. MELTZER:  I can tell you I
17  believe that it -- I'm pretty confident it's either
18  August 10 or August 11.  It was when they were told.
19  When they were told that an order was going to be
20  issued, they stopped and then they pulled the cameras
21  out.
22  BY MR. HODGSON:
23  Q.    Do you know when the cameras were installed
24  in the attorney conference rooms?
25  **A.    I don't.  I believe it was around 2009, but**

1  I'm not sure.  I believe somewhere around that time.
2  2009, 2010.
3  Q.    Why were they installed?
4  **A.    Cameras are -- are for supervision, safety.**
5  Q.    Any other reason?
6  **A.    I mean, those are the primary reasons.**
7  Q.    Any others that you can think of?
8  **A.    In the attorney-client room?**
9  Q.    (Nods head affirmatively.)
10  **A.    Again, safety, supervision, and to maybe go**
11  **back and reference if there's some type of incident**
12  **that occurred in those rooms to see what may have**
13  **occurred.**
14  Q.    Investigation in other words?
15  **A.    Yes.**
16  Q.    Any other reason?
17  **A.    No.**
18  Q.    Okay.  How long were those videos maintained
19  or kept?
20  **A.       The videos, there were several different**
21  **DVRs, but it was overwriting.  They overwrote -- or,**
22  **I mean, recorded over.  So there were DVRs that**
23  **maintained for 30 days.  And then after 30 days, it**
24  **records over.  And then there was one, I believe,**
25  **that was 60 days.  30, 45, and 60, I believe.**

1 Q.    Was each of those types of DVRs in each of
2 the attorney visiting -- attorney meeting rooms?
3        MR. MELTZER:  Just a second, did you say
4 the DVRs?  I'm going to object to the form of the
5 question since the DVR -- there's no evidence that
6 DVRs would be in the rooms.
7 BY MR. HODGSON:
8 Q.    Were the DVRs in the rooms?
9 A.    No.
10 Q.   Okay.  Where were they maintained?
11 A.   In a separate utility area.
12 Q.   Does that have a name at Leavenworth?
13 A.   I would call it a utility storage area.
14 That's what it was.
15 Q.   Fair enough.  So was it a redundant DVR
16 system then?  For example, the camera in meeting room
17 whatever recorded to both the 30 -- all -- the 30,
18 the 45, and the 60 day?
19 A.   No, no.
20 Q.   How was that assigned?
21 A.   As I understand it, it was based on when
22 those DVRs were put in.  And so the camera system, if
23 I recall correctly, was -- they were installed at the
24 same time and -- I believe.  And so whether it was a
25 30 , 45, or 60 I don't know exactly for those

1 particular ones.  But it was a -- they were all, I
2 believe, on the same DVR if my memory serves me
3 correctly.
4 Q.    Okay.  Whose decision was it to install
5 cameras in the attorney meeting rooms?
6 A.    I'm sure it was management.
7 Q.    Do you know which management?
8 A.    Possibly Richardson or before.  Warden
9 Richardson or before.
10 Q.   Could it have come from a corporate level?
11 A.   Could it?  Sure.
12 Q.   Do you know whether it did?
13 A.   I don't.
14 Q.   Were cameras in all of the attorney rooms?
15 A.   No.
16 Q.   So if you want to refer to Exhibit 32 -- or
17 not 32.  52.
18 A.   (Witness complies.)  Okay.  Okay.
19 Q.   We have a list of attorney meeting rooms,
20 rooms one through nine, right?
21 A.   Oh, yes.
22 Q.   Okay.  Is that all of the attorney meeting
23 rooms at Leavenworth?
24 A.   I believe so, yes.
25 Q.   Which rooms had cameras in them?

1 A.    Three through nine.
2 Q.    And why didn't rooms one and two have cameras
3 in them?
4 A.    Well, rooms one and two can easily be seen.
5 You can see in -- if someone is in distress or there
6 needs to be some form of supervision, I can walk
7 through the sally port and I can look in.  You can
8 look in from two as well.  From inside the facility
9 you can look in.  In three is where the video con --
10 tele -- video conferencing machine is.  You can look
11 inside, but sometimes because it's soundproofed it's
12 a little bit darker in that space.
13 Q.    And then I'm assuming that rooms -- why is
14 there no room four or five on this document?
15 A.    Because they were -- they were hardly ever --
16 during this period in question there were no
17 attorneys placed in those rooms for whatever reason.
18 Because there were -- I suppose because they were in
19 the back.  We use the -- one, two, three are next to
20 each other.  And then I want to say six, seven,
21 eight, nine are on the opposite side of the hallway.
22 And so that -- those are the rooms that we use the
23 most.
24 Q.    Where were the cameras located inside the
25 rooms?

1 A.    Up in the corner of the room.
2 Q.    Were they under like a black bubble?
3 A.    Yes.
4 Q.    How many cameras were in each room?
5 A.    One.
6 Q.    Did the cameras record audio?
7 A.    No.
8 Q.    Was there any other device that was capable
9 of recording audio in these rooms with cameras at the
10 CCA Leavenworth facility operated by -- that would
11 have been operated or managed by CoreCivic?
12 A.    No.
13 Q.    Or operated or managed by Praeses?
14 A.    No.
15 Q.    Do -- did rooms one and two contain audio
16 recording devices?
17 A.    No.
18 Q.    What about rooms four and five?
19        MR. MELTZER:  What about them?  Object to
20 the form of the question.
21 BY MR. HODGSON:
22 Q.    Did they contain audio recording devices?
23 A.    No.
24 Q.    So what is the process -- actually we're at a
25 -- we're at a five minute limit on the video, so we

Case 4:16-cv-00947-SBB Document 179-4 Filed 05/31/16 Page 40 of 67
*Elite Reporting Services* (655)596-6033
www.EliteReportingServices.com
153..156

1 need to just take a break so she can switch out. And
2 I'm going to be pretty close to done.
3          THE VIDEOGRAPHER: We are going off the
4 record. The time on the monitor is 5:18 p.m.
5          (Short break.)
6          THE VIDEOGRAPHER: We are going back on
7 the record at 5:25 p.m.
8 BY MR. HODGSON:
9 Q.     Do you understand you're still under oath?
10 A.     I do.
11 Q.     All right. Were video recordings ever
12 provided to law enforcement?
13 A.     Law enforcement in the context of the grand
14 jury subpoena?
15 Q.     Sure.
16 A.     Yes.
17 Q.     What about in the context of administrative
18 subpoenas?
19 A.     No.
20 Q.     What in the -- what about in the context of
21 informal requests?
22 A.     No.
23 Q.     Was -- were video recordings ever provided to
24 the United States Attorney's Office?
25 A.     In the form of that grand jury subpoena that

1 I referenced?
2 Q.     Sure. Let's start there.
3 A.     Yes.
4 Q.     And in any other form or in the context of
5 any other requests? Like informal requests.
6 A.     No, no.
7 Q.     Any other reasons why videos would be
8 provided to law enforcement or the United States
9 Attorney's Office?
10 A.     No.
11 Q.     Other than grand jury subpoena?
12 A.     No.
13 Q.     So turning to -- turning back to that
14 exhibit, Exhibit thirty -- or fifty --
15 A.     Two?
16 Q.     52. Do you know whether or not the
17 spreadsheet identified here between room three and
18 room six do you know whether the fields for room four
19 and five are hidden?
20 A.     I don't think it's hidden. It's just the
21 rooms that are used on the days that the visits are
22 assigned. So if you're not -- if you're not
23 assigned -- if you're not using the rooms, then it
24 don't need to be on the report.
25 Q.     Oh, now, let's turn to -- I don't want to do

1 this one yet. Let's turn to Exhibit 53. And that's
2 the meeting room sign-in sheets, I believe. Or
3 actually you tell me what it is.
4 A.     You're asking me? I thought you said --
5 Q.     Yeah, what is it?
6 A.     -- you told me.
7 Q.     No. No, you tell me.
8 A.     This is a visitor's log for people coming in
9 and out of the facility --
10 Q.     Okay.
11 A.     -- that they sign in.
12 Q.     Is that kept at the front desk?
13 A.     Either the front desk or the receptionist
14 both depending on who was there.
15 Q.     Is the information contained on Exhibit 53
16 then entered into some sort of computer?
17 A.     On 53? No.
18 Q.     So these are just maintained in handwritten
19 format?
20 A.     Yes.
21 Q.     Okay.
22          (WHEREUPON, the above-mentioned document
23 was marked as Exhibit Number 54.)
24 BY MR. HODGSON:
25 Q.     Ms. Thomas, you've been handed what's been

1 marked as Exhibit 54. Do you know what this document
2 is?
3 A.     Yes.
4 Q.     What is it?
5 A.     It's a memorandum that I wrote to the
6 population notifying them of the attorney client
7 verification form and the process.
8 Q.     And who is that distributed -- who is that
9 memorandum distributed to?
10 A.     Staff and inmates, all concerned. So the
11 staff and the detainee population.
12 Q.     Was it distributed to outside -- to
13 attorneys?
14 A.     No. It's not excluded from the attorneys if
15 they certainly have access. The inmate population
16 could certainly share it. It's not a confidential
17 document.
18 Q.     Are there any other attorney rooms that we
19 have not discussed today that would have -- that
20 contained video cameras?
21 A.     No.
22 Q.     When you enter the facility, there's a
23 correctional -- is there a correctional officer that
24 maintains a logbook other than the sign-in sheets?
25 A.     There's a logbook at the front entrance.

Case 4:16-cv-00947-SBB-Document 170-4 Filed 05/31/18 Page 41 of 67
Elite Reporting Services
www.EliteReportingServices.com
157..160

1  Q.    What information is contained on the logbook?
2  A.    **Pretty much the same thing as the loose leaf**
3  **binder log.**
4  Q.    All right.  Have we seen a copy of that
5  today?
6  A.    **The logbook?**
7  Q.    Right.
8  A.    **I don't recall seeing it.**
9  Q.    So with respect to the prerecorded message,
10 this admonition that we've been sort of talking about
11 it, that you're on the telephone --
12 A.    **Okay.**
13 Q.    -- aside from privatized numbers are you
14 aware of any reasons why that message may not have
15 been played during the period in question?
16 A.    **I'm not aware of a reason why it wouldn't**
17 **play, any other reason.**
18 Q.    Okay.  All right.  No further questions.
19
20           EXAMINATION
21 QUESTIONS BY MR. MARTIN:
22 Q.    Warden Thomas, my name is Joshua Martin.  I
23 represent Securus Technologies.  We have not met
24 before today, have we?
25 A.    **No.**

1  Q.    Okay.  And I appreciate your patience.  We
2  have been going a while.  I just have a few questions
3  for you.
4  A.    **Okay.**
5  Q.    You were asked questions about Exhibits 45
6  through 50, which are privatization reports produced
7  by CoreCivic in this case.  Do you recall those
8  questions generally?
9  A.    **Generally.**
10 Q.    And would you agree that it appears that
11 Exhibit 45 contains some information derived from the
12 Securus system and some derived from the ICS system?
13 A.    **I believe --**
14 Q.    Exhibit 45 is the one with the font change.
15 A.    **Yes.**
16 Q.    And other than that ICS data would you agree
17 that all the data within those exhibits, 45 through
18 50, appear to be ultimately sourced to or derived
19 from the Securus system?
20 A.    **Yes.**
21 Q.    And with respect to those folks who pulled
22 the data would you agree that Securus ultimately has
23 better access to the data contained within its
24 database?
25       MR. HODGSON:  Objection.  Calls for

1  speculation.
2  A.    **THE WITNESS:  Likely.**
3  BY MR. MARTIN:
4  Q.    Okay.  And if there was differences between
5  the data in Securus' privatization reports and
6  Exhibits 45 through 50, would you agree that the
7  Securus data is more likely to be accurate?
8  A.    **Yes.**
9  Q.    And you were asked some questions earlier
10 today about those same exhibits and about how there
11 were what appeared to be some discrepancies between
12 the content.  Do you recall the questions?
13 A.    **Yes.**
14 Q.    And is it fair to say that you don't actually
15 know why there might be discrepancies in that data?
16 A.    **That's correct.**
17 Q.    Okay.  You testified earlier that you --
18 strike that.
19       Just to confirm one piece of testimony, you
20 said before that only information technology
21 personnel and STG personnel at Leavenworth had the
22 ability to privatize numbers within the Securus
23 platform; is that correct?
24 A.    **I believe so.**
25 Q.    Okay.  And what is the title of the IT person

1  that you were referring to?
2  A.    **It's IT assistant, I believe.**
3  Q.    Okay.  You testified earlier that you had --
4  prior to coming to CCA you had served -- worked 30
5  years for the Bureau of Prisons; is that correct?
6  A.    **Yes.**
7  Q.    And in your capacity -- strike that.
8        That was in the corrections environment, I
9  assume?
10 A.    **Yes.**
11 Q.    Okay.  And in that capacity did you have the
12 opportunity to observe the benefits that call
13 recordings -- inmate call recordings or detainee call
14 recordings provide to a facility?
15 A.    **Yes.**
16 Q.    Okay.  And you described before the benefits
17 they provide in terms of safety and security?
18 A.    **Yes.**
19 Q.    And helping facility personnel avoid threats
20 to the facility in good order?
21 A.    **Yes.**
22 Q.    And would you say that in your experience at
23 Leavenworth that CCA personnel used those call
24 recordings -- used inmate call recordings for those
25 purposes?

1  A.   Yes.
2  Q.   And is that something that happened on a
3  daily basis?
4  A.   No.
5  Q.   Okay.  Were -- do you know if CCA personnel
6  listened to calls on a daily basis?
7  A.   It's possible.
8  Q.   Okay.  And would that be because they were
9  trying to fulfill that role of maintaining the safety
10 and security of the facility?
11 A.   Yes.
12 Q.   And if you had to rank the priorities you
13 have as a warden at Leavenworth, where would you put
14 maintaining safety and security of the facility in
15 that rank?
16 A.   At the very top.
17 Q.   And do you think you could do as an effective
18 job as you do right now if you didn't have those call
19 recordings?
20 A.   No.
21 Q.   Okay.  And so is it fair to say that call
22 recordings are something that CCA Leavenworth
23 personnel rely on in the ordinary course of their
24 business?
25 A.   Yes.

1  Q.   And you're required by the contract with the
2  U.S. Marshal Service to record detainee calls; is
3  that correct?
4  A.   That's correct.
5  Q.   With the exception of ones that have been
6  designated as private?
7  A.   That's right.
8  Q.   Okay.  And your contract -- strike that.
9       Do you know if your contract with Securus
10 required Securus to record calls by default?
11 A.   By?  Say that again.
12 Q.   By default.  I can ask it a better way.
13 A.   Yes, please.
14 Q.   Do you know if the contract, the CCA contract
15 with Securus, required Securus to record all calls
16 except those that were designated as private?
17 A.   I believe so.
18 Q.   And do you know if the same is true with
19 respect to the ICS contract?
20 A.   I believe that to be true.
21 Q.   And do you recall the ICS contract being
22 awarded in response to a request for proposal?
23 A.   I believe so.
24 Q.   And do you know if that request for proposal
25 required that bidding vendors record all calls by

1  default except for those designated as private?
2  A.   I believe so.
3  Q.   And if someone had submitted a bid and said
4  we're not going to record all calls, do you know if
5  they would have been considered noncompliant?
6  A.   Sure.
7  Q.   Okay.  So it's sure you know, or sure they
8  would be?
9  A.   Sure, they would not -- they would be
10 considered noncompliant because we wouldn't be
11 conforming to our contractual obligations.
12 Q.   Okay.  If you were asked in your capacity as
13 warden if CCA Leavenworth should do business with a
14 vendor, vendor A who records calls and vendor B who
15 doesn't record calls, which one would you pick?
16 A.   The one that records calls.
17 Q.   And that's because the recording of inmate
18 calls, detainee calls, is something again that's done
19 in Leavenworth's ordinary course of its business?
20 A.   Among other things, yes.
21 Q.   Is it your testimony that Praeses currently
22 handles privatization on the ICS platform?
23 A.   Yes.
24 Q.   Do you understand if Praeses handled
25 privatization on the Securus call platform?

1  A.   Do I know if they handled them or had the
2  ability?
3  Q.   Had the ability.
4  A.   Yes.
5  Q.   They did?
6  A.   Yes.
7  Q.   Do you know if they were -- if they from time
8  to time privatized numbers within the platform?
9  A.   I don't know.
10 Q.   Okay.  And if they had done so, would they
11 have been doing so at the direction of Leavenworth
12 personnel?
13 A.   Perhaps.
14 Q.   Are you aware of any instances where Praeses
15 employees made changes to the privatization settings
16 at Leavenworth on their own volition or without
17 direction from facility personnel?
18 A.   I'm not aware of that.
19 Q.   No further questions.
20
21       EXAMINATION
22 QUESTIONS BY MR. HODGSON:
23 Q.   A couple of follow-ups.  Mr. Martin was
24 asking about whether or not it's a priority for the
25 recording of phone calls?

Case 4:16-cv-00947-SRB  Document 172-4  Filed 05/31/19  Page 43 of 67
Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com                    165..168

1  A.    Okay.
2  Q.    Is it also a priority for CoreCivic to
3  maintain a good working relationship with the U.S.
4  Marshal Service?
5  A.    Yes.
6  Q.    Is that a high priority?
7  A.    Sure.
8  Q.    Would that fit perhaps just under the safety
9  and security issues that we've discussed today?
10        MR. MELTZER: I object to the form of the
11  question. It's overbroad.
12        THE WITNESS: **To the extent that we are**
13  **meeting our contractual obligations, we're following**
14  **laws, regulations, sure.**
15  BY MR. HODGSON:
16  Q.    Can you think of any reason as you sit here
17  today that there would be a reason to record attorney
18  phone calls?
19  A.    **A legitimate reason or ...**
20  Q.    A legitimate reason.
21  A.    **No.**
22  Q.    No further questions.
23        MR. MARTIN: No further.
24  ///
25  ///

1              EXAMINATION
2  QUESTIONS BY MR. MELTZER:
3  Q.    Ms. Thomas, I -- this is the deposition of
4  you taken by plaintiffs and any other parties here,
5  but I have a couple of questions I want to get some
6  clarification on. I think, first of all, one of the
7  things that you were asked -- and I think you may
8  have already clarified it -- as you were asked some
9  of the reasons why the calls are recorded. And one
10  of those was to comply with the contract that the
11  federal government has with CoreCivic, correct?
12  A.    **Yes.**
13  Q.    Okay. Safety and security and the good order
14  in the facility is another one, right?
15  A.    **Yes.**
16  Q.    Okay. Now, you were asked about whether the
17  recorded calls are sometimes used for investigation
18  purposes. Do you recall that?
19  A.    **I believe so.**
20  Q.    Okay. And from the standpoint of why
21  CoreCivic at the facility records calls from an
22  investigation standpoint what investigation are you
23  referring to?
24  A.    **Our internal investigations.**
25  Q.    Okay. And so --

1  A.    **Misconduct.**
2  Q.    All right. And so are we talking about
3  investigation in the incidents in the -- incidents
4  that occur in the space in the facility? Is that the
5  investigations you're referring to?
6  A.    **Yes.**
7  Q.    Okay. Now -- oh, you were asked about some
8  logs when requests for information which come into
9  the facility which would come in requesting either
10  documents or potentially call records or phone -- or
11  audio files of calls. Do you remember being asked
12  about requests for information from outside sources?
13  A.    **Yes.**
14  Q.    Do you recall that?
15  A.    **Yes.**
16  Q.    Okay. And you talked about the fact that Mr.
17  Lajiness had some kind of a log that he would keep
18  when he would respond to those requests. Do you
19  recall that?
20  A.    **Yes.**
21  Q.    Okay. Now, you said I think something about
22  there was a period of time he had been keeping them.
23  And what I want to go back and clarify is are you
24  aware of -- the log that you're talking about, are
25  you familiar with when that -- about who initiated

1  that log to be kept in the first place?
2  A.    **I did.**
3  Q.    So -- so that we don't have any issues
4  about this can you explain the timing of when those
5  -- when that log was started? Because I think you
6  may have suggested that it was in the three to four
7  year range, and I want to tell the Court when
8  that actually got started, the log that you were
9  referring to.
10  A.    **I believe it was shortly after my arrival, so**
11  **like April 2016 I believe it was.**
12  Q.    Okay. All right. And did Mr. Lajiness,
13  however, keep hard copies of some of the documents
14  that he received in terms of requests and that type
15  of information?
16  A.    **Yes.**
17  Q.    Okay. And were those documents, after he
18  left, at some point to the extent they could be found
19  located and maintained then thereafter by Sergeant
20  Bigelow?
21  A.    **Yes.**
22  Q.    Okay. And has Sergeant Bigelow then
23  continued to maintain the log of requests in that
24  regard?
25  A.    **Yes.**

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/96 Page 44 of 67
Elite Reporting Services * (850)531-6006
www.EliteReportingServices.com
169..172

1  Q.    Okay.  Now, another matter, the calls in
2  the -- in the staff offices --
3  **A.    Yes.**
4  Q.    -- when those calls occur, when an inmate
5  goes to the staff office and has the call, is the --
6  if the staff member is in the office as opposed to
7  standing outside looking in, if they're out -- if
8  they're inside, are they visible then to the -- to
9  the inmate?
10 **A.    Yes.**
11 Q.    Okay.  And is there any electronic monitoring
12 or monitoring including the recording occurring
13 during that time frame?
14 **A.    No.**
15 Q.    Okay.  So those calls are not electronically
16 monitored, correct?
17 **A.    Correct.**
18 Q.    To the extent that there is someone observing
19 the detainee or the inmate who is making the call
20 that's a supervisory function, is it not?
21 **A.    Yes.**
22 Q.    Okay.  And typically is the -- when those --
23 when the call is placed, who places the call?
24 **A.    Staff.**
25 Q.    Okay.  And when they talk to the lawyer on

1  the other side, do they tell the lawyer, look, either
2  I'm going to be in the room or I'm not going to be in
3  the room?
4        MR. HODGSON:  Objection, assumes facts
5  not in evidence.
6  BY MR. MELTZER:
7  Q.    You can go ahead and answer.
8  **A.    There have been cases where that's -- that**
9  **occurs, yes, that I'm aware of.**
10 Q.    Okay.  Is that currently the custom and
11 practice to tell the lawyers that -- that there's --
12 if the -- if the staff member is going to be in the
13 room, is that the custom and practice to tell the
14 lawyer on the phone that the staff member is going to
15 be in the room?
16 **A.    Yes.**
17 Q.    Okay.  Now, you mentioned that one of the
18 times that the detainee or inmate is notified and
19 given notice about the recording of calls, the
20 monitoring of calls, is in orientation.  Can you
21 explain that -- sort of that orientation process in
22 general terms as it relates to the notification of
23 calls being recorded?
24 **A.    Okay.**
25 Q.    And, well, also about how the inmate gets an

1  unmonitored unrecorded call, private call if you
2  will, with his or her attorney.  Explain how that --
3  what's related to the inmate detainee during the
4  orientation process.
5  **A.    Okay.  So the -- there are -- it's actually**
6  **several different phases of that process.  One is**
7  **staff have discussions, general discussions, with the**
8  **inmates.  Staff including myself.  And then there are**
9  **one-on-one discussions with the inmate.  So as a**
10 **general practice when I do my segment, I mention to**
11 **the inmates that, you know, the telephone calls do**
12 **record and they should submit their attorney numbers**
13 **to staff to ensure that it is privatized before**
14 **placing a call.  At that stage the inmate does not**
15 **have a PIN number.  And then the staff member who**
16 **gives the inmate a PIN number, that's a one-on-one**
17 **process because a PIN number is a private number for**
18 **each inmate.  It's assigned to each inmate.  And then**
19 **at that point that staff member, usually the case**
20 **manager or a member of the unit team who is acting in**
21 **that capacity or serving in that capacity, then will**
22 **inform the inmate of how they can initiate getting**
23 **their attorney's phone numbers privatized.**
24 Q.    All right.  Now, what do you tell the inmates
25 and what does the orientation -- during the

1  orientation process what is the inmate told about the
2  recording of calls specifically?
3  **A.    That we monitor calls, and they are recorded.**
4  Q.    Okay.  Anything else?
5  **A.    And that if they don't want their -- if they**
6  **don't want to have a recorded call, one, how they can**
7  **go about privatizing the number or they can make a**
8  **request to unit staff to have an unmonitored call.**
9  Q.    Okay.  And you mentioned that the -- now, as
10 of at least October of 2016, there was a way for the
11 inmate to ask or to submit a telephone number of a
12 lawyer.  And after it was verified, then the number
13 would be privatized if everything went according to
14 Hoyle.  Before that when the process --
15 **A.    Yeah.**
16 Q.    -- and even today is there a process that was
17 explained to the inmates, detainees, about how they
18 would go about having their attorneys get their phone
19 numbers set to be not recorded?
20 **A.    Yeah.  Yeah, the -- yes, there's a process,**
21 **and it's also indicated in the handbook that the --**
22 **it is the inmate's responsibility to ensure that**
23 **their attorney is aware of the steps to be taken to**
24 **privatize their number.**
25 Q.    Okay.

Case 4:16-cv-00947-SBB  Document 172-4  Filed 05/31/19  Page 45 of 67
Elite Reporting Services * (850) 595-6788
www.EliteReportingServices.com
173..176

1  A.    And that is to submit a request to the
2  facility.  And they could fax it to -- and the number
3  is indicated in the handbook.
4  Q.    All right.
5  A.    The fax number.
6  Q.    Okay.  And I'm going to hand you what has
7  been marked Exhibit 32 and ask if you could read the
8  language that tells them how to do the privatization
9  or how to get the numbers privatized for the
10  attorney.  Now, what does the attorney have to do --
11  what is the inmate told in that regard from the
12  inmate handbook?
13  A.    That your attorney may request of our
14  facility that calls to their office not be recorded
15  to ensure attorney-client privilege.  They may
16  request this by way of sending CCA/LDC a fax on their
17  office letterhead.  This request must include contact
18  information and signature.  They may fax it to
19  913-723-2231.  And in bold print capitalized it is
20  your responsibility to ensure that your attorney is
21  aware of the procedure.  Telephone calls are subject
22  to being recorded if they do not request they be
23  restricted.
24  Q.    All right.  Is it also -- you said it was
25  bolded and in all caps.  Is it also underlined, that

1  language -- that last language you read?
2  A.    Yes.
3       MR. HODGSON:  Objection.  Document speaks
4  for itself.
5  BY MR. MELTZER:
6  Q.    And in addition is that language that's
7  contained in Exhibit 32, which I think was the --
8  look at it.  That was the July -- that was in 2015.
9  That was the July 2015 handbook?
10  A.    Yes.
11  Q.    Okay.  Was that same language included in all
12  the versions of the handbook that you were shown by
13  plaintiff's counsel including exhibits -- actually if
14  you could pull those.  Where are those?
15       MR. HODGSON:  We'll stipulate.  Same
16  objection.
17  BY MR. MELTZER:
18  Q.    That they were present.  Do you see that same
19  language present in Exhibits 31, I think it's -- 30,
20  Exhibit 30 and Exhibit 29 and exhibit -- it may be --
21  I don't know which number that is.  There it is.
22  Maybe it's 33.  Yeah, 33.  Is that contained in all
23  of the versions of the handbook that you were shown
24  or that you were handed by plaintiffs' counsel, that
25  same language?

1  A.    Yes.
2  Q.    All right.  And in the later versions of the
3  handbook after 2012 did it also -- did the handbook
4  also say that calls were -- all calls were subject to
5  monitoring or monitored?
6       MR. HODGSON:  Objection, compound.
7  BY MR. MELTZER:
8  Q.    Let me just show you the language I'm
9  referring to.  Right here, daytime telephones are
10  subject to monitoring, right up here.  Do you see
11  that (indicating)?
12       MR. SANDAGE:  What exhibit is that?
13       MR. MELTZER:  Exhibit --
14       THE WITNESS:  32.
15       MR. MELTZER -- 32.  And it's also
16  thirty-one -- I'll show you 31 and Exhibit 33.
17  BY MR. MELTZER:
18  Q.    That same language about the daytime -- the
19  day room phones subject to monitoring contained in
20  all three of those?
21  A.    Yes.
22  Q.    Okay.  And is the inmate in the forms that
23  they're provided, are they told that monitoring
24  includes recording?
25  A.    Yes.

1  Q.    All right.  Okay.  Now, in terms of the
2  videotaping or video surveillance without audio that
3  occurs is -- when you talk about security and
4  supervision, what is the role of video -- or
5  videotaping -- silent video surveillance if you will
6  as a deterrent?  How is it a deterrent?
7  A.    To discourage any type of inappropriate or
8  unauthorized behavior.
9  Q.    And from a security standpoint what types of
10  things are you trying to have, and how is it a
11  security tool?  How does it affect security?
12  A.    To deter folks from passing things, having
13  inappropriate activity, or even any type of
14  disruptive type behavior on the part of either party.
15  Q.    Okay.  Warden Thomas, that's all the
16  questions I have at this time.  I'll have more
17  questions for you at the time of trial.
18
19       EXAMINATION
20  QUESTIONS BY MR. HODGSON:
21  Q.    A couple of follow-up, Ms. Thomas.  That
22  language that we were talking about that was
23  contained in the handbooks about it is your
24  responsibility to inform your attorney that the calls
25  need to be privatized -- I'm summarizing at this

Case 4:16-cv-00947-SRB  Document 170-4  Filed 05/31/19  Page 46 of 67
Elite Reporting Services * (850) 595-6066
www.EliteReportingServices.com                    177..180

1 point.
2 **A.    Okay.**
3 Q.    I just wanted to know is this language given
4 to attorneys --
5 **A.    No.**
6 Q.    -- by CoreCivic?
7 **A.    No.**
8 Q.    Okay.  Is there anything similar to that
9 that's given to attorneys by CoreCivic?
10 **A.    No.**
11 Q.    In your time at the Bureau of Prisons were
12 you ever assigned to an individual correctional
13 facility?
14 **A.    Individual correctional facility?**
15 Q.    Well, to a particular correction facility.
16 **A.    Several.**
17 Q.    Okay.  In all of those facilities were there
18 attorney meeting rooms?
19 **A.    Yes.**
20 Q.    Were there video cameras in any of those
21 facilities with the attorney meeting rooms?
22 **A.    I don't -- I really don't recall.  The design**
23 **was different than what it is here.  So the design of**
24 **the rooms were completely different than the way it's**
25 **laid out here.**

1 Q.    Mr. Meltzer was talking about the logs
2 maintained by Mr. Lajiness, I think.  Is that his
3 name?
4 **A.    Yes.**
5 Q.    Prior to the logs that were maintained by Mr.
6 Lajiness regarding law enforcement requests for
7 records --
8 **A.    Okay.**
9 Q.    -- were there any other similar types of
10 documents that were maintained that would record
11 that?
12        MR. MELTZER:  Are you talking about a log
13 or a physical document that --
14 BY MR. HODGSON:
15 Q.    Other than the physical documents themselves
16 is there any other sort of document similar to what
17 Mr. Lajiness maintains?
18 **A.    No.**
19 Q.    And just I want to be clear, by responding to
20 all the additional questions we had you weren't
21 trying to change any of the responses that you gave
22 me earlier today, right?
23        MR. MELTZER:  Object to the form of the
24 question to the extent that they clarify any of them.
25 I object to the form of the question.  It's

1 misleading.
2 BY MR. HODGSON:
3 Q.    You weren't trying to change any of your
4 answers, though, correct?
5 **A.    Change?**
6 Q.    Yeah, like -- right?
7 **A.    Clarify if -- clarification or further**
8 **clarification, change.**
9 Q.    Not -- but not change?
10 **A.    When you say "change", like we referenced the**
11 **log, I think the -- certainly when I said three to**
12 **four years, obviously I wasn't calculating --**
13 Q.    I understand.
14 **A.    Yeah.  But other than that, no.**
15 Q.    Okay.  And do you stand by everything that
16 you testified in response to my questions today?
17 **A.    To the extent that it was clarified, yes.**
18 Q.    Yeah.  Okay.  No further questions.  Thank
19 you very much.  Have a safe trip home.
20        THE VIDEOGRAPHER:  This concludes this
21 deposition.  The time is 5:58 p.m.
22        FURTHER DEPONENT SAITH NOT.
23
24
25

1         E R R A T A   P A G E
2     I, LINDA THOMAS, having read the foregoing
   deposition, Pages 1 through 183, do hereby certify
3 said testimony is a true and accurate transcript,
   with the following changes (if any):
4
5 PAGE    LINE    SHOULD HAVE BEEN
6 _____  _____   _____
7 _____  _____   _____
8 _____  _____   _____
9 _____  _____   _____
10 _____  _____   _____
11 _____  _____   _____
12 _____  _____   _____
13 _____  _____   _____
14 _____  _____   _____
15 _____  _____   _____
16 _____  _____   _____
17 _____  _____   _____
18
19
20 _____
            LINDA THOMAS
21
22 _____
   Notary Public
23
   My Commission Expires:  December 16, 2019 _____
24
   Reported by:  Joy Kennedy, LCR, CCR, RPR
25

Case 4:16-cv-00947-SBJ   Document 179-4   Filed 05/31/19   Page 47 of 67
*Elite Reporting Services* (850)  599 - 6000
www.EliteReportingServices.com
181..184

```
                                                        Page 185
 1              C E R T I F I C A T E
 2
 3    STATE OF TENNESSEE
 4    COUNTY OF DAVIDSON
 5         I, JOY KENNEDY, Licensed Court Reporter, with
 6    offices in Nashville, Tennessee, hereby certify that
 7    I reported the foregoing deposition of LINDA THOMAS
 8    by machine shorthand to the best of my skills and
 9    abilities, and thereafter the same was reduced to
10    typewritten form by me.
11         I further certify that I am not related to
12    any of the parties named herein, nor their counsel,
13    and have no interest, financial or otherwise, in the
14    outcome of the proceedings.
15         I further certify that in order for this
      document to be considered a true and correct copy, it
16    must bear my original signature and that any
      unauthorized reproduction in whole or in part and/or
17    transfer of this document is not authorized, will not
      be considered authentic, and will be in violation of
18    Tennessee Code Annotated 39-14-104, Theft of
      Services.
19
20
21
      _____
22    JOY KENNEDY, LCR, CCR, RPR
      Elite Reporting Services
23    Associate Court Reporter and
      Notary Public State of Tennessee
24
      My Notary Commission Expires:  12/16/2019
25    LCR #528 - Expires:  6/30/2018
      Elite Reporting Services  *  (615)595-0073 185
```

Elite Reporting Services * (615)595-0073
www.EliteReportingServices.com                    185

## Exhibits

**Ex 25** 4:14 12:4 14:20

**Ex 26** 4:15 12:4,5

**Ex 27** 4:17 24:9,12 26:7 89:11

**Ex 28** 4:18 26:12,14

**Ex 29** 4:20 29:20 31:17 32:19 178:20

**Ex 30** 4:21 29:20 33:2 178:20

**Ex 31** 4:23 29:21 33:10

**Ex 32** 4:24 29:21 154:16 177:7 178:7

**Ex 33** 5:2 29:21,22 179:16

**Ex 34** 5:4 64:12 70:20,23

**Ex 35** 5:6 64:12,13 73:8

**Ex 36** 5:8 80:3

**Ex 37** 5:10 83:7 88:13 103:25

**Ex 38** 5:12 86:5

**Ex 39** 5:13 86:5,6

**Ex 40** 5:15 96:14,17

**Ex 41** 5:17 106:23 107:1

**Ex 42** 5:19 108:14,17

**Ex 43** 5:21 112:25 113:3

**Ex 44** 5:23 122:15

**Ex 45** 6:2 122:15 129:1 131:6 137:18,19 138:3, 25 139:1,5,13,24,25 141:5 142:6 162:11,14

**Ex 46** 6:4 122:16 125:23 126:2,6 133:13 138:2,9, 18,19

**Ex 47** 6:6 122:16

**Ex 48** 6:8 122:16,17

**Ex 49** 6:10 122:17 123:14,21 141:12 145:8, 9

**Ex 50** 6:12 122:17

**Ex 51** 6:14 143:1,2,4

**Ex 52** 6:17 149:11,14 150:22

**Ex 53** 6:19 150:18 159:1, 15

**Ex 54** 6:21 159:23 160:1

## 0

**015** 139:20

**016** 139:24

## 1

**1-7-4** 81:8

**10** 151:18

**103** 33:3

**11** 10:22 151:18

**12** 10:22

**121** 82:5

**12:54** 8:5

**13** 10:22

**132** 82:18,21,22,24

**13th** 114:11,22 115:7

**14** 10:22 34:3 38:17 133:7

**15** 10:22 34:21

**15th** 115:10

**160** 20:1

**17** 65:8,10,11

**174** 81:5

**19** 99:11

**196** 24:16

**1986** 99:13

## 2

**20** 61:20

**200** 145:23

**2009** 151:25 152:2

**2010** 106:21 108:24 152:2

**2011** 31:20,23 53:6 57:23 61:18 67:20

**2012** 31:24 34:3 35:10 38:9,17 179:3

**2014** 32:3 35:10 38:10

**2015** 32:3 178:8,9

**2016** 32:4,8,16 33:25 39:17 85:17 99:13 108:23 114:11 115:7,10, 25 151:11 172:11 176:10

**2018** 8:4

**203** 113:6

**20th** 8:4

**22** 10:11 82:23 133:3

**23** 132:25

**24** 10:22 11:2 15:16,17

**25** 10:22 12:4,8,14,20 13:22 14:20 15:1

**26** 10:22 12:5,8,16 13:3, 9,10,15,24 14:6,7 15:2

**27** 10:22 24:9,12 26:7 89:11 104:2

**270** 139:18

**28** 10:23 26:8,12,14

**29** 10:23 29:20,25 31:17, 23 32:19 178:20

**2:12** 62:1

**2:24** 62:4

**2:58** 84:20

## 3

**30** 29:20 31:24 33:2 152:23,25 153:17,25 164:4 178:19,20

**31** 29:21 32:3 33:10 178:19 179:16

**316** 114:4,5,24 115:2,11

**317** 114:4 115:1,8

**32** 29:21 32:3 154:16,17 177:7 178:7 179:14,15

**33** 29:22,25 32:4 33:10 178:22 179:16

**34** 64:12,15,18,22 65:11 69:11 70:20,23

**35** 64:13,15,18 65:12,15 73:8,16

**352** 126:9,16,19

**36** 80:1,3

**37** 83:5,7 85:3 88:13 103:25 104:2

**37214** 8:12

**375** 123:21 141:11 144:23 145:19,24

**38** 86:5,9

**380** 144:24

**383** 123:17,21 144:23 145:19,24

**384** 97:12,13

**39** 11:7 15:13 83:4 86:6,9

**391** 98:2

**3:12** 84:23

## 4

**40** 96:14,17

**41** 106:23 107:1

**419** 126:1,8

**42** 108:14,17

**43** 112:25 113:3 116:3

**438** 65:19

**439** 66:2

**44** 116:3 122:15

**440** 66:7,9

**441** 66:11,13

**45** 122:15 123:9,14 129:1 131:6 137:18,19,20,21, 24 138:3 139:1,5,13,25 141:4,5,20 142:1,2,6 152:25 153:18,25 162:5, 11,14,17 163:6

**46** 122:16 125:11,12,23 126:2,3,4,6,21 127:3 131:5 133:9,13 138:2,9, 19 145:6

**47** 122:16 125:11,12

126:21 127:14,17 131:5
133:9 145:6

**48** 122:17 125:11,12
126:21 128:12 131:5
133:10 145:6

**485** 73:17 75:21

**49** 122:17 123:14,21
131:5 140:19,22 141:12,
13 145:9

**4:16-cv-00947** 8:8

**4:27** 132:16

**4:38** 132:19

---

**5**

**50** 122:17 123:8,14 131:5
140:19 145:9 162:6,18
163:6

**51** 143:2,4

**52** 149:11,14 150:22
154:17 158:16

**53** 150:18 159:1,15,17

**54** 159:23 160:1

**5:18** 157:4

**5:25** 157:7

**5:58** 183:21

---

**6**

**60** 152:25 153:18,25

**600** 8:11

---

**7**

**7-4** 81:7

**7198** 122:20 125:25
144:16 145:7,22,23

**7199** 122:23 144:16
145:8

**7200** 122:24 144:17
145:8

**75** 130:9

**785** 139:9

**785-246-6016** 138:15,22
139:10

---

**8**

**8** 26:16 33:5

**8-1-2017** 130:15

**81** 25:4

**8196** 24:19,24 25:13,17
26:2 89:16

**8205** 27:4

**8218** 24:19

**8245** 130:8

**8267** 87:2

**8268** 137:20

**8275** 129:23 130:8,11

---

**9**

**913-723-2231** 177:19

**99** 145:22,23

---

**A**

**A3** 87:19

**ability** 30:17 42:1 57:10
69:6 95:13 97:17 118:23
131:19 148:4 163:22
168:2,3

**above-mentioned** 12:3
24:8 26:13 29:19 64:11
80:2 83:6 86:4 96:13
106:22 108:13 112:24
122:14 143:3 149:10
150:17 159:22

**absence** 105:14

**absolutely** 112:15
151:14

**accept** 122:8

**access** 29:13 48:13
49:20 56:16 57:2,3,9,24
76:16,23 77:2,12,15,23,
25 78:3,7,10,21 79:15,20
122:11 141:21 160:15
162:23

**accessing** 95:2

**account** 52:1 71:9 74:12

**accuracy** 120:14

**accurate** 163:7

**acknowledgement**
147:19

**acknowledgment**
147:15

**acronym** 70:11

**Act** 47:11

**acting** 175:20

**active** 134:25 135:1,2

**activity** 45:5 180:13

**actual** 66:7 148:10

**Adam** 97:21

**add** 19:25 86:19 101:10

**added** 100:23 101:1,4
102:18

**adding** 101:5,7

**addition** 84:5 178:6

**additional** 71:22 91:2
116:16 144:24 182:20

**adjudicated** 19:24 20:6,
7,9

**adjudication** 18:4 20:10

**administrative** 56:24
62:18 63:1,4,8,9,13,16,
23 65:2,3 66:10 68:16
157:17

**admonition** 15:18
161:10

**ADO** 56:24

**advertised** 148:18,22

**advised** 60:14

**affect** 180:11

**affected** 119:8

**affirmatively** 103:16
107:8 152:9

**afternoon** 8:18 9:11,12

**agencies** 44:13 48:5

**agency** 137:1,2

**agree** 32:5,6 72:1 114:14
162:10,16,22 163:6

**agreed** 78:2 114:23

**ahead** 26:10 50:5 57:20
132:8 174:7

**Alissa** 120:17,18 121:4

**allegations** 16:8

**allowable** 27:5

**ambiguous** 45:18 86:23

**amount** 68:20

**Amy** 96:5

**and/or** 41:22 111:22

**annual** 88:12

**annually** 61:6

**answering** 46:23

**answers** 183:4

**anymore** 122:6

**apologize** 22:10 70:11
85:25

**appeared** 163:11

**appearing** 131:5

**appears** 66:2,14 127:9
129:18 143:8 162:10

**apples** 110:24

**applicable** 11:14,17

**appointment** 149:18

**appointments** 149:19

**approve** 77:22 78:7,22

**approved** 78:10

**approximately** 129:3

**April** 8:4 43:9 172:11

**area** 17:7 35:7 80:17
153:11,13

**areas** 16:24,25 19:3,4
39:25 105:1

**arrival** 172:10

**arrived** 22:19

**asks** 46:15 81:25 89:8
102:17 124:19 128:17

**assessment** 47:3

**assigned** 17:11,20 19:1
25:18 31:10 111:21
153:20 158:22,23 175:18

181:12

**assignment** 17:25

**assignments** 17:24

**assistant** 164:2

**assisted** 83:19 100:3

**association** 8:14

**assume** 114:21 164:9

**assumes** 49:5 57:18
78:4 174:4

**assuming** 113:14,15,18
155:13

**assumption** 101:11

**assurance** 34:8,10

**ATE** 136:15

**Atkins** 35:21,23 36:1
50:10,13

**attempts** 107:25

**attention** 32:19 100:14
125:11 144:10

**attorney** 28:12,14 56:5
59:2,4,11,12,14,15,17
69:23 70:15 71:1,13,15,
23 73:4,12 75:22 80:21
85:9,13 88:5,21 90:1,7
91:4 92:6,25 94:13,14
96:10 97:9,21 101:24
102:18,21 103:3,4,20
104:10,11,12,17 105:18,
22,23 106:1,11 107:5,6
108:25 110:11 111:8,23
112:5,14 116:8 117:24
120:19 121:6,9 122:1
129:15,16 131:16 137:1
144:5,17 149:1,7,20
151:6,24 153:2 154:5,14,
19,22 160:6,18 169:17
175:2,12 176:23 177:10,
13,20 180:24 181:18,21

**attorney's** 77:7 89:19,20
91:9 109:2 157:24 158:9
175:23

**attorney-client** 16:9,11
58:21 59:21,23 60:16,19,
23 69:15 70:19 71:19,24
80:10 112:9 115:18
122:4 149:4 152:8
177:15

**attorney-detainee**
58:12

**attorneys** 11:22 92:14
102:10 105:6,7,19 112:7
121:23 144:5 148:15
149:19 155:17 160:13,14
176:18 181:4,9

**audio** 156:6,9,15,22
171:11 180:2

**August** 151:11,18

**authorized** 11:14

**authorizing** 78:23

**avoid** 164:19

**awarded** 166:22

**aware** 21:19 29:10 43:23
45:13 48:7 49:21 58:9
64:10 67:25 76:15,25
85:15 90:3 91:13 94:2
97:6 105:25 108:12
119:3,4,7 120:4 121:18
122:13 140:13 148:8,17,
21,24 161:14,16 168:14,
18 171:24 174:9 176:23
177:21

---

**B**

**back** 25:12 30:20 41:15
55:13 58:21 60:10 62:3
67:18 69:11 71:12 78:23
82:5 84:22 88:13 89:11
106:15,17,20 113:7,11
116:15 119:17,18,20
120:15 129:22 132:18,
21,25 140:19 152:11
155:19 157:6 158:13
171:23

**Baker** 8:23

**ball** 31:22

**bank** 92:22 105:2 110:20

**banks** 104:25 110:20
148:1

**based** 18:11 21:21,22
22:14 45:21 47:2,18
50:10,16 91:9 98:24
105:18 109:8,9,20 110:6
117:16 121:6 129:13
153:21

**basement** 107:22,25

**basis** 68:17 100:15,17
165:3,6

**batch** 71:2

**Bates** 11:9 24:19 27:2
122:19 123:17,18 137:20
144:16,22,24

**beginning** 36:14 43:9
60:8 88:25

**behalf** 8:7,25 10:7

**behavior** 180:8,14

**belated** 74:22

**belief** 127:12 129:12
131:17

**believed** 134:2

**benefits** 164:12,16

**bid** 167:3

**bidding** 166:25

**big** 45:14

**Bigelow** 37:3,17 66:14
68:20,21,24 104:5
105:12,21 106:1,9
117:14,15 132:10
172:20,22

**Bigelow's** 68:14 107:18

**bigger** 141:3,4,20

**binder** 161:3

**bit** 23:6 72:16 138:12
141:7 155:12

**black** 156:2

**blank** 127:22

**block** 135:9

**blocked** 134:24 135:4,5

**blocks** 140:4

**blue** 140:25 141:2,3

**board** 88:20

**bold** 177:19

**bolded** 177:25

**BOP** 20:2,3

**bottom** 66:13 69:14
82:11 139:14,18

**break** 61:23 62:2,9 84:21
85:3 132:13,17,22 157:1,
5

**bring** 23:14

**broadly** 72:16

**brochures** 148:20

**Brockert** 120:17,18
121:4 122:11

**brought** 27:9 100:14

**bubble** 156:2

**building** 17:5 22:22
109:24

**bullet** 87:19,23

**bulletin** 88:20

**burdensome** 72:23

**Bureau** 22:23 99:6,7,14,
16 164:5 181:11

**business** 99:1 103:7
165:24 167:13,19

---

**C**

**calculating** 183:12

**calendars** 150:9,22,23

**call** 12:22 13:19,25 14:3
15:18,20 17:3 19:10
23:12 28:11,14 33:5 41:1
45:9 48:14,23 50:2 52:4,
5,7 55:14 56:4,6 57:4,15
58:11,12,21 59:2,4,11,
18,21 60:6,7,8,11,12,13,
16 64:6 66:16 69:21,23,
24,25 70:1,14,15 71:2,
11,12,13,16,19,23,24
72:6,8,9,14 76:1,24 77:2,
17 78:8,18 79:20 92:5,16
93:1,11 94:16 96:7,10,25
97:5,25 101:20 104:18,
19,20 112:18 113:12
115:24 118:8,24 119:9
120:4 126:22 131:13
132:4 135:6,9,13,21
142:8 147:12 153:13
164:12,13,23,24 165:18,
21 167:25 171:10 173:5,
19,23 175:1,14 176:6,8

**called** 9:6 13:4 15:18
30:24 50:23 53:9 102:19

caller 135:11

calls 11:21 12:13 13:4,
11,12 16:9 27:8 28:9
40:7 42:2 45:25 52:13,
15,20 53:8,18 55:5,11,18
57:18 60:19 62:11,15
64:3,4 70:20 71:7,20
72:17,24 73:1,2,4,12,21,
23 74:10,18 75:16 93:25
94:4 99:3 112:9,14 121:5
127:18 131:16 144:6,18,
20 148:8,11 162:25
165:6 166:2,10,15,25
167:4,14,15,16,18
168:25 169:18 170:9,17,
21 171:11 173:1,4,15
174:19,20,23 175:11
176:2,3 177:14,21 179:4
180:24

camera 153:16,22

cameras 95:4 151:20,23
152:4 154:5,14,25 155:2,
24 156:4,6,9 160:20
181:20

capabilities 57:25

capable 133:7 156:8

capacity 54:25 164:7,11
167:12 175:21

capitalized 177:19

caps 177:25

captain 93:21

career 44:4 99:2,5

case 8:8 28:5 31:15,16
35:9 37:12 41:17 54:18,
19 55:2 85:12 93:18,19,
20 96:1,3,8,11,25 101:20
111:17 151:2 162:7
175:19

cases 40:5 64:1 92:16
105:3 111:17 174:8

caseworker 54:18 94:14

categories 45:4,10

category 48:8 130:14
137:15

Cathy 54:14

caution 60:10

CCA 26:18 27:17 37:8,24
38:5,23 39:8 107:14

144:6,21 156:10 164:4,
23 165:5,22 166:14
167:13

CCA/LDC 177:16

CD 76:8

CDS 67:1 76:19

cell 28:4 144:21

cells 19:10,11 23:13

center 9:18 17:3,4 19:3,
5,9,15 22:20 34:19 35:2
41:1

certainty 28:24

change 43:1,4,24 57:10
84:5,17 85:16,19 86:12
87:24 91:3 134:19
162:14 182:21 183:3,5,8,
9,10

changed 34:3 43:2,8
44:2,5,13 47:4 121:21

changing 38:9 87:16

characterization 72:1

characters 136:12

Charlie 35:20,23 50:10,
19

check 104:20 119:14
120:7 121:9 139:2

circumstances 92:17
110:7

City 8:24

civil 22:5 62:22

clarification 46:16 82:1
89:9 123:1 124:20
128:18 170:6 183:7,8

clarified 170:8 183:17

clarify 122:21 171:23
182:24 183:7

clarity's 25:4

class 50:20,22,23,24

classification 17:16,21

classifications 31:14

clear 14:11 60:9 65:18
128:20 182:19

Clem 54:6,8,10,11,14

clerical 144:25

click 75:17,18

client 144:5 149:7,20
160:6

clients 105:8

close 157:2

close-up 82:13,17

closer 139:19

clothing 24:6

Code 52:24

coextensive 145:20

coincide 137:14,15

Collins 37:18,22

column 127:21 134:23

columns 133:16

committed 45:7

communicate 90:7
121:2

communicated 58:16
85:19

communicates 85:21

community 47:18

company 36:17 38:6
47:13 48:2 61:4,19
83:19,22

compared 20:8

complete 17:15 26:25

completed 117:21

completely 181:24

compliant 15:5

complies 33:4 69:12
73:9,18 81:7 82:20 98:3
114:5 125:12 139:3,21
143:25 144:12 154:18

comply 18:22 170:10

compound 150:11
179:6

comprehensive 141:23

computer 150:2 159:16

con 155:9

conceded 78:2

concerned 160:10

concerns 16:10

concludes 183:20

conduct 44:18 47:13

conference 92:17 149:1
151:6,24

conferencing 155:10

confident 151:17

confidential 160:16

confirm 102:20,24
163:19

confirmation 71:14

confirmed 71:13

confirming 100:1

conforming 167:11

Congratulations 99:18

Connie 107:20,21 150:7,
20

Conry 16:13

Conry's 56:2

consented 72:8

considered 17:19
167:5,10

consist 56:22

constitutes 59:23

contact 28:12 54:2
127:18 177:17

contained 13:15 71:2,24
104:15 144:11 159:15
160:20 161:1 162:23
178:7,22 179:19 180:23

content 83:17 163:12

contents 30:18

context 157:13,17,20
158:4

continued 172:23

contract 11:3,13 15:12,
25 18:23 19:20 21:9
48:3,22 98:24 166:1,8,9,
14,19,21 170:10

contractor 11:15,17,19
15:6 48:9 54:2 63:20
101:9

contractors 47:16,20,24 48:4,6

contractual 167:11 169:13

contractually 20:14

control 90:16,19

controlled 80:20

conversation 11:25 56:19

conversational 46:14

conversations 11:16 32:23 33:6,14 69:15

convicted 20:6 21:4

conviction 18:6,17,21, 24 21:10,18 22:2,14

coordinator 37:1,5,16 39:12 40:19 41:3 42:8 44:16 46:4 111:19

coordinator's 45:12 68:14

copied 84:14

copies 68:9,10,11,15,22, 25 86:2 117:19 141:19 150:8,11,13,21 172:13

copy 30:11,12 64:22 65:2 68:3,4,21 76:20 121:11 141:9,11,15 161:4

Corecivic 8:7,8,25 10:8 22:25 24:22 27:17 34:18 36:5 38:5 48:19 49:8,19 50:1 51:9 52:7,13 53:6, 18 55:8,9 58:25 62:13 63:19 66:19 69:18 70:18, 25 71:21 72:17 75:25 76:19,22 77:1 78:11 79:8 83:23 89:16 90:24 91:8 93:23,24 94:1 97:4,24 98:7 99:15,20 100:6,11 104:16 106:10 107:13 111:7 116:7 117:24 118:10,13,22 119:12,13 121:19 124:11,12 143:18 144:23,24 145:7,8 148:14,19,25 151:5 156:11 162:7 169:2 170:11,21 181:6,9

Corecivic's 53:18,19 83:25 102:4 112:13

122:22 143:11

Corecivic000100 32:19

Corecivic375 123:17

corner 156:1

corporate 83:25 142:18, 20 154:10

correct 10:8,9 14:1 21:25 32:25 56:1 87:5 90:21 92:3 122:23 126:1 133:7 145:14 163:16,23 164:5 166:3,4 170:11 173:16,17 183:4

correction 54:4 181:15

correctional 45:1 53:25 54:24 160:23 181:12,14

corrections 164:8

correctly 11:23 33:8 36:19 51:15 67:12 144:7 145:3 153:23 154:3

counsel 8:16 24:23 49:16 120:13 121:22 125:2 128:9 129:3 131:3 138:20 139:9 141:10 142:23 143:20 178:13,24

counsel's 122:8

counselor 31:16 37:12 93:20

counted 126:17

country 98:11 100:10

county 18:12 22:16,20 23:1 109:21 146:25

couple 23:17 68:18 108:4,5,21 128:3 139:4 146:18 150:6 168:23 170:5 180:21

court 8:9,13 12:1,7 17:3, 4 19:3,5,9,15 22:5 26:11 32:1 46:11,15 57:6 60:14 81:25 83:5 89:8 119:20 123:8 124:19 126:10 128:17 146:3 172:7

covers 92:14

Cowden 8:24

Crane 8:7

create 133:21 134:2 150:15

created 67:12,17 124:8, 10 134:11 149:22

creating 83:17

cross-reference 121:5

CTRY 133:18,20

curiosity 106:19

current 9:16 38:24 40:11 41:14 44:2 73:2 76:4 84:5 87:5 100:18 112:16 120:3 125:4 131:13

custom 174:10,13

cut 38:19 135:24 136:8, 14

---

**D**

daily 165:3,6

darker 155:12

data 67:3 123:22 134:20 162:16,17,22,23 163:5,7, 15

database 70:2 71:5,6 112:10 123:23 124:14 125:4,20 162:24

date 28:16 93:7,8,13 106:18 116:10,12 123:24 124:1,8 130:14 133:21, 22 134:2,20 150:25 151:12

dated 130:24

dates 10:1 37:15 114:16 129:19 130:13 142:10 150:12

dating 59:14

day 25:19,20,22 60:14 96:7 150:15 153:18 179:19

days 103:7 152:23,25 158:21

daytime 179:9,18

DEA 66:5

dealing 44:16

dealt 51:11,12

Deborah 39:5

December 43:10

114:11,22 115:6,10,25

decision 154:4

default 166:10,12 167:1

defendant 8:25 144:4

defendants 8:21

defender 99:21 139:15

defender's 70:5 98:9 99:4 100:25 105:2,5

defenders 98:21 127:18 128:1

defenders' 99:24 100:8

Define 85:11

definitive 106:18

definitively 101:17 110:3

degree 28:23

department 53:12 56:19,20,22 58:17 66:4 73:20 142:19,20

depending 93:6 159:14

depends 59:19

DEPONENT 183:22

deposition 8:6,11 10:17,18 11:10 16:13 133:1 170:3 183:21

deprivatization 119:5

deprivatize 118:11,23

deprivatized 118:7

derived 162:11,12,18

description 136:24 137:13

design 181:22,23

designate 89:19 90:1,5, 24 91:8

designated 19:4,6,7,8, 16,23 91:5 96:25 144:18 166:6,16 167:1

designating 90:11

designed 15:5 131:20

desk 86:15 87:6 94:12 159:12,13

details 122:6

Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

i5

detainee 11:15 12:21,24 17:14 18:13 23:6,10 25:6,11 26:3 27:8 29:3 30:16 34:25 42:2 53:17 56:5 59:1,2,10 86:20 89:18 90:1,4,23 91:23 92:4,12,15,25 93:14 96:7 104:4 113:9,12,20 114:12 116:4,6 117:6,17 147:22 148:4 160:11 164:13 166:2 167:18 173:19 174:18 175:3

detainee's 11:16 91:10

detainees 11:18,20 15:6 17:11 18:15,21,25 21:18 22:2 23:1 25:13 26:17 27:16 30:8,23 32:15 40:9 52:14 53:8 85:12,20 87:14 91:4 101:21 116:8 176:17

detainees' 147:18

Detention 9:18 11:4 22:20 34:19

deter 180:12

determine 59:20

deterrent 180:6

developed 101:10

developing 34:24 101:12

development 61:10,11, 15

device 156:8

devices 156:16,22

dialed 134:22 135:10 137:14

dialing 74:14 95:1

dictated 110:6

difference 62:25 63:3,7 134:10

differences 75:4 163:4

direct 32:18 52:10 58:18 76:16 77:2 122:11 144:10

direction 142:12,16 168:11,17

directly 21:17 52:5 56:18 88:2

discharge 23:12

discourage 180:7

discrepancies 163:11, 15

discuss 10:20

discussed 10:17 39:20 45:12 56:25 71:11 146:23,24 160:19 169:9

discussing 95:21

discussions 175:7,9

disprove 55:14

disruptive 180:14

distress 155:5

distributed 160:8,9,12

District 8:9,10

divided 16:23 17:2 21:21 22:13

Division 8:10

document 10:13 11:7 19:20 24:8 26:13,24 27:13,15 29:4 66:24 68:4 83:2,6,9,12 85:6,18,21 88:8 96:13,18 106:22 107:1,9 108:13,17 112:24 113:4 124:10,13, 22 125:1,3,7 129:2 133:4 137:18,21 141:23 143:1, 3,7,16,19,24 149:10,14, 15 150:15,17 155:14 159:22 160:1,17 178:3 182:13,16

documentation 43:15

documented 43:11,12, 21 45:6 52:20 56:11 60:24

documenting 67:4

documents 12:3,9 13:18 21:2,5 24:13 25:6, 10,11 29:17,19 30:1,7 64:11,19 65:9 84:7,8 86:4 89:12 116:3 117:1, 10 122:14 123:1,3 124:18 125:13,17 143:10,13 144:3 171:10 172:13,17 182:10,15

door 95:7

doors 80:20 88:22

dot 120:3

download 70:1 71:6 74:2,18,19,20

downloaded 75:10,12

downloading 75:7,8,9

Drive 8:11

driven 104:10

due 144:25

duly 9:6

duplicate 141:14

duplication 126:20

duties 46:25

duty 39:23 56:24 116:19

DVR 153:5,15 154:2

DVRS 152:21,22 153:1,4, 6,8,22

--- 

E

e-mail 65:16 76:13 78:17,18 79:8,9,10,24 83:20 84:3,4,6,14,16 93:6,11 108:18 121:3

e-mailed 66:15

e-mails 64:2 68:7

earlier 27:16 56:3,23 71:11 133:6 146:24 163:9,17 164:3 182:22

early 121:15

easily 79:23 155:4

ECARF 77:17,18

effect 115:24

effective 165:17

efficient 29:18

efforts 71:22 97:4 119:14

eighth 139:18

Eischens 8:19

elaborate 18:18

electrical 48:2

electronic 77:21 78:18 79:22,24 80:20 108:18 121:11 149:24 173:11

electronically 67:7 68:1,2 104:6 173:15

Elimination 47:11

Elite 8:14

Elliott 61:16

eminent 93:10

employ 151:6

employed 34:18 36:5

employee 31:13 61:2 79:15,17 117:24

employees 50:2 52:11 53:6,21 61:9 66:20 71:1 76:23 78:11 93:24 118:10,13,15,17,22 168:15

enable 95:22

end 13:13 17:5 19:6 43:10 135:6 136:21

enforcement 21:8,16 39:22 40:3,4,6,8 41:10 42:14,23 44:13 46:7 48:5 53:2 55:17,19,21,22,25 62:10,14 63:4,18 64:5 76:16 77:3 157:12,13 158:8 182:6

engaged 56:3

English 30:14,15

ensure 175:13 176:22 177:15,20

enter 17:14 25:7 26:18 88:25 137:8 160:22

entered 117:16 134:11 137:8 159:16

entering 137:9

enters 137:3

entire 109:4,5 110:19 116:6 117:6 136:20 137:24

entrance 80:17,19 148:22 160:25

entry 30:8 80:25 134:3,4

environment 164:8

Elite Reporting Services (501) 516-5556
www.EliteReportingServices.com

i6

equipment 87:18 149:3

err 60:9

error 118:1 140:3,6,8 144:25

errors 147:1

essentially 67:14

established 11:3 53:11 107:5 131:17

Estimate 34:21 37:7

et al 8:7,8

events 73:13

evidence 49:6 57:19 78:5 153:5 174:5

exact 10:1 33:16,18 114:16

EXAMINATION 9:9 161:20 168:21 170:1 180:19

examples 43:19 45:3 47:22 59:12 146:18

Excel 67:9 144:15 149:21

exception 166:5

exceptions 58:14

exclude 73:14 74:1

excluded 160:14

excluding 73:23

excuse 110:12 130:8

execution 53:7

exhibit 10:11 11:2,5 12:1,4 14:20 15:13,15 24:9,12 25:5 26:7,12,14, 16 29:20,21 31:17 32:19 33:2,10 64:12 65:8 70:20,23 73:8 80:3 83:7 86:5 88:13 89:11 96:14, 17 103:25 106:23 107:1 108:14,17 112:25 113:3 122:15,16,17 123:14,21 125:23 126:2,6 129:1 131:6 132:25 133:3,13 137:18,19 138:2,3,9,18, 25 139:5,13,24 141:5,12 142:6 143:1,4 145:8 149:11,14 150:18,22 154:16 158:14 159:1,15,

23 160:1 162:11,14 177:7 178:7,20 179:12, 13,16

exhibits 12:8 29:25 64:18 65:11 86:9 116:3 123:6,14 125:11 131:5 133:9 140:19 145:6 162:5,17 163:6,10 178:13,19

existence 67:23

exit 80:18,19

expectation 58:22,24

expected 27:20 35:11 59:22,24 60:4

experience 66:25 164:22

expertise 35:7

explain 28:8 32:10 172:4 174:21 175:2

explained 176:17

extent 18:23 20:15 21:11 60:1 100:13 106:3 117:2 119:22 129:14 169:12 172:18 173:18 182:24 183:17

extra 86:1 141:11

extract 87:25

---

## F

F-A-T-E 96:5

facilities 52:17,18 105:9 181:17,21

facility 9:24 11:20 16:16, 21 17:14 19:8 26:4,18 34:1 35:2 37:25 39:22,24 44:19 45:2 53:22 55:23 80:12 81:2,3 83:14 84:14 88:25 89:23 95:16,17 105:9 107:14 110:16,17, 20,21 111:13,21 112:1 128:6,13 144:6 148:23 149:2 155:8 156:10 159:9 160:22 164:14,19, 20 165:10,14 168:17 170:14,21 171:4,9 177:2, 14 181:13,14,15

fact 49:5 103:3 171:16

factors 17:17,19,22

facts 57:18 78:4 174:4

fair 47:3 71:21 72:13 92:11 130:19 131:4 143:23 153:15 163:14 165:21

familiar 10:20 27:13 54:9,11 65:9 83:9,12 96:17 125:17 149:5,6 171:25

family 127:24

fast 31:25 32:1

Fate 96:5

fault 27:12

fax 66:2 71:15 92:15 177:2,5,16,18

faxed 93:5

feature 135:5,8

federal 11:4 52:25 98:9, 21 99:3,6,7,14,16,21,24 100:8,24 105:1,4 127:17 128:1 139:14 170:11

Fein 97:21

field 36:9 134:25 135:4, 18,23 136:2,6,9,14,18,25 137:6,10

fields 133:15 158:18

fifty 158:14

figure 38:2

file 78:16 117:15,18 150:25

filed 8:9

files 117:13 171:11

filled 103:24 115:7

filling 90:2 119:23,24 121:21

fills 89:18 104:3,4 113:21

financial 52:4

find 107:25 138:25 151:12

fine 27:12 28:20 55:10 86:3 120:15 134:2

fingerprinting 24:5

firm 120:21,23,25

firsthand 62:24 69:9

fit 169:8

focused 45:25

folk 52:3

folks 162:21 180:12

follow-up 180:21

follow-ups 168:23

font 142:10 162:14

forever 67:14,15

forget 39:16

form 12:23 13:6 16:1 24:14 25:16,21 26:20 27:19 28:6,7,8,10,15,21 29:8 43:20 45:17 48:15 49:2 50:3 55:8 57:12 62:13 64:1 68:3,5 74:22 78:1,4 79:2 82:11 84:9 86:23 89:4,18,22,24 90:2,3,10,22 92:7 95:15, 18 102:1 103:23 104:1,2, 3,4,5 109:11 111:4 113:5,21 114:7,8,25 115:7,20 118:19 124:3 125:14 126:24 127:6 132:6 134:16 136:4 137:4 138:5 140:1,11 145:10 146:1,12,14 153:4 155:6 156:20 157:25 158:4 160:7 169:10 182:23,25

formal 41:21 42:23 58:19

format 125:4,6 126:18 144:16,22 149:24 159:19

formats 76:12

forms 24:1 25:25 26:2,25 28:5,17 81:19 89:14 108:11 179:22

found 172:18

foundation 13:7 50:6 57:13,18 125:15 146:13, 19

frame 41:12 173:13

free 95:1,2 98:12,22 99:3 127:18,21 131:16,22

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/19 Page 55 of 67
Elite Reporting Services (615) 595-0073
www.EliteReportingServices.com

i7

**frequently** 105:6

**Friday** 8:4

**friend** 127:24

**front** 81:3,4 88:8 159:12, 13 160:25

**FTP** 76:14

**fulfill** 165:9

**full** 9:13 30:5 136:23

**function** 19:13 173:20

**functionality** 75:15

**functions** 40:1

---

**G**

**gang-style** 19:11

**gangs** 45:6

**gathering** 117:1,9

**gave** 31:18 123:10 182:21

**gender** 18:3

**general** 16:20 17:7,9 19:14 24:3,4 46:24 56:10 58:10,15,20 62:10 137:23 174:22 175:7,10

**generally** 18:22 19:9,13 24:7 31:11 34:4 47:2 58:18 63:4,17 74:11 75:13 80:19 93:5 96:17 118:24 140:5 147:12 150:7 162:8,9

**generated** 137:6

**girlfriend** 59:15

**give** 16:12 19:5 27:18 29:17 47:22 71:19 76:16 77:11 84:18 90:23 94:16 96:3 106:18 108:5 116:20 139:8

**giving** 43:19

**glasses** 27:9 133:25 136:16 139:22

**global** 109:22 110:15,23 112:6,11,12 117:25 127:4,10,12,13 128:14 129:5,10 137:24 140:22

**globally** 97:24

**goal** 112:11

**God** 72:20

**good** 8:18 9:11,12 45:2 164:20 169:3 170:13

**Gordon** 8:13

**Gotcha** 81:1 113:8

**government** 170:11

**governmental** 21:13

**grand** 62:19,25 63:5 157:13,25 158:11

**grant** 77:25

**greater** 36:8 141:21

**Gregory** 114:10 115:7, 16

**group** 37:1,5 39:15 40:19 41:1,23 44:15,17, 22,23,24 46:3,9,19 53:12,13 56:15,16 68:13

**groups** 44:25

**guess** 53:11 129:22 142:3

**guidance** 111:22

**guilty** 20:6 21:3

**guy** 22:5 46:9

**guys** 24:20 76:14

---

**H**

**Hal** 8:23 60:9 116:23 122:18

**half** 129:23

**hallway** 155:21

**hand** 10:10 11:1 126:5 177:6

**handbook** 23:21,22 30:4,5 31:1,11,20,23 32:3,4,7,8,12,14,15,16 33:21 34:6,25 38:10 39:17 88:1 91:16,17,22 92:2 176:21 177:3,12 178:9,12,23 179:3

**handbooks** 29:16 30:13,17 33:12,24 180:23

**handed** 12:8 24:11 25:5 26:3,16 29:24 64:17 86:8 96:16 106:25 108:16 113:2 123:13 141:9 149:13 159:25 178:24

**handing** 72:19

**handled** 45:23 167:24 168:1

**handles** 167:22

**handling** 72:19

**handwriting** 66:13,14

**handwritten** 159:18

**happen** 23:10 25:15 43:6 69:19 93:3 108:2

**happened** 29:9 91:14 165:2

**happening** 44:14 95:22

**hard** 30:11,12 68:3,4,9, 10,11,15 172:13

**head** 56:20,22 59:14 103:16 107:8 152:9

**heads** 56:19,20,23 58:17

**hear** 13:14 58:20 60:6 72:13 126:12 147:16

**heard** 96:6

**hearing** 126:11

**hears** 13:12

**Heather** 54:6,8,10

**held** 8:11

**helpful** 82:18

**helping** 48:13 52:7 164:19

**herewith** 144:16

**hey** 53:25 94:14 102:19

**hidden** 158:19,20

**hiding** 31:22

**high** 169:6

**highlight** 74:19

**historically** 106:6

**hit** 78:21 79:13

**Hodgson** 8:18,19 9:10 12:1,6 13:2,8 14:13,17,

23,25 16:2 24:10,18,22 25:3 26:15,22,23 29:23 31:25 32:2 33:17,19 45:19 46:13,17 48:17 49:7,10,13,16,18 50:4,12 51:5 55:9,16 57:7,8,14, 22 62:5 64:15,16 70:8 75:1,3,11,14 78:6 79:3 80:1,4 82:2,4 83:4,8 84:24 85:25 86:7,24 89:10 90:14,17,18 92:9, 19 95:20 96:15 102:3,8 106:24 108:15 109:13 111:6 113:1,16,17 114:9 116:12,24 118:20 119:17 120:6 122:7,18,23 123:2, 6,11,12,16,20 124:4,9,21 125:16,21 126:13,14 127:2,7,8,16,20 128:19 129:11 130:3,8,10 132:7, 20 134:21 136:5,13 137:5,22 138:7,18,22,24 139:10,12 140:7,14,18 141:16,18 143:5 145:13 146:6,17 149:12 150:19 151:22 153:7 156:21 157:8 159:24 162:25 168:22 169:15 174:4 178:3,15 179:6 180:20 182:14 183:2

**holding** 23:12 28:4

**home** 52:3 183:19

**honest** 46:22

**honestly** 98:9 106:16

**house** 18:1 19:15 20:16

**housed** 18:15 22:21 23:12 24:2,4 52:18

**houses** 19:11

**housing** 16:24,25 17:1, 5,6,7,8,19 19:3,6,7,8,16 22:20,22 25:14,19,21,25 81:11 88:15,16 99:25

**Hoyle** 176:14

**human** 106:8 118:1

**humans** 106:8

**hypothetical** 98:13,14

---

**I**

**I-D** 34:15

**ICS** 74:4,24 75:4 79:7 100:18 101:3 103:12 109:6,14 112:16 122:12 142:8 162:12,16 166:19, 21 167:22

**identified** 44:25 58:11, 23 70:14 74:1,17,21 75:22 76:3 97:9 158:17

**identifies** 59:4

**identify** 20:19 56:4 71:1, 22 91:23 113:3

**identifying** 99:20

**imagine** 51:7 100:8

**Immediately** 54:23

**implemented** 99:3 121:20

**important** 20:10,12

**inability** 94:22

**inadvertently** 145:1

**inappropriate** 180:7,13

**incarceration** 114:16

**incident** 52:19 152:11

**incidents** 171:3

**include** 177:17

**included** 24:15 69:15 87:15 101:5 145:1 178:11

**includes** 179:24

**including** 173:12 175:8 178:13

**inclusive** 24:17

**incoming** 111:14

**indicating** 26:1 66:15 76:3 81:16,20 82:12 84:6 86:19 93:11 104:12 126:6 136:20 141:2 142:11 179:11

**indication** 120:2

**individual** 102:5 150:4, 11,13 181:12,14

**individuals** 18:1 22:21 40:22 84:12

**inform** 30:25 175:22 180:24

**informal** 41:9 42:23 64:8,10 68:6 157:21 158:5

**information** 35:14 41:7, 10 42:24 50:17 55:12,15 63:19,21 64:6,22 65:6 67:13 71:2,15,16,25 74:2 76:17 90:7 94:17 95:3 100:21 103:23 104:15 121:8 130:25 136:22 159:15 161:1 162:11 163:20 171:8,12 172:15 177:18

**informational** 65:6 148:18

**informed** 56:13

**informing** 69:22

**initiate** 85:8 147:23 175:22

**initiated** 124:8 171:25

**inmate** 12:12 17:13 20:20,25 21:1 27:1,8,19 28:2,3,5,6,7,8,14,15 30:4,25 31:1,3,4,6,7,11 39:10 44:18 53:25 59:14 69:20 71:9,17,18 72:4,7, 8,10,11 74:14 85:7,21 88:20 90:6,15,19,22 93:13 95:1 97:16 99:25 104:1,2,3,10 109:3 113:6,7 117:13 160:15 164:13,24 167:17 173:4, 9,19 174:18,25 175:3,9, 14,16,18,22 176:1,11 177:11,12 179:22

**inmate's** 74:12 88:5 176:22

**inmates** 20:2,7,17,23,24 21:10 22:13,23 24:1 30:23 40:9 51:25 92:18 100:3 102:13 109:24 146:25 147:1 160:10 175:8,11,24 176:17

**inmates'** 60:22

**inside** 55:22 95:1,17 155:8,11,24 173:8

**install** 154:4

**installed** 151:23 152:3 153:23

**instance** 96:23

**instances** 91:13 119:4 168:14

**institution** 24:6 35:1,4

**instruct** 122:5

**instructed** 110:10 142:17

**instruction** 122:8

**instructions** 111:2,5,7, 25

**intake** 17:15,16 23:6 24:7 25:6 26:17 27:1 28:3 30:12,20 89:3

**intended** 69:24 131:18

**intent** 112:7,8,12,13

**interacting** 42:13

**interaction** 52:10

**interest** 35:6

**interface** 50:14 74:10 75:4

**internal** 170:24

**internet** 50:13

**Interruption** 51:4

**interview** 23:15,16

**introduce** 8:16

**inventory** 23:19

**investigation** 21:6 40:3 44:10 53:1 56:4 152:14 170:17,22 171:3

**investigations** 39:11 44:4,18 47:9,10,11,12,14 55:21,22 170:24 171:5

**investigative** 55:6,18 63:10

**investigator** 38:12,22 39:8,10,11,19,21,22,23, 24 40:5,7,12,15 41:8 42:1,12,15,22 43:16,24, 25 44:3,18 46:6 47:6,9, 14,24 48:12,21 53:13 56:17 58:5 59:3 70:4 88:9

**involved** 22:15 36:24 39:16 44:20 53:16 105:10 116:25 132:11 142:12 143:15,19

**involvement** 45:6

**Isaac** 9:22

**issue** 18:4 20:18,19 31:9 56:21 61:6 139:22

**issued** 63:14 151:20

**issues** 44:17 169:9 172:3

**ITE** 136:15

**items** 69:6

---

### J

**Jason** 51:14 83:20 124:25

**job** 43:3 54:23 165:18

**Johnston** 9:22,23 10:5 38:18,19

**join** 49:4 99:15 146:16

**Joseph** 8:19

**Josh** 85:25

**Joshua** 8:21 161:22

**Joy** 8:13

**judge** 63:12,15

**July** 178:8,9

**jury** 62:19 63:1,5 157:14, 25 158:11

**Justice** 66:4 73:20

---

### K

**Kansas** 8:24 100:5 120:25 139:14

**keeping** 171:22

**Kennedy** 8:14 9:1

**Kenneth** 36:2

**Kenny** 39:5,6

**kind** 16:22 43:17,18 62:17 79:5 87:18,22 139:5 171:17

**knowledge** 24:25 69:9 71:10 126:15 129:13 134:5,7 141:22 143:19, 21 150:22

Elite Reporting Services (850)596-6900
www.EliteReportingServices.com

Kyle 65:23

---

**L**

L-A-J-I-N-E-S-S 36:4
lack 13:6 125:14
Lacks 50:6 57:13,17
laid 146:13 181:25
Lajiness 36:2 67:12 171:17 172:12 182:2,6, 17
Lance 8:19
language 11:12 12:20 13:3,10,14 15:4,13,20 30:22,24 31:3 33:12,13, 16,18,20,25 34:1,3 35:10 36:24 38:9 50:15 85:22 87:21,22,25 88:1,3,4,6 177:8 178:1,6,11,19,25 179:8,18 180:22 181:3
Languageline 30:25 31:4
languages 28:22 30:14 89:4,6
Largely 62:16
late 74:25 85:17
laughingly 83:11
law 11:14,17 21:8,16 39:21 40:2,4,5,8 41:9 42:14,23 44:12 46:7 48:5 53:2 55:17,19,21,25 60:8 62:10,14 63:4,18 64:5 76:16 77:3 120:21,23 157:12,13 158:8 182:6
laws 169:14
lawsuit 16:8
lawyer 61:12 173:25 174:1,14 176:12
lawyers 174:11
lay 146:19
layer 91:2
layout 16:20
leaf 161:2
learning 31:9 61:10,11, 14

leave 36:7
Leavenworth 9:18,24 16:16,18,22 18:16 22:19 23:7,10 25:7 26:4,18 27:17 30:8 34:19 36:20 37:25 39:9 40:23 53:22 56:9 76:22 77:12 80:11 81:2 84:13 89:23 107:14 110:19,21 114:22 120:25 144:6,21 149:2 153:12 154:23 156:10 163:21 164:23 165:13,22 167:13 168:11,16
Leavenworth's 167:19
left 36:10 81:17 99:14 133:18 172:18
legal 69:21 120:4,20 142:19,20,24
legitimate 169:19,20
letter 105:21
letterhead 98:15 104:10, 13,16 177:17
level 18:2 109:20,21 110:15,16,17 112:1,2 117:25 128:6,13,14 142:18 154:10
levels 109:10
liaison 39:21 40:2,4 46:6 52:9 147:5
likewise 111:16
limit 156:25
limited 117:2
Linda 8:6 9:5,15
lines 92:18,20 97:19
links 76:14
list 66:16 99:22,24 100:6 120:10 121:9,10,12 126:19 129:5,10 154:19
listed 73:21
listen 42:2 55:13 57:9 59:18
listened 70:13 165:6
listening 56:6 57:2 58:11 59:3 70:16
listings 140:22 144:25

lists 140:21 144:17
litigation 10:11 125:8
live 42:4
lobby 81:4
local 101:5 120:19
locally 53:20
located 80:12 81:1,13 155:24 172:19
location 10:17
locations 84:13
log 66:24 67:5,6,8,13,22, 24 68:6 78:15 105:23 117:15,18 149:18 159:8 161:3 171:17,24 172:1,5, 8,23 182:12 183:11
logbook 160:24,25 161:1,6
logs 105:17,20 171:8 182:1,5
long 9:19,23 19:20 34:20 35:23 36:12 37:4,13,22, 24 39:2,6 54:25 61:17 67:16 91:11 103:2 121:14 133:2 152:18
long-term 107:21
longer 33:20 136:9
longest 106:19
looked 17:18 98:10 100:2
loose 161:2
lot 41:20 45:2 72:23 115:13 133:22 136:17

---

**M**

M-E-D-L-I-N 130:6
machine 155:10
made 13:12 60:13 86:17, 21 91:18 93:7,12 94:10 97:6 109:2 110:11 112:6 134:3 168:15
mailbox 93:9
mailroom 39:12 40:20, 21 41:4,24 42:10

maintain 21:2 48:13 76:19 77:11 79:19 117:15 150:8,11 169:3 172:23
maintained 67:6,13,16 68:1,2,4,10 78:15 150:21 152:18,23 153:10 159:18 172:19 182:2,5,10
maintaining 68:2,25 165:9,14
maintains 78:25 79:21 160:24 182:17
majority 130:13
make 12:22 15:11 22:9 29:18 40:25 43:18 54:2 69:18 76:20 92:16 93:14 97:17 100:11 106:8 119:14 134:19 150:10 176:7
maker 131:19
makes 39:23 72:8
making 53:16,23,24 173:19
manage 52:7
managed 156:11,13
management 20:21 31:12,13,14 46:5 95:25 154:6,7
manager 31:15 34:9,10 54:5,18,19 55:3 61:10, 11,15,21 93:18,19,20 175:20
manager's 96:8,11,25 101:20
managers 38:21,22 96:1,2,4
manual 75:17
mark 26:7,11 122:10
marked 10:11 11:2 12:4 24:9,12 26:14 29:20,25 64:12,18 80:3 83:7 86:5, 9 96:14,16 106:23 107:1 108:14,16 112:25 113:3 122:15 123:9,13 141:7 143:4 149:11 150:18 159:23 160:1 177:7
Marriott 8:11

**marshal** 18:12 63:21 64:23 65:7 72:18 166:2 169:4

**marshal's** 109:20

**marshals** 11:4 20:5 22:15,23 77:9 109:25 146:25

**marshals'** 22:25 70:22

**Martin** 8:21 13:6 16:1 48:15 49:4 50:3,6 57:12, 16 70:7 74:22 79:2 86:3 92:7,11 102:1,6 109:11 111:4 118:19 122:21 124:3 125:14,19 126:24 127:6,15 129:7 132:6 134:16 136:4,7 137:4 138:5,20 140:1,11,16 145:10 146:1,14 161:21, 22 163:3 168:23 169:23

**matched** 137:12

**matter** 8:7 35:6 173:1

**meaning** 18:6 72:9 96:1 100:18 102:18 103:12 119:23 135:22 137:15

**means** 20:6 81:24 133:19 134:25 135:20 136:3,25

**medical** 18:3 23:25 24:1

**medicine** 133:23

**Medlin** 129:25 130:1,4,5

**meeting** 27:23 58:17 88:21 149:8 153:2,16 154:5,19,22 159:2 169:13 181:18,21

**meetings** 53:8 56:20,22 57:1

**Meltzer** 8:23 12:23 14:10,14,19,24 24:14,21, 24 26:19 33:16 45:16 49:2,5,8,12,15 55:7,10 57:17 60:9 64:14 75:9 78:1 79:25 86:22 90:9,15 95:14 113:14 114:7 116:10,14 122:2 124:6 130:2,7 138:16 139:8 141:15 146:16 151:16 153:3 156:19 169:10 170:2 174:6 178:5,17 179:7,13,15,17 182:1,12, 23

**member** 28:2,16 35:5 54:14 95:22 173:6 174:12,14 175:15,19,20

**member's** 93:9

**members** 95:24

**memorandum** 160:5,9

**memory** 36:18 67:11 154:2

**mention** 175:10

**mentioned** 22:12 40:2 44:8,11,12 47:5 58:10 76:8 98:20,21 101:3 131:22 174:17 176:9

**message** 15:19 72:11, 12,13 161:9,14

**messages** 72:13

**messed** 27:3

**met** 161:23

**method** 102:16

**Michael** 8:18

**Microsoft** 79:9

**middle** 60:12

**midst** 60:11 94:10

**mind** 40:1 75:2 94:13 102:17

**minimum** 129:17

**minute** 64:24 156:25

**minutes** 84:18

**mischaracterize** 42:18

**Misconduct** 171:1

**misinformation** 19:5

**mislead** 19:4

**misleading** 183:1

**missed** 139:16

**missing** 97:11

**Missouri** 8:10,24 100:5

**mistakes** 106:8

**mix** 19:16,25 22:1

**mod** 38:9

**modifications** 35:10 119:8

**modifying** 36:24

**moment** 18:10 21:15

**monitor** 11:15 157:4 176:3

**monitored** 11:17 28:9, 12 32:23 33:6,14 173:16 179:5

**monitoring** 11:19 13:19, 25 14:4 15:7,21,24 23:23,24 27:7 82:16 147:13 148:9,12 173:11, 12 174:20 179:5,10,19, 23

**months** 55:4 108:3,4,7 120:8

**moved** 87:24

**moving** 87:19

**multiple** 28:21 30:14 44:8 89:4 105:8 112:17

---

## N

**names** 129:15

**narrow** 31:8

**Nashville** 8:12

**native** 126:18 144:15 149:21

**natives** 122:19

**nature** 46:21

**navigate** 50:9,11

**necessarily** 41:10 126:4 131:6

**needed** 70:15 94:7 100:21 101:4 111:22

**nods** 103:16 107:8 152:9

**noncompliant** 167:5,10

**normal** 115:22

**note** 69:14 137:10

**notice** 10:16 11:18 15:6 23:22,23 27:18 28:8 72:7 85:7 113:6,11,20,25 115:16 133:1 174:19

**notices** 16:4 88:14

**notification** 148:3 174:22

**notifications** 15:23

**notified** 147:12 174:18

**notify** 69:20 82:15 88:5

**notifying** 23:24 84:4 160:6

**number** 8:8 12:4 17:17 20:7,8 24:9,19 26:14 29:20,21,22 43:5 54:1 55:1 58:23 59:6 64:12 71:7,8,9 73:25 74:1,17, 21 79:25 80:3 83:7 85:14 86:5,14,20 89:19,20 90:5,11,12,24 92:6 93:21 96:14 97:10,23,24 98:7 99:1 100:21,24 101:24 102:17,20 103:3,4,19,20 104:17 105:22,23 106:23 107:7 108:14 109:3,8,19 110:3 112:25 113:13,15, 18,25 115:17 117:16,25 118:4,7,11 119:12,25 122:15,16,17 123:18 133:7 134:22,24 135:1,7, 9,21 137:9,11,13,14,16, 17,20 138:21,25 139:8 143:4 144:1,16,24 146:8 148:16 149:11 150:18 159:23 175:15,16,17 176:7,11,12,24 177:2,5 178:21

**numbering** 27:3

**numbers** 11:8,9 12:2 19:19,22,25 27:4,11 57:11 64:14 73:5,14,21 74:13,14,15 75:19,22,23 76:1,3 85:9 91:4,8 95:2 97:4 98:10 99:21,23 100:1,2,7,9,12,18,22 101:5,7,10 102:10 104:13,25 105:3,4,18 107:4 108:10,19 111:9 115:13 116:8 118:23 119:9,15 120:15 121:6 123:17,23,24 126:19 127:18 129:6,10,15,17 131:4,24 132:11 138:2 139:4 140:3,4 142:6,7 144:17,19,23 145:6,12, 19,22,23 146:2,7 161:13 163:22 168:8 175:12,23 176:19 177:9

**numbing** 75:2

**numerical** 122:25

138:11 139:6

**numerically** 75:19

---

## O

**oath** 62:7 85:1 132:23 157:9

**object** 12:23 24:14,16 26:19 45:16 49:2 55:7 78:1,3 79:2 86:22 90:10 95:14,18 114:7,8 153:4 156:19 169:10 182:23,25

**objecting** 146:12

**objection** 13:6 16:1 48:15 49:11 50:3 57:12, 16,17 74:23 92:7 102:1,7 109:11 111:4 116:22 118:19 124:3 125:14 126:24 127:6,15 132:6 134:16 136:4,7 137:4 138:5 140:1,11,16 145:10 146:1,15 162:25 174:4 178:3,16 179:6

**obligations** 167:11 169:13

**observe** 95:22 164:12

**observed** 96:4

**observing** 173:18

**obtain** 76:17 131:13

**obtained** 79:23

**occur** 93:25 171:4 173:4

**occurred** 43:5 73:6 152:12,13

**occurring** 173:12

**occurs** 174:9 180:3

**October** 43:4 176:10

**offenses** 45:7

**office** 11:4 60:9 68:14 69:1 77:7 84:1 85:5 93:4 94:15 96:8,11 97:1 98:10 99:4 100:9,25 101:20 105:2,5 107:18 137:12, 16 140:5 157:24 158:9 173:5,6 177:14,17

**officer** 39:23 40:2,3 53:25 54:4,24 56:24 160:23

**offices** 95:4,6,7,11 99:24 100:9,10 173:2

**oftentimes** 20:21 52:4 72:24

**one-on-one** 28:1 175:9, 16

**ongoing** 116:21

**operated** 156:10,11,13

**operational** 53:17,23 54:3

**opportunities** 36:9

**opportunity** 164:12

**opposed** 53:21 92:22 150:14 173:6

**opposite** 155:21

**option** 29:3

**order** 45:2 138:11 151:11,19 164:20 170:13

**ordered** 151:10

**ordinary** 165:23 167:19

**organized** 106:4

**orientation** 23:21 25:14 30:19 31:2 148:10 174:20,21 175:4,25 176:1

**original** 100:23 133:1 145:1

**originally** 125:3 149:22

**outgoing** 144:20

**overbroad** 45:17 86:23 169:11

**Overland** 121:1

**oversees** 39:10

**overwriting** 152:21

**overwrote** 152:21

---

## P

**P-U-E-D-E-N** 82:2

**p.m.** 8:5 62:1,4 84:20,23 132:16,19 157:4,7 183:21

**packet** 24:20,25 25:2

26:17

**packets** 148:19

**pages** 114:4 126:17 141:6

**papers** 94:12,15

**paperwork** 20:25 51:19

**paragraph** 14:11 33:5

**parameters** 111:2,25

**paraphrase** 12:19

**Park** 121:1

**part** 18:16 20:17,18 24:25 25:1,5 53:12 101:11 146:14 180:14

**parties** 77:25 147:12 170:4

**parts** 109:24

**party** 12:17 13:4,12,14 65:25 72:12 78:3 148:7 180:14

**pass** 80:18

**passed** 10:12 11:5 133:25 137:21

**passing** 180:12

**past** 81:3 100:20 101:2,4

**patience** 162:1

**PDF** 144:22,25

**people** 19:11,12 21:16, 17 30:21 36:23 40:16,18 43:25 45:3,4,5,7,10 48:1 50:8 52:17 53:9,15 58:16,17 77:22 108:9 111:8,12 118:21,24 132:10 140:23,24 145:16 147:7 159:8

**period** 18:14 20:3 22:13 35:17 38:14,16 48:18 57:21 68:24 103:10 146:23 155:16 161:15 171:22

**periodically** 119:14

**periods** 103:11

**person** 21:2 35:15 40:7, 21 41:22,23,24 43:16 44:12 47:12 51:12 59:3,7 77:16 78:20 79:18,19,21

80:18 90:23 105:15 111:11,14,15,18,21 128:10,11,24 130:18 131:1 135:6,12 137:8 141:24 163:25

**personal** 23:17,18,19 27:5

**personally** 94:11 98:25 100:2

**personnel** 48:22 163:21 164:19,23 165:5,23 168:12,17

**persons** 58:6

**peruse** 64:24

**phases** 175:6

**Phelps** 107:20,21 150:7, 8

**phone** 12:13,21 13:5 29:13 40:7 42:2 44:10 52:13,15,20 53:8,17 54:1 55:14 57:11 60:11,12 62:11,14 64:3,4 66:16 70:14,15 71:24 72:5,9, 17,24 73:1,5 74:13,14, 15,17,21 75:22 76:3 85:9,13 86:20 92:5,22 93:1 94:16 95:2 97:10,19 98:7 99:3,23 101:19 107:3,6 109:3 110:20 111:8 115:17 119:9 121:3 123:23,24 129:16 134:24 142:7 144:6 147:15,16,19 148:1 168:25 169:18 171:10 174:14 175:23 176:18

**phones** 21:20,24 28:9 54:3 57:24 81:19 88:17 97:8 179:19

**phonetic** 35:21 39:5 51:14 54:6 120:17

**photographs** 80:3

**physical** 182:13,15

**physically** 26:3 81:1,13

**pick** 12:21 13:5 167:15

**picture** 24:5 45:14 80:9 81:10 82:6,7,8 136:23

**pictures** 80:5

**piece** 163:19

Case 4:16-cv-00947-SBB Document 70-4 Filed 05/31/16 Page 60 of 67
*Elite Reporting Services* • (651) 595-0303
www.EliteReportingServices.com
i122

**PIN** 71:8 175:15,16,17

**place** 11:21 56:9 110:5
149:19 172:1

**places** 173:23

**placing** 45:10 175:14

**plaintiff's** 178:13

**plaintiffs** 8:20 170:4

**plaintiffs'** 143:12 178:24

**platform** 48:14,23 49:9,
20,24 50:2 51:1 52:8
57:5,15 74:4,7,24 75:17
76:1,24 77:2 78:8 79:4,
20 92:8,10 97:5,25
112:16,18 115:24 118:8,
24 119:10 122:12
124:15,16 126:23 131:14
132:5 135:9,13 142:8
163:23 167:22,25 168:8

**play** 161:17

**played** 72:11 161:15

**pled** 20:6 21:3

**pod** 16:21 17:6,19 21:22,
24 22:2 25:19,21 31:2

**pods** 16:25 17:4,5,6,8,12
19:6,7,8,16 21:23 22:22
23:1 25:14 81:11 88:15,
16 144:21

**point** 56:6 82:9 91:10
115:25 116:17 147:8
148:25 172:18 175:19
181:1

**points** 80:17,25

**policies** 27:17 53:7
86:11 87:1 102:4 110:5,8
147:19

**policy** 34:1 43:21 56:8,
11,14 58:10,19 85:19,22,
23 86:14,15 87:3,12,13
88:2,10 91:3 93:23 94:1

**population** 17:8 19:14
24:3,4 85:7,22 160:6,11,
15

**port** 80:10,14,15,16
155:7

**portions** 30:4,6 32:6,7

**posing** 45:1

**position** 9:16,19 34:20
35:20 54:17 61:18
105:15

**possession** 107:17

**Possibly** 38:12 106:14
154:8

**post** 18:6,16,21,24
21:10,18 22:1

**posted** 83:15,16 88:14
99:24

**potential** 11:18 15:7,24

**potentially** 171:10

**practicable** 18:23 19:17,
18 20:15 21:11

**practice** 20:24 35:5
56:10 58:20 60:10 76:2,5
111:10 174:11,13 175:10

**Praeses** 48:8,13,23
49:9,19 50:25 51:7,11,12
52:6 76:23 78:13 100:19
101:16 104:6 105:11
118:15 128:9,23 131:3
142:3 147:5 156:13
167:21,24 168:14

**PREA** 47:11,13

**preconviction** 18:15,25
21:10,18 22:1

**predecessor** 9:21 36:1
39:4

**preferences** 87:17

**preparation** 106:17

**prerecorded** 15:19
161:9

**prescribes** 52:25

**present** 178:18,19

**presentence** 21:6

**pretrial** 18:6

**pretty** 77:6 151:17 157:2
161:2

**prevent** 135:6

**previous** 11:9 43:25
114:25 150:14

**previously** 10:10 11:2,3
22:12 39:20 63:24 74:6
111:19 144:22 145:19

**primarily** 92:13 121:2

**primary** 39:25 46:6
152:6

**print** 129:18 141:3,4
142:9 177:19

**printed** 125:4

**prior** 10:5 21:6 36:14
37:16 44:3 54:22,23
61:18 67:20,23 72:19
91:3 99:2,5 103:17 104:9
151:10 164:4 182:5

**priorities** 165:12

**priority** 168:24 169:2,6

**prison** 22:4 45:8 47:11

**prisoners** 19:24

**Prisons** 22:24 99:6,8,14,
16 164:5 181:11

**privacy** 110:10 111:3
112:1 119:8

**private** 23:16 28:1 31:5
58:23 89:20 90:1,5,11,24
91:5,9 93:1 96:7,10 98:8,
10,11,22 101:19 109:25
110:19 115:18 116:9
117:16 118:4,5 119:15,
25 129:6 131:24 135:18
166:6,16 167:1 175:1,17

**privatization** 57:4,11,25
73:5,13 85:8,13 90:20
101:22 105:18 106:2,11
107:13 110:15 111:24
112:6,17 113:8 117:7
126:22 127:4,5 128:5,13
131:10,13 142:7 147:22
148:4 162:6 163:5
167:22,25 168:15 177:8

**privatize** 75:25 76:2
86:20 97:4,24 98:7 99:21
109:8,19 148:15 163:22
176:24

**privatized** 59:7 71:17
90:12 92:6 101:25
104:14 107:7 108:20
109:3,4 113:13 114:1
117:24 118:8 119:13
120:10 121:10 123:25
129:10 131:21 135:21
161:13 168:8 175:13,23
176:13 177:9 180:25

**privatizing** 105:22 111:8
176:7

**privilege** 59:23 60:22,23
122:4 177:15

**privileged** 59:11 115:19

**problem** 22:6,11 126:10

**procedure** 43:22 177:21

**procedures** 11:20 69:23
84:6 102:4 110:5,8

**process** 13:10 17:15,16,
17,18 21:3 23:6,15,16
24:7 27:1 28:1,2 29:2
30:12,19 39:17 40:11
43:6,7,11,13,14 44:13,
22,23,24 45:9 71:14
75:5,8 77:16 85:10,16
86:20,21 87:14 88:12
90:16,20 91:1,2,23 99:2
100:4,20 101:5 102:20,
25 103:2,13,18 104:7
105:11 106:17 113:20
115:22 120:5 121:20,22
131:12 148:10 156:24
160:7 174:21 175:4,6,17
176:1,14,16,20

**processed** 41:22 115:17

**processes** 40:12 131:14

**processing** 43:7 102:13
107:19

**produce** 73:1 144:3

**produced** 24:20 144:16,
22 145:19 162:6

**production** 116:13
122:22 125:5 136:10
143:13 145:2

**program** 50:8 111:20

**pronouncing** 51:14

**proper** 72:5

**properly** 28:11,13 69:21

**property** 23:18,20 27:6

**proposal** 166:22,24

**prosecution** 40:6

**prove** 55:14

**provide** 11:18,19 15:6
111:7,21 164:14,17

*Elite Reporting Services* (615)595-0073
www.EliteReportingServices.com

**provided** 12:13 28:21 67:1,5 157:12,23 158:8 179:23

**providing** 111:8

**public** 70:5 92:22 98:9, 21 99:4,21,24 100:8,25 105:4 128:1

**published** 32:8,9

**pueden** 81:23 82:2

**pull** 28:3 74:12 120:1 131:15,19 141:25 178:14

**pulled** 124:11 125:1,3 128:10,11,24 130:18,19, 23 131:1 132:1 140:23 141:1,21 142:1,2,3,18 145:16 146:22 147:7 151:20 162:21

**pulling** 124:12,17,22 132:11 142:12,16

**purposes** 16:17 33:15 63:5,10 94:21 164:25 170:18

**pushed** 87:19

**put** 24:5 27:18 72:7 88:1, 6 100:18 106:10 153:22 165:13

---

**Q**

**Q-U-I-N-N** 39:1

**qualified** 32:10

**quality** 34:8,10

**quarters** 138:14

**question** 12:24 15:10 24:15 25:12 26:20 45:17 46:23,24 49:3,12 51:24 55:8 68:25 71:18 72:16 73:11 78:2,4 90:10 95:19,23 97:20 98:4,6 107:12 112:22 119:16,21 125:23 145:5 147:2,4 153:5 155:16 156:20 161:15 169:11 182:24,25

**questions** 9:10 22:7,8 24:1 86:23 161:18,21 162:2,5,8 163:9,12 168:19,22 169:22 170:2, 5 180:16,17,20 182:20 183:16,18

**quick** 139:2

**Quinn** 39:1,2 121:22

**Quinn's** 43:2

**quote** 37:19

---

**R**

**R-E** 34:13

**R-E-E-D** 34:14

**R-E-I-D** 34:16

**raised** 56:21

**ran** 69:3,10 102:18

**range** 95:1,2 172:7

**rank** 165:12,15

**Rape** 47:11

**Rapp** 114:10 115:7,16,21

**reach** 148:14

**read** 11:23 14:1 28:7,14 30:17 31:9 32:25 33:8 81:21 82:20 119:17 144:7 145:3 177:7 178:1

**reads** 13:18 32:22 119:20 144:15

**real** 121:1 139:2

**realistic** 101:11

**reason** 20:17 24:2,3 52:24 86:1 94:7 117:23 152:5,16 155:17 161:16, 17 169:16,17,19,20

**reasonable** 96:6

**reasons** 21:14 32:24 33:7 44:6 52:22 94:19 140:10,15 152:6 158:7 161:14 170:9

**recall** 9:25 18:9 37:14 50:9 56:2,7 62:11 84:11 106:20 109:22 153:23 161:8 162:7 163:12 166:21 170:18 171:14,19 181:22

**receipts** 65:17

**receive** 13:4 32:15 55:13 62:14 68:17 69:25 84:2 111:13,15 113:25

**received** 55:15 62:18 65:23 76:7 84:3,4,7 97:3, 23 110:12 111:24 115:16 116:7 129:3 144:4 172:14

**receiver** 135:11

**receives** 25:6

**receiving** 13:4,13 23:11 111:18

**recently** 20:1

**receptionist** 93:6,10 107:20 150:7 159:13

**recognition** 52:2

**recognize** 58:20 83:1 130:4

**recognizes** 105:3

**recollection** 84:3

**recommended** 121:23, 24

**record** 8:4 9:14 11:15 14:17 22:9 24:18 52:13, 23 62:1 66:2,20 78:25 84:20,23 89:15 103:25 112:9,14 123:16 125:25 128:20 132:16,19 136:8 137:20 145:7 156:6 157:4,7 166:2,10,15,25 167:4,15 169:17 175:12 182:10

**recorded** 16:10 28:10 32:23 33:6,15 42:4 52:15 55:5,12 66:23 72:6,9,14 144:19 152:22 153:17 170:9,17 174:23 176:3,6, 19 177:14,22

**recording** 13:19,25 14:3 15:21 23:25 53:8,16,17 66:16 70:15 71:3 135:22 144:5 147:13 148:9,12 151:6 156:9,16,22 167:17 168:25 173:12 174:19 176:2 179:24

**recordings** 57:3,10 66:17 67:2,3 69:16 76:8, 11 157:11,23 164:13,14, 24 165:19,22

**records** 43:18 62:10 65:17 67:25 68:22 77:11 78:15 79:19 117:19

152:24 167:14,16 170:21 171:10 182:7

**red** 120:3

**redundant** 153:15

**refer** 33:3 132:21,25 142:25 143:23 154:16

**reference** 60:13 88:4 152:11

**referenced** 41:21 52:21 56:23 76:13 87:2,4 146:21 158:1 183:10

**references** 28:11

**referencing** 65:18 88:7

**referring** 11:8 13:21 33:13 90:13 103:11,25 141:5 145:25 146:8 164:1 170:23 171:5 172:9 179:9

**refers** 40:5

**reflect** 86:11 130:14 144:4

**reflects** 85:18 107:9

**refuse** 29:5,6,11,14

**regard** 62:4 75:6 82:19 172:24 177:11

**regular** 47:10 100:15,17

**regulations** 52:25 169:14

**Reid** 34:11,12,13 36:25 38:8

**related** 35:12 45:25 46:3, 5,25 47:14 62:11 87:3 175:3

**relates** 174:22

**relationship** 169:3

**relevant** 18:14 22:13

**rely** 73:4,11 165:23

**remain** 118:5 119:15

**remainder** 107:17

**remains** 112:8

**remember** 87:15 88:19 91:20 99:2 109:23 110:1, 3 135:17 171:11

i14

**remove** 89:13

**repairs** 48:3

**repeat** 14:2 119:16 138:20

**rephrase** 15:10 53:10 87:1

**report** 21:6 127:4 128:5 130:18,20,22 131:7,13, 16,19,25 134:13 158:24

**reporter** 8:13 12:1,7 26:11 32:1 46:11,15 57:6 81:25 83:5 89:8 119:20 123:8 124:19 126:10 128:17 146:3

**Reporting** 8:14

**reports** 40:16 56:17 58:18 127:1 131:10 137:25 142:13,16,17 145:16,17 146:22 147:7 162:6 163:5

**represent** 8:17 59:16 124:2 126:21 129:2 142:7 143:6 161:23

**represented** 137:2

**represents** 126:1 136:6, 18

**request** 43:19 63:19,21 64:23 65:6,7,16,23 66:7, 15 73:15 76:7,9 85:8,13 90:11 91:4,6,7,10,24 92:13,25 93:4,7,12,14 94:9 96:7,10,21 97:3 100:25 101:21 104:22 107:3,6 108:18,19 109:2 110:11 111:23 112:5 113:8 114:11,20 127:24 143:8,12 144:1 147:21 148:4 166:22,24 176:8 177:1,13,16,17,22

**requested** 67:4 71:25 72:18,24 97:5 138:1 140:12

**requesting** 71:3 116:8 171:9

**requests** 41:9,21 42:23 55:25 62:10,14 63:25 64:8,10 66:21 68:6 70:23 73:20,24 92:15,25 105:19 106:2,5,11,17 107:10,13,17,18,19

**response** 76:9 128:15 144:11 145:18 166:22 183:16

108:25 116:4,7 117:7,17, 21 131:9 144:4 157:21 158:5 171:8,12,18 172:14,23 182:6

**required** 15:24 166:1,10, 15,25

**requirement** 15:5 98:24

**requires** 21:9

**respect** 33:10 35:3,9 38:10 40:4 44:9 48:18 81:14 87:13 116:2 129:1 133:9 161:9 162:21 166:19

**respects** 116:2

**respond** 43:14 48:4,6 79:11 111:10 120:14 171:18

**responded** 43:20,21 66:20

**responding** 41:9 42:22 44:12 55:25 70:20,22 73:3 182:19

**responses** 143:11,12 182:21

**responsibility** 50:21 88:5 104:7 106:10 176:22 177:20 180:24

**responsible** 34:5 41:8 42:22 43:17 48:12,22 53:7,22 61:8 83:17 117:9 124:17 150:5

**rest** 26:7,12 61:22

**restricted** 29:13 115:18 177:23

**restrictions** 21:13

**restrictive** 17:8,9

**results** 126:1,9,16

**retired** 99:16

**retrieve** 131:20

**retrieved** 131:8

**review** 21:6 39:17 72:17, 25 73:2 120:13 143:15, 19

**revised** 86:16 87:6,12 88:11

**revising** 32:11

**revision** 88:12

**revisions** 33:24 34:25 86:17

**Rice** 8:24

**Richardson** 10:6 154:8, 9

**rights** 60:22

**Robert** 39:1

**role** 35:24 36:12 37:4,11, 22 38:3 39:2,6 42:12,16 45:12 51:22 54:20,22 61:20 100:19 106:9 165:9 180:4

**room** 61:22 69:3 80:10, 11 88:21 93:24 94:2,3,8, 17 95:18 149:20 152:8 153:16 155:14 156:1,4 158:17,18 159:2 174:2,3, 13,15 179:19

**rooms** 149:1,4,8 151:7, 24 152:12 153:2,6,8 154:5,14,19,20,23,25 155:2,4,13,17,22,25 156:9,15,18 158:21,23 160:18 181:18,21,24

**rounds** 39:23 53:24

**routine** 120:5

**run** 128:5

---

**S**

**safe** 114:21 183:19

**safety** 20:18 52:16,21 152:4,10 164:17 165:9, 14 169:8 170:13

**SAITH** 183:22

**sake** 25:4

**sally** 80:10,14,15,16 155:7

**sanctions** 29:11

**Sandage** 8:19 116:22 179:12

**Sandra** 61:16

**Sara** 17:6

**saves** 150:24

**saving** 134:20 150:14

**scrambled** 136:22

**screen** 8:5

**screening** 28:3 30:20

**scroll** 138:14

**search** 125:20

**searched** 23:13,14

**secret** 63:5

**secretary** 83:15 117:11

**section** 13:18 14:17 15:1,2 17:3 19:12,14 87:17 88:7 112:10

**sections** 14:20 15:19 19:2

**secure** 48:13 49:9 52:7 57:4

**secured** 76:1 80:17 97:25

**security** 18:2 20:19 32:24 33:7,15 37:1,5,16 39:15 40:19 41:3,23 42:8 44:15,17,21,24 45:2,11 46:3,9,10,18 49:23 52:21 53:13 68:13 164:17 165:10,14 169:9 170:13 180:3,9,11

**Securus** 8:22 12:13 48:23 49:20 50:1 51:1 52:10,11 53:21 57:5,15 74:7,24 75:5,17 76:22,24 77:2 78:8,24 79:20 97:5, 7 101:2,13 103:17 109:4, 16,17 112:18 115:24 118:8,17,24 119:9 124:15 126:22 128:9,23 132:4 135:9,13 142:8 144:18,19 161:23 162:12,19,22 163:7,22 166:9,10,15 167:25

**Securus'** 48:19 49:24 79:4 163:5

**seek** 92:14

**segment** 175:10

**select** 56:15,16

Case 4:16-cv-00947-SBB Document 170-4 Filed 05/31/96 Page 63 of 67
*Elite Reporting Services* (655) 595-6013
www.EliteReportingServices.com

i115

selected 35:21

selection 75:10,11

send 63:25 77:22 78:22
79:4,12,13 102:10
113:11 120:13 121:24

sending 177:16

sends 71:15 77:16 104:5
113:6,20,21

sense 46:24

sentenced 20:5,17,20,
23,25 21:1,4

sentencing 21:2,5,7

separate 18:1,16,18,23
19:17,18 21:10,17 23:4
26:6 85:22 150:8,21,23
153:11

separately 20:16

separation 17:23,25

Sergeant 172:19,22

series 29:17 123:10
139:4 140:3 144:9

served 164:4

serves 28:8 36:19 39:22
52:9 67:12 154:2

service 11:4 30:24 63:21
64:23 65:7 72:18 77:19
166:2 169:4

services 8:15 48:19

serving 175:21

sessions 47:15

set 21:24 24:12,15 25:10,
25 28:5 58:23 89:12
110:10,14 111:3 112:1
116:6 117:6 118:4 135:8
176:19

sets 40:8 149:19

setting 31:6 45:1 109:22
110:19 112:1,6,11,12

settings 57:4,11 109:9,
17 110:1,4,6,11,14 111:3
112:17 119:9 168:15

Shadicus 51:14 83:21
124:25

share 160:16

shared 36:8

sharing 105:8

sheets 159:2 160:24

Shelton 10:6

short 62:2 84:21 92:6
132:17 157:5

shortly 172:10

show 20:24 82:9 179:8,
16

shown 178:12,23

shows 120:3 123:23

sic 26:16

side 12:12,17 53:18,19
60:10 80:21 133:18
155:21 174:1

sign 23:20 27:21 28:15,
16 29:7,11,14 63:12,15
81:20 82:11 159:11

sign-in 159:2 160:24

signature 23:24 177:18

signed 28:17

significant 20:8

signing 29:4

signs 81:11 83:15
147:25

silent 180:5

silly 22:7,8

similar 78:16 181:8
182:9,16

single 146:8

sit 169:16

site 109:9,20 110:15
112:2 117:25 127:5,11
128:6,13,14

sits 48:14 92:1 126:4

situation 52:19 59:1
70:4 94:13 98:6,14

situations 51:25 94:9
101:21

slash 27:8

slot 81:19

slots 25:24

Slow 46:11 57:6

small 129:18

software 101:10,12
131:19

Solutions 112:16

Sophia 8:12

sort 29:2 45:14 75:19
117:20 159:16 161:10
174:21 182:16

sought 93:8

sounded 32:10

soundproofed 155:11

sounds 52:6 83:11

sourced 162:18

sources 171:12

South 17:5 19:6

space 68:20 69:10
94:22,24,25 155:12
171:4

Spanish 30:15,21,22
31:2 81:21 89:7

speak 30:24 81:21 84:15
86:16 87:6 129:7

speaker 146:4

speaking 18:22 30:21,
23 31:2 34:4 47:2 49:11
62:24

speaks 60:22 178:3

special 18:3

specialist 39:13

specific 37:15 41:12
60:17 61:6 71:6 73:25
95:12 137:25

specifically 35:3,12
51:11 60:2 74:20 88:16
111:23 133:11 144:10
176:2

speculation 57:18
163:1

spell 51:16

spelling 96:6

spent 70:3

spoken 118:25

spot 120:7

spreadsheet 67:9
121:12 149:21 158:17

spreadsheets 144:15

SRB 8:8

staff 23:14 26:25 28:2,6,
16 29:8 30:21,23 31:2,
10,12,13,14 35:1,2,4,5,8
38:10 39:10,12,25 40:16
47:6,8 50:8 52:4,11
54:15 56:3,13,15,17,18,
24 57:2,9,24 58:1,3
59:22 60:21 71:10 92:13,
18,20 93:1,4,9,11,18,21
94:1,3,10,20,25 95:4,6,
11,22,24,25 97:8,19
101:5 104:5 105:3
110:10 113:7,11 119:23
135:14,16 149:18
160:10,11 173:2,5,6,24
174:12,14 175:7,8,13,15,
19 176:8

stage 175:14

stamp 122:19

stand 183:15

standing 173:7

standpoint 170:20,22
180:9

stands 77:18

start 25:10 41:14 57:23
91:1 121:19 123:5,14
136:2 139:6 151:5 158:2

started 172:5,8

starting 11:13 35:22

state 8:17 9:13

statement 71:21 104:11

states 8:9 18:12 64:23
70:22 72:18 100:5
157:24 158:8

status 18:5 20:10 123:24

stay 94:16,20

step 30:20 72:7

steps 13:11 70:25 71:4
72:3,5 100:11 104:16
121:4 176:23

Sterchi 8:24

**STG** 39:12,14 58:4 70:7, 9,13 111:11,18 163:21

**stipulate** 178:15

**stop** 56:5 58:11 70:15,16 99:12 150:10 151:9

**stopped** 116:18 151:20

**storage** 69:5,8 107:22 153:13

**store** 69:6,7

**stored** 107:21

**strike** 133:3 163:18 164:7 166:8

**stuff** 44:10 46:10

**style** 87:16

**stylistic** 87:17

**subject** 13:19,25 14:3 15:20 35:6 56:21 147:13 148:8,11 177:21 179:4, 10,19

**submit** 92:12 175:12 176:11 177:1

**submitted** 144:18 167:3

**subpoena** 41:11 63:1,8, 13,16,23 65:3 66:10 119:24 120:14 157:14,25 158:11

**subpoenas** 40:12 41:21 43:7,15 48:5,7 62:16,17, 18,19,20,22 63:6,17 68:16,22 120:13 121:21, 24 157:18

**subsequent** 61:5 126:17

**succeeding** 111:16

**suggest** 60:15 100:21 101:13 107:15 118:16,18 126:25 134:17 140:25 142:19

**suggested** 172:6

**suggesting** 87:4 106:7, 8 141:20

**suggestion** 142:5

**suggests** 58:15

**summarize** 12:19

**summarizing** 180:25

**summary** 12:12,17 117:20

**summer** 103:14

**supervise** 94:22,24

**supervised** 95:17

**supervises** 39:11 40:20

**supervising** 117:6

**supervision** 52:16 94:21 117:3 152:4,10 155:6 180:4

**supervisory** 173:20

**supplement** 116:13,19

**supplemental** 143:8,11 144:11

**supplements** 144:9

**support** 35:2

**suppose** 118:9 151:3 155:18

**surveillance** 180:2,5

**suspected** 45:4,5

**swear** 9:2

**switch** 157:1

**sworn** 9:7

**system** 12:18 22:4 50:9, 10,11 52:2 53:17,23 75:15 77:12,15,25 78:24 79:8,9,20 97:7,16 100:18,19 101:25 102:2 109:4,5,12,14,16,18,20 110:4 118:5 119:7,23 120:1,3 131:20 134:6,8, 18 137:6,24 144:20 153:16,22 162:12,19

**systems** 102:5

---

**T**

---

**takes** 40:7

**taking** 24:5 50:20

**talk** 23:5 69:13 72:15 87:23 91:16 93:17 103:6 173:25 180:3

**talked** 11:12 16:13,20,21 29:16 44:10 46:5,18

63:24 64:9 71:11 100:3 101:19,20 133:2 146:9 147:11,15,18,21,25 148:3 171:16

**talking** 14:11 16:18 27:15 38:11 42:13 44:1 45:21 50:14 59:10 60:20 62:9 68:7,12,23 70:3 73:19 78:16 85:3,4 88:3 92:8,9,20 93:18 96:24 102:3,9 110:24 135:15 150:24 161:10 171:2,24 180:22 182:1,12

**talks** 60:22

**Tammy** 34:11,12

**tape** 84:18

**tasked** 44:16

**TE** 135:24 136:15

**team** 28:13 175:20

**Technologies** 8:22 161:23

**technology** 35:14 41:7 163:20

**teed** 143:1

**tele** 155:10

**teleconference** 96:21 97:14,17

**Teleconferences** 97:6

**telephone** 11:21 12:18 23:23 27:8,17 28:9 32:22 33:5,14 55:11 71:9 73:25 77:15 81:17 87:18,24 97:7,16 108:19 118:23 135:1 144:18,20 145:11 146:2,7 161:11 175:11 176:11 177:21

**telephones** 35:12 56:16 79:18 81:12,14,15 179:9

**telling** 45:21 69:22

**tells** 177:8

**ten** 10:22

**Tennessee** 8:12,15

**tenure** 23:2 43:2

**term** 18:19 24:15 26:20

**terminology** 20:5

**terms** 60:14 90:10 164:17 172:14 174:22 180:1

**terrible** 25:12 70:11

**terrorist** 45:5

**testified** 9:7 111:19 133:6 140:4 163:17 164:3 183:16

**testify** 10:7

**testifying** 133:7

**testimony** 56:3 138:4 146:24 163:19 167:21

**thing** 42:6,8 72:10 109:6 128:12 131:24,25 161:2

**things** 17:23 18:2,9,11 22:16 23:9,17 40:14 45:22 46:1 47:10 68:7 94:11 167:20 170:7 180:10,12

**thinking** 142:2

**thirty** 158:14 179:16

**Thomas** 8:6 9:5,11,15, 17 12:7 62:6 64:17 80:5 84:25 86:8 106:25 113:2 132:21 149:13 159:25 161:22 170:3 180:15,21

**thought** 42:21 159:4

**threat** 37:1,5,16 39:15 40:19 41:3,23 42:8 44:15,17,21,24 45:1 46:3,9,10,18 53:13 68:13

**threats** 20:20 164:19

**ticket** 77:19,21 78:19

**tickets** 78:25 79:5

**time** 8:5 10:18 20:4 23:21,23 34:8 36:21 38:24 41:12 43:6 48:18, 24 57:21 61:21 70:3 93:8,10,13 94:10 103:10, 11 105:16 108:9 111:13 114:11 116:16,17,20 117:5 123:9 133:2 146:4, 23 152:1 153:24 157:4 168:7,8 171:22 173:13 180:16,17 181:11 183:21

**timeout** 84:17

**times** 174:18

*Elite Reporting Services* (615)595-0073
www.EliteReportingServices.com

timing 172:4

title 163:25

titled 27:7

today 8:4 10:7,20 16:17
28:19 32:15 48:14 84:15
100:20 106:13 118:25
147:11 160:19 161:5,24
163:10 169:9,17 176:16
182:22 183:16

told 50:19 148:11
151:18,19 159:6 176:1
177:11 179:23

tool 20:21 52:16 53:3
55:6,19 180:11

top 14:17 15:1,19 59:13
64:22 65:2,15 113:5
114:20 115:6 151:4
165:16

topics 10:12,16,19

total 17:9 38:6

traditionally 19:13

train 47:25 49:19,24,25
50:1 111:11

trained 47:12,13 50:25
60:2 110:14

trainer 61:8

training 47:6,8,15 48:22
49:8 50:11,24 60:17,21
61:2,5,9,20 110:13
111:14,15,18,20,22

trains 39:24

transition 23:5 55:2

transportation 20:3

travels 54:1

trial 62:20 63:6,7,10,11
180:17

trip 27:10 183:19

true 14:19 132:4 166:18,
20

truncated 136:9

trust 139:23

Trustee 11:5

turn 11:7 27:2 31:17 33:2
69:11 73:8,16 81:5 89:11
98:2 114:3 125:10

129:22 133:3 138:8
145:7 158:25 159:1

turned 73:4,12 76:9,12
121:5

turning 70:19 88:13
158:13

Twaddle 65:23

two-person 19:10

type 18:3 47:17,20 52:19
67:8 96:18 146:22
152:11 172:14 180:7,13,
14

types 44:14 45:7 47:24
50:17 62:13 64:8 126:22
127:1 145:15 153:1
180:9 182:9

typically 44:25 67:16
76:8 94:3 95:7 173:22

typing 150:1,5,6

## U

U.S. 11:3 22:15,23,25
73:20 77:7,9 109:20,25
146:25 166:2 169:3

Uh-huh 45:24 47:7 48:10
74:16 75:24 82:10 90:8
93:2 101:8 108:1 111:1
115:15 116:5 136:11,20
151:14

ultimately 162:18,22

unauthorized 180:8

uncheck 118:13

undergo 61:2

underground 69:5,6,8

underlined 177:25

understand 15:11 30:17
31:7,8 46:23 59:22,24
60:4 62:6 63:5 84:25
87:11 90:17 97:20 98:13
110:22 132:22 138:3
153:21 157:9 167:24
183:13

understanding 16:7

understood 16:19 42:21
70:3 102:6

undertake 119:13

unit 16:21,24,25 18:25
19:3 21:21 25:25 28:13
31:12,13,14,15 38:13,21,
22 54:4 92:13 93:11
95:25 96:2 175:20 176:8

United 8:9 18:12 64:23
70:22 72:18 157:24
158:8

units 17:1 18:20 99:25

unmonitored 11:21
28:13 92:5,14,16 175:1
176:8

unrecorded 92:5 96:22
97:14 175:1

update 34:5 134:4,19

updated 100:12,22
130:14

updating 32:12 34:6

upgrades 119:7

upside 80:13,14

usage 87:20

user 78:7 140:8

USMS 21:16 71:3

utility 153:11,13

utilized 135:3

## V

vacant 35:20

vague 45:17 86:23 92:7
95:19 111:4

validation 45:8,9

vast 130:13

vendor 167:14

vendors 166:25

verification 102:25
103:2,18 104:7 105:10
114:25 120:5 160:7

verified 71:19 105:22
113:15,18,22,24 176:12

verify 30:16 70:19 73:11
91:11 100:24 103:3
104:17

verifying 71:14,15 73:3
103:19 113:12

version 67:22,23 136:10
150:14

versions 178:12,23
179:2

versus 18:6,12 109:25
117:25 146:25

vested 35:6

video 8:5,6 82:16 149:3
151:6 155:9,10 156:25
157:11,23 160:20 180:2,
4,5 181:20

videos 46:1 152:18,20
158:7

visible 173:8

visitation 60:23

visiting 52:17 80:10,11
149:20 153:2

visitor's 159:8

visits 16:11 40:8 158:21

visually 23:13,14

voice 52:2

volition 168:16

voluminous 72:22,23

voluntarily 36:10

volunteers 47:15,16,17,
18,19

## W

wait 122:2 146:19

waiting 20:2

walk 133:10 151:4 155:6

walked 100:4

wanted 181:3

warden 9:18,23 10:5
38:4,12,14 77:24 154:8
161:22 165:13 167:13
180:15

Wayne 37:3,18 66:14

ways 63:18 71:7 76:11
92:4 102:12,22,23 134:7,
14 148:7

**web** 50:10,16

**web-based** 50:7,23
   111:20

**website** 148:20

**week** 35:22 68:18

**weekly** 68:17

**weeks** 129:3

**Western** 8:10

**wide** 127:5

**window** 95:7,11,15,16,
   19,24 96:4

**windows** 95:21

**withdraw** 102:6

**Withdrawn** 26:22

**word** 58:15 81:23

**words** 58:25 152:14

**work** 34:24 35:4 41:14
   74:9 84:13 92:24 102:19

**worked** 35:11 38:8 164:4

**workers** 48:3

**working** 37:8,24 44:17
   51:22 54:1 88:8 120:24
   135:12 169:3

**works** 35:7 47:6 74:11
   75:5

**write** 30:17

**written** 30:13 58:19
   63:25 85:23 89:4

**wrong** 10:4 54:13

**wrote** 160:5

**Wyandotte** 22:20
   146:25

---
### Y
---

**year** 39:3 43:4,9,10
   103:14 121:16 172:7

**years** 9:20 10:2,3 34:21
   35:25 36:18 37:7 38:1,7
   39:7 55:1 61:20 67:19
   99:1 106:17 164:5
   183:12

*Elite Reporting Services* * (615)595-0073
www.EliteReportingServices.com