1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5    v.                                Docket No. 16-20032-02-JAR

6    KARL CARTER,                      Kansas City, Kansas
                                       Date:  10/09/2018
7

8         Defendant.                   Day 6
     ....................

9

10            TRANSCRIPT (EXCERPT) OF MOTIONS HEARING
                   TESTIMONY OF JOSH MARTIN
11         BEFORE THE HONORABLE JULIE A. ROBINSON
                UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14   For the Government:   Mr. Steven D. Clymer
                           Department of Justice - USAO
15                         Lrm Eckert, William
                           100 S. Clinston Street
16                         Suite 9000
                           Syracuse, New York 13261

17                         Mr. Duston J. Slinkard
                           Office of United States Attorney
18                         444 Southeast Quincy
                           Suite 290
19                         Topeka, Kansas 66683-3592

20                         Mr. Stephen R. McAllister
                           Office of United States Attorney
21                         500 State Avenue
                           Suite 360
22                         Kansas City, Kansas 66101

23

24

25

```
 1   APPEARANCES:

 2   (Continued)

 3   For the Defendant Karl Carter:
                         Mr. David J. Guastello
 4                       The Guastello Law Firm, LLC
                         811 Grand Boulevard
 5                       Suite 101
                         Kansas City, Missouri 64106
 6
     For the Movant Federal Public Defender:
 7                       Ms. Melody J. Brannon
                         Mr. Kirk C. Redmond
 8                       Mr. Branden A. Bell
                         Office of Federal Public Defender
 9                       117 Southwest Sixth Street
                         Suite 200
10                       Topeka, Kansas 66603

11   For the Special Master David R. Cohen:
                         Mr. David R. Cohen
12                       David R. Cohen Co., LPA
                         24400 Chagrin Boulevard
13                       Suite 300
                         Cleveland, Ohio 44122
14
                         Ms. Alleen VanBebber
15                       VanBebber Law Firm, LLC
                         2029 West 95th Street
16                       Leawood, Kansas 66206

17

18

19

20

21

22
     _____
23
           Kelli Stewart, CSR-KS, CRR-MO, RPR, CRR, RMR
24                    Official Court Reporter
              259 U.S. Courthouse, 500 State Avenue
25                    Kansas City, Kansas 66101
```

```
 1                         I N D E X

 2

 3      Federal Public Defender's Witnesses:              Page

 4      JOSH MARTIN
          Direct Examination By Ms. Brannon                 5
 5        Cross Examination By Special Master Cohen         58
          Cross Examination By Mr. Clymer                   70
 6        Redirect Examination By Ms. Brannon               91
          Recross Examination By Special Master Cohen      100
 7        Recross Examination By Mr. Clymer                105
          Redirect Examination By Ms. Brannon              108

 8

 9                       E X H I B I T S

10

        Government's
11      Exhibits              Offered            Received

12         38                    81                81

13

14      Federal Public Defender's
        Exhibits                 Offered            Received
15
           560                    4                  5
16         561                    4                  5
          563**                   4                  5
17        564**                   4                  5
          565**                   4                  5
18        566**                   4                  5
          567**                   4                  5
19        568**                   4                  5
          569**                   4                  5
20         572                    4                  5
          573**                   4                  5
21         667                    4                  5

22

23
        * Denotes demonstrative exhibit
24      ** Denotes admitted under seal

25
```

```
 1                    (8:36 a.m., proceedings commenced).
 2             THE COURT:  All right.  You can be seated.
 3  All right.  Ms. Brannon, are you calling the next
 4  witness?
 5             MS. BRANNON:  Yes, Your Honor.
 6             THE COURT:  Okay.
 7             MS. BRANNON:  We would call Josh Martin.
 8                    JOSH MARTIN,
 9  called as a witness on behalf of the Federal Public
10  Defender's Office, having first been duly sworn,
11  testified as follows:
12             MS. BRANNON:  Your Honor, before we begin
13  with Mr. Martin, we would move by stipulation to admit
14  the following exhibits.
15             THE COURT:  Okay, just a minute.  All right.
16             MS. BRANNON:  560, 561.
17             MS. VANBEBBER:  Excuse me, I think the
18  microphone is off.
19             THE COURT:  Is that microphone-- I believe
20  mine is on.  I don't know if mine-- yeah.
21             MS. VANBEBBER:  There.
22             MS. BRANNON:  560, 561, 563 through 569 we
23  would offer under seal.  572, 573 and 667.
24             THE COURT:  All right.  Any objection?
25             MS. VANBEBBER:  No objection.
```

1              MR. CLYMER:  No, Your Honor.

2              THE COURT:  Exhibits 560, 561, 572, 573, 667

3    admitted, and Exhibits 563 through 569 are admitted

4    under seal.

5              MS. BRANNON:  Thank you, Your Honor.

6                   DIRECT EXAMINATION

7    BY MS. BRANNON:

8         Q.   Would you state your name for the record, please?

9         A.   Yes.  It is Joshua Paine, P-A-I-N-E, Martin.

10        Q.   And, Mr. Martin, what do you do for a living?

11        A.   I am an attorney employed by Securus

12   Technologies, Incorporated.

13        Q.   And what is Securus?

14        A.   Securus is a provider of inmate telephone

15   services to the corrections industry as well as

16   associated public safety-related products and services.

17        Q.   About how big of a company is Securus?

18        A.   We employ right around a thousand people.  We

19   service over a thousand different customers, and we're

20   deployed at over 2,000 facilities.

21        Q.   What do you-- day-to-day what do you do for

22   Securus?

23        A.   My primary responsibilities-- while my title is

24   assistant general counsel and chief compliance officer,

25   my primary responsibilities are management oversight and

1   direction of our outside litigation, the

2   administration-- well, development and administration,

3   excuse me, of our compliance programs.  I'm also

4   involved in informal dispute resolution with customers,

5   vendors, third parties, and I oversee our subpoena

6   compliance program.

7       Q.   Because you oversee litigation, are you familiar

8   with the case pending in Western District of Missouri

9   the *Crane versus-- Johnson versus CCA and Securus*?

10      A.   Yes, quite so.

11      Q.   Have you been active in that in terms of

12  providing information from Securus for the litigation?

13      A.   Yes.

14      Q.   Okay.  Same question with the-- the case here,

15  you're familiar with the litigation in *United States*

16  *versus Black*?

17      A.   I am.

18      Q.   Have you worked with the Special Master, David

19  Cohen, in providing information?

20      A.   I have.

21      Q.   And have you also worked with me in answering

22  subpoenas?

23      A.   Yes, quite a few.

24      Q.   All right.  If we could look at Exhibit 565.  To

25  begin with, I just want to ask you which facilities

1    within Kansas that Securus serves or has served.  If we

2    flip over to the second page-- third page I guess.

3        A.   Yes.  So as reflected in the e-mail that

4    comprises at least a portion of this exhibit, we serve

5    Sedgwick County, Butler County, Shawnee County, and we

6    previously served Jackson County, and we previously

7    served CCA's Leavenworth Detention Center.

8        Q.   Do you know when you stopped providing services

9    for CCA?

10       A.   It would've been late summer, early fall of 2017.

11       Q.   Part of the service that you provide to

12   facilities such as CCA is to record phone calls that are

13   outgoing from the inmates; is that right?

14       A.   Yes.  We provided at CCA-Leavenworth what I would

15   characterize as a barebones or plain vanilla deployment

16   of our inmate telephone system.  And that is in broad

17   terms a voice-over Internet protocol enabled

18   telecommunication system that allows detainees or

19   inmates at our agency or facility customers to place

20   outbound telephone calls.

21            And in connection with that, the system provides

22   all the-- the telephone-- excuse me-- technology

23   necessary to, you know, route, place, complete, process

24   the call as well as generate recordings or not generate

25   recordings, depending on the particular, excuse me,

1    facility configuration.  And it also generates what are

2    known as call detail reports, which is kind of a

3    detailed summary of the who, what, when, and where of a

4    telephone call.

5        Q.  Was CCA's default to record all calls?

6        A.  At CCA-Leavenworth, yes.

7        Q.  You also service other CCA facilities; is that

8    right?

9        A.  Yes.  We previously serviced quite a few of CCA's

10   facilities.

11       Q.  So for today when we're talking, we are referring

12   only to CCA-Leavenworth unless we state otherwise; is

13   that right?

14       A.  Understood.

15       Q.  Okay.  Are there facilities that Securus provides

16   service to that choose to have a default of not

17   recording anything?

18       A.  Yes.  Juvenile facilities, at least in my limited

19   experience, almost exclusively do not record calls by

20   default.  And I am aware of at least one adult detention

21   facility in north Texas that does not record calls by

22   default.  There may be other examples, but probably very

23   few.

24       Q.  Let's look at Exhibit 563, please.  You mentioned

25   the call detail report.  Can you define what a call

1    detail report is?

2       A.   A call detail report is a standard collection of

3    data that we generate and retain in connection with

4    attempted or completed calls.  And it contains a variety

5    of information, including things like the facility from

6    which the call originated, the number that was dialed,

7    the date and time of the call, the duration of the call.

8    Oftentimes, it will include the inmate or detainee name

9    that's placing the call as well as his or her account or

10   PIN number information.  And there are other things that

11   are included in it as well, but that's what comes to

12   mind.

13      Q.   So when someone obtains a-- an audio-recording of

14   a phone call, is it the call detail report that gives

15   that audio-recording some context?

16      A.   I would say, yes.  A call recording standing

17   alone would be simply the audio of the inmate or

18   detainee and the called party.  And it doesn't have-- to

19   my knowledge at least, it doesn't have included or

20   imbedded within the audio file the details such as the--

21   well, the facility name might play, but it won't tell

22   you the date and time of the call or things like that.

23   You would need to reference the call detail report to

24   get that information.

25      Q.   Did you work with me in providing information

1   regarding a case *United States versus Brenda Wood*?

2     A.   Yes.

3     Q.   And if you look at this Exhibit 563, I subpoenaed

4   at some point her call detail reports.

5     A.   I recall that.

6     Q.   All right.  And just by way of example, if we

7   could walk through her call detail report.  I think it's

8   a couple of pages over.  There we go.  Blow that up a

9   little bit.

10          All right.  So the first column, that's cut off

11  just a little bit, but can you describe what's in the

12  first column?

13    A.   The first column will typically display the name

14  of the facility at which the call originated.  For

15  CCA-Leavenworth, there is additional information

16  contained within the parenthetical that follows

17  CCA-Leavenworth, KS.  In this instance, it lists

18  default.  That identifies the-- the agency affiliation

19  or site affiliation within the call platform as relates

20  to CCA-Leavenworth.

21    Q.   Let's define a couple of terms.  When you talk

22  about "facility," what are you talking about in this

23  context?

24    A.   That's a difficult question to answer because it

25  is used in a variety of different ways.  In broad terms,

1    facility in my mind means the-- the actual facility,

2    physical building from where the call is originating.

3    For example, Collin County, Texas, a former customer,

4    they have one county detention center and so the

5    facility would be that.

6           Leavenworth was configured a little bit

7    differently in that it had distinctions between

8    facility, which would cover 100 percent of the inmates,

9    and sites, which is a determine-- it's an imprecise

10   term, but it's the term that's used within our platform.

11   And that could typically be used-- if you think of a

12   state Department of Corrections context where there are

13   multiple correctional facilities, the contract or

14   facility level would be the department as a whole.  And

15   then each site would be the separate stand-alone prisons

16   or penitentiaries.

17          In-- at CCA-Leavenworth, the site designator was

18   used by Leavenworth to segregate within the call

19   platform inmates associated with the three agency

20   customers that they provided services to at Leavenworth

21   Detention Center.

22   Q.   In other contexts when we talk about site, if I

23   understand, that would refer to physical sites and

24   divisions among those physical sites?

25   A.   That's correct.

1      Q.   And within CCA, they chose to designate sites

2   based on the inmate population?

3      A.   That's my understanding, yes.

4      Q.   Okay.  So when we talk about site in this

5   context, we're talking about sites at CCA.  Can you tell

6   us what those sites are, what those divisions are?

7      A.   Yes.  There were three sites.  The default site

8   is that associated with United States Marshal detainees.

9   There is a county site, which is for county detainees.

10   And I apologize, I can't remember the name of the county

11   as I sit here.  And then they're a Maryland DOC site,

12   which is associated with Maryland Department of

13   Corrections that were housed by CCA in Leavenworth.

14      Q.   Would the county be Wyandotte?

15      A.   Yes.  Thank you.

16      Q.   Okay.  So looking at this call detail report, the

17   site listed is the default site, which you described as

18   United States Marshals Service population?

19      A.   Correct.

20      Q.   Skipping over to the dialed number, is that just

21   what it says?

22      A.   It is.  It's the number that the inmate called or

23   attempted to call.

24      Q.   Start time and end time?

25      A.   The start and end time of the call.

1    Q.   Let's talk about that for just a minute.  First

2    name and last name.  In this case it lists first name as

3    Wood, last name as Brenda.  Did that cause us some

4    problems?

5    A.   It did.

6    Q.   Can you describe those?

7    A.   If I recall correctly, you had-- your office had

8    issued a subpoena to us for Brenda Wood's call detail

9    reports.  And a search was conducted using first name

10   Brenda, last name Wood, and either generated no results

11   or very few results.  And we provided those to you.

12        And I believe you contacted me with some

13   information indicating you had evidence of other calls

14   that were completed.  And after an inquiry, I determined

15   that Ms. Wood existed two ways within Leavenworth, one

16   as first name Brenda, last name Wood; one as first name

17   Wood, last name Brenda.

18   Q.   The first name/last name, who enters that

19   originally?

20   A.   CCA.

21   Q.   So you were dependent in this context at least on

22   the accuracy of the information that CCA provides you?

23   A.   Correct.

24   Q.   All right.  Is that true in other contexts as

25   well?

1    A.  It is.

2    Q.  Can you give us a couple of examples?

3    A.  The one that springs immediately to mind is

4  information entered by CCA in connection with the

5  privatization of attorney numbers.  The system-- our

6  system is technologically advanced in many respects.

7  But when it comes to the procedural mechanism of

8  determining whether or not it should record a call, it

9  is dependent upon the information that is entered into

10 the system either directly by CCA or in some instances

11 provided to Securus to be entered into the system on

12 CCA's behalf.

13   Q.  If CCA enters the wrong phone number, for

14 example, to be privatized, do you have any way of

15 knowing that?

16   A.  No.  And, in fact, in the great majority of

17 instances-- let me back up slightly.  The call platform

18 is designed to be-- to have administrative

19 responsibilities distributed out to our facility

20 customers.  They want the ability to do things like

21 create user accounts, privatize numbers, make calls

22 free, block numbers, a variety of other things.  And so

23 we-- we give them the tools to do that and the training

24 necessary to accomplish what it is that they want to

25 accomplish.

1          And the great majority of those actions they can

2     do without informing Securus or it otherwise coming to

3     our attention.  The transactions are recorded within the

4     call platform, but we don't necessarily know.  And so

5     we-- to answer your question directly, we wouldn't

6     necessarily even know that they had privatized a number

7     at all, much less that it had been entered incorrectly.

8          And that's particularly true, excuse me, because

9     the decision as to what numbers should be privatized and

10    at what level, that's within CCA's sole discretion.  We

11    don't have the authority to do that.  We maintain the

12    list for them, but the list is theirs.  And so we

13    wouldn't even know that they got a request to privatize

14    a number, much less that they tried to do it, and much

15    less that it was done incorrectly.

16    Q.   Can you think of reasons that a number that had

17    been requested to be privatized would still be recorded

18    after that request?

19    A.   Yes.

20    Q.   And can you tell us those reasons?

21    A.   One would be, and I'm speaking in broad terms

22    here, general terms, across all our customer bases, it

23    could be a failure to comply with the request for

24    whatever reason.  It could be that the-- a person

25    attempted at the facility to enter the number and

1   entered it incorrectly inadvertently.  And Leavenworth

2   has an additional complicating factor, which I'm happy

3   to explain now if you like.

4       Q.  I think we'll get to that.

5       A.  Okay.

6       Q.  Were there-- what about delay in entering the

7   number?

8       A.  Absolutely delay.  I mean, if there is not an

9   efficient process at the facility level to get the-- to

10  get the request and process it within a short period of

11  time, then yes, that could be another reason.

12      Q.  Let's finish going through this example of a call

13  detail report.  Agency type, USMS?

14      A.  Agency type is a field that was used by CCA as

15  part of that kind of administrative segregation in the

16  computer sense of the various agency detainees they

17  have.  So because they designated Ms. Wood as a United

18  States Marshals Service inmate, it shows up in the

19  agency type field, and it also explains why the site is

20  the default level in the first column.

21      Q.  The call status column, can you tell us the

22  difference between complete and incomplete?

23      A.  It is simply that.  A completed call is one where

24  it reaches the point of positive acceptance by the

25  called party, who is then connected to the detainee.  An

1    incomplete call is a call that fails to reach that

2    stage, which could happen for a variety of reasons.

3        Q.  We've been defining some terms.  Can you define

4    the difference between positive acceptance and passive

5    acceptance?

6        A.  Sure.  Positive acceptance is by far the great

7    majority of configurations that we deploy, and that

8    simply means that it requires the called party to take

9    an affirmative action, to press a digit on his or her

10   keypad, after hearing the order admonishment and hearing

11   that it's a call from a detainee.  It's necessary to

12   complete the call.

13       We have it that way-- it's configured that way

14   largely because that's what our facility customers

15   require, but it also helps us an organization when it

16   comes to things like billing disputes.  If there's an

17   affirmative act to accept the call, that helps us.

18       Passive acceptance is used sparingly, in my

19   experience only usually in connections with repeated

20   failed calls to someone who is, for example, hard of

21   hearing.  And that will allow the call to be connected

22   without that affirmative step taking place by the called

23   party.

24       Q.  If a number is set to be free, in other words

25   there's no charge for that call, do you know whether

1    it's set to positive or passive acceptance?

2        A.   Can you repeat the question, please?

3        Q.   If a number is designated to be free, no charge

4    for that number, do you know whether it's set to be

5    positive or passive acceptance?

6        A.   I do not.

7        Q.   Okay.  If we go over a couple of more columns,

8    there's one that at the top says Priv, P-R-I-V.  What's

9    that column for?

10       A.   That column indicates that the number-- the

11   dialed number was designated as private at the facility

12   either for all inmates or for the inmate subpopulation,

13   the site that is placing the call.  And it further

14   indicates that the call was not recorded.

15       Q.   All right.  If a number is private, that call is

16   just not recorded.  Correct?

17       A.   Correct.

18       Q.   Okay.  If we go down to the third row, the call

19   was to (816) 835-1000.  In the private column, that

20   number was not marked private.  Correct?

21       A.   I see that.

22       Q.   Okay.  If we could flip over a couple of pages.

23   So a complete call detail report in this case was how

24   long?

25       A.   I'm sorry, I don't understand the question.

1      Q.  If we go to that last page.  I just pulled a

2  couple of sheets out of this, but in Ms. Wood's case it

3  was 597 pages?

4      A.  Oh.  Yes, I see that.

5      Q.  All right.  Let's look at the next exhibit which

6  is 572.  I talked about privatization.  Privatization

7  essentially means no record?

8      A.  Correct.

9      Q.  Does it have any other meaning?

10      A.  No.

11      Q.  Okay.  In 572, if we blow that up a little bit,

12  can you just describe what this represents?

13      A.  So this document is a limited excerpt from what I

14  would call a master privatization report that was

15  produced by Securus in the *Crane* and *Huff* matters.  And

16  this reflects the data that was captured by our system

17  that is associated by the transaction by which this

18  particular dialed telephone number represented in the

19  second column was made private on December 22nd of 2014

20  at about 8:22 in the morning.

21      Q.  So after this privatization on that call detail

22  report, that privatization column would have an "X" in

23  it for this number; is that right?

24      A.  It would regardless of the agency affiliation or

25  site level of the detainee placing the call.  And I say

1    that because, the way this report was generated, you see

2    the contract info in the center and then site name to

3    the right of it.

4         If the-- if the number was made private for

5    100 percent of the inmates at Leavenworth, that site

6    name would be blank.  If it was made private for a

7    limited inmate subpopulation, that site name would be

8    populated and it would tell us which subpopulation was

9    impacted.

10   Q.   This action, does it mean that just Ms. Wood's

11   calls to this number are not recorded or all calls to

12   that number are not recorded?

13   A.   All calls.

14   Q.   The user name, what does that signify to you?

15   A.   The most significant thing there is what follows

16   after the "@" sign.  The way our system is configured,

17   user accounts for Securus employees or user accounts

18   created by Securus at the request of somebody else may

19   have a secur.tx after the "@" sign.

20        Here it is a little bit hard for me to see, but

21   it's I think a seven-digit character-- or string of

22   characters that reflects the contract identifier for

23   this facility within our system.  And so that-- just

24   looking at that alone tells me that that is or was an

25   employee of CCA whose credentials were used to process

1    this transaction.

2        Q.  Let's look at Exhibit 573.  And while we're

3    pulling that up, you mentioned the *Crane-Johnson*

4    litigation.  The information that we're looking at here,

5    where did you pull that from?

6        A.  I would have to answer that in response to a

7    specific exhibit.  But the majority of the information

8    we provided in response to your subpoenas that related

9    to privatization history or recording access logs were

10   generated by pulling subsets from the larger versions of

11   those same documents that we had produced in the *Crane*

12   case.  And the smaller versions we pulled were those

13   that corresponded to the criteria either in your

14   subpoena or that we negotiated.

15   BY MS. BRANNON:

16       Q.  573, can you tell from that document where that

17   information was pulled?

18       A.  This information would've been produced from--

19   let me back up slightly.  In the *Crane* case and also in

20   the *Huff* case that's pending here, we produced a master

21   recording access log and a master privatization report

22   that reflected transactions associated with the numbers

23   contained in Special Master David Cohen's known attorney

24   telephone number list.

25           And in response-- as I suggested a moment ago, in

1    response to your subpoenas, we produced limited subsets

2    of that.  This document would've been generated from

3    that master recording access log that was filtered based

4    on criteria provided by you.

5               MS. BRANNON:  Your Honor, I think I

6    overlooked this, but we would ask for 573 to be under

7    seal.

8               MR. CLYMER:  No objection.

9               THE COURT:  573 admitted under seal.

10   BY MS. BRANNON:

11      Q.  If we flip over to the last page of this exhibit.

12   There are different ways you can run reports in your

13   system or run spreadsheets.  Right?

14      A.  Yes.

15      Q.  And in this case, if you look down to the

16   requested numbers, can you describe what criteria you

17   ran to produce this report?

18      A.  So this would've been-- we would've started with

19   all of Brenda Wood's transactions and then we would've

20   pulled out those that were related to calls to the four

21   numbers-- four numbers contained below the asterisk on

22   the bottom left corner at Page 7.

23      Q.  We will talk more about accessing in just a

24   minute.  But when you use the term "access," what does

25   that mean?

1       A.  It refers to any transaction or activity within

2   the call platform that involves access to a call

3   recording.

4       Q.  And when you look at this particular spreadsheet,

5   the second column, what does that tell you?

6       A.  The type of activity that was performed.

7       Q.  It shows that these calls were accessed?

8       A.  Oh, yes.

9       Q.  Okay.  If you look at the next to last column,

10  does that tell you who accessed the calls?

11      A.  It tells us whose user credentials were used in

12  connection with this-- these access events.

13      Q.  And the last column?

14      A.  The last column reflects the number to - boy, I'm

15  going to mess up my syntax here - that's the phone

16  number that was called that generated the recording that

17  was accessed, and that access event is reflected in this

18  document.

19      Q.  The information that Securus receives when calls

20  are being accessed, does Securus record in any way why

21  the calls are accessed?

22      A.  No.

23      Q.  Does it record in any way who originally asked

24  for the calls to be accessed?

25      A.  No.

1    Q.  All you know would be that that user account is

2    the one that was used to access Securus' call platform?

3    A.  That's correct, with one very minor exception

4    would be where in the event that a facility customer

5    contacted our technical support department and asked for

6    assistance in downloading calls, which happens from time

7    to time.

8         And as a general rule, who requested it and, at

9    least broadly speaking, the basis for a request; i.e.,

10   the facility received a subpoena, will be recorded by

11   help desk technicians in the ticket tracking system that

12   is used to record their activities.

13   Q.  How often does that happen?

14   A.  Very-- relatively infrequently.

15   Q.  Let's look at just a couple of quick exhibits.

16   551.  Do you know who Wayne Bigelow is?

17   A.  Not directly.  I know that he was employed in

18   some capacity by CCA and worked at the Leavenworth

19   Detention Center.

20   Q.  This exhibit has already been admitted.  Can you

21   tell us who Michael Kenyon is?

22   A.  Yes.  Michael Kenyon is an account manager at

23   Securus.  And during the time that CCA was a customer of

24   ours, he was CCA's account manager.  That was the sum

25   total of his responsibilities was to take care of the

1   CCA account.

2       Q.  In this case does it appear that Securus is

3   actually setting up a user account for Mr. Bigelow?

4       A.  Can I see the next page of the exhibit, please?

5       Q.  Sure.

6       A.  Yes.

7       Q.  And why would Securus be setting up an account

8   for Wayne Bigelow?

9       A.  As a courtesy in response to the question from

10  Kennith Lajiness, if I'm pronouncing his last name

11  correctly.

12      Q.  For a standard user account, can the facility

13  itself set up those accounts?

14      A.  Yes.  The facility has the ability-- they will

15  have an administrative-- administrator or super user

16  account that can be used to generate other user accounts

17  and define roles, responsibilities, things like that.

18  It's referred to as a security template.

19          As I sit here, it's not clear to me why

20  Mr. Lajiness would've been asking this of Michael

21  Kenyon.  It could be he didn't want to do it himself and

22  it's easier to send an e-mail to Michael Kenyon.

23      Q.  All right.

24      A.  It might be because the user account that

25  Mr. Kenyon is creating for Mr. Bigelow is that

1  administrator level account, because I don't know if one

2  administrator has the ability to create another

3  administrator.

4      Q.   If we go back to the first page, can you just

5  tell us what date the user name was set up for

6  Mr. Bigelow?

7      A.   Yes.  Mr. Kenyon e-mailed the credentials to

8  Mr. Lajiness with a copy to Mr. Bigelow on

9  December 2nd-- excuse me, December 10th, 2015.

10     Q.   Let's look at Exhibit 550, please.  And can you

11 tell us what this exhibit represents?

12     A.   Yes.  This appears to be an e-mail from Michael

13 Kenyon to Wayne Bigelow on July 27th of 2016, and he is

14 conveying instructions to Mr. Bigelow on how to

15 privatize a number at Leavenworth for all inmates.

16     Q.   That's some seven months after Mr. Bigelow had

17 his user account set up?

18     A.   It appears to be the case, yes.

19     Q.   All right.

20     A.   Is this the whole page of the exhibit or is there

21 another one?

22     Q.   I'm not sure.

23     A.   I was just curious if it reflected when

24 Mr. Bigelow asked Mr. Kenyon to provide him with that

25 information, and it looks like it was on July 27th of

1    2016 and Mr. Kenyon responded the same day.

2        Q.   Very good.   In the course of talking with me, did

3    you provide me some screenshots?

4        A.   I did.

5        Q.   All right.   If we could look at 667, please.   And

6    you've already talked about facility level/site level.

7    If we go up to the very top of this, can you describe

8    what those drop-down categories are?

9        A.   I can, but I'd like to provide just a little bit

10   of context.

11       Q.   Sure.

12       A.   As I've discovered in the two-plus years that

13   I've been working on these issues, the terminology that

14   is used in this context suggests a degree of complexity

15   that doesn't exist, and it makes it hard to convey it

16   using the terms.

17            So I just want to talk about the privatization

18   process in broad terms.   And then as we go through this

19   exhibit, I think we'll have a chance to marry those up

20   to the specific terms.

21       Q.   Great.

22       A.   If I'm at CCA-Leavenworth and I want to privatize

23   a number, I would go to this page and-- I'm sorry, to

24   the next page and I am selecting-- I need to put that

25   number on a list.   And I have four lists to pick from.

1      Q.  All right.

2      A.  And the decision I-- well, once I pick a list,

3    all I need to do is type in the number, click the

4    "private" box and hit submit and the transaction is

5    complete and the system immediately recognizes that

6    number as a private one.

7          The important decision is which list I pick,

8    because there are four.  And the first one will make the

9    number private for the entire facility.  100 percent of

10   outbound calls, regardless of a detainee's agency

11   affiliation will not be recorded.  But there are three

12   smaller lists that are associated with the agency

13   subpopulations.

14         So there's a list for the whole facility, that's

15   the big one.  And then there's a list for marshal

16   service inmates, a list for county inmates, and a list

17   for Maryland DOC inmates.

18         And if the number is privatized-- entered only on

19   the marshals service list, for example, calls from

20   marshals service inmates to that number will not be

21   recorded, but calls from county inmates to that number

22   will be recorded, and calls from Maryland DOC inmates to

23   that number will be recorded.

24         And throughout kind of the course of this, folks

25   have looked at the data, including David Cohen,

1   attorneys in the-- plaintiff's attorneys in the *Crane*

2   case, and your office and have identified instances

3   where the number-- a call was recorded after a

4   privatization request was submitted and entered.

5         And I just want-- it's important I think from

6   Securus' perspective for you and the Court to understand

7   that the data we produced in the *Crane* case shows that

8   the system worked as designed and as instructed

9   100 percent of the time.  There is no example where a

10  number was privatized, for example, at the "all inmate"

11  list on January 1st, 2016, and calls were subsequently

12  recorded.  It worked as designed.

13        I think the issues that have come up have arisen

14  because, for whatever reason, CCA decided to make a

15  number private for only one inmate subpopulation, which

16  prevented those calls from being recorded, but then

17  there would be potentially instances where, for example,

18  a county inmate or a DOC inmate called the same number

19  and the call was recorded because the platform by

20  default at Leavenworth records all calls unless

21  Leavenworth tells it not to.  And absent an instruction

22  not to do it, it's going to do what it was originally

23  programmed to do, which is record all calls.

24  Q.  I send my number in to be privatized by CCA.  If

25  they don't choose from the drop-down, then that number

1   is privatized for all inmates.  Correct?

2       A.  Yes.  And if you go to the next page, I think it

3   will illustrate that point a little bit better.  So

4   after-- when you're navigating to the screen where you

5   want to privatize a number, this is the first page--

6   place that you land.  And you'll see at the left there's

7   a management level, and it shows Leavenworth Detention

8   Center, because that's the facility that I'm personally

9   operating in in this screenshot.  And then the site,

10  the-- the first box, the box that is present on the

11  screen when you get there is all sites, which is the all

12  inmate list.

13      Q.  So if you just leave that alone and don't do a

14  drop-down, then that number that I sent in would be

15  privatized for all inmates?

16      A.  Yes.

17      Q.  If I send my number in and the drop-down goes and

18  whoever is entering my number chooses, for example, the

19  Maryland inmates, that means only Maryland inmates'

20  calls would be not recorded, but all USMS inmates would

21  still be recorded?

22      A.  That's correct.

23      Q.  Okay.  And did you find that sort of error in

24  this litigation?

25      A.  I don't know that I know enough to characterize

1    it as an error, but certainly I have seen examples where

2    numbers were privatized for one of those named

3    subpopulations and calls were being made to the same

4    attorney number by other inmate populations for which

5    the number was not made private.

6        Q.   Is there anything else from this page that you--

7    we need to cover?

8        A.   No.

9        Q.   Okay.  And the next page, does that just show the

10   different sites that can be chosen?

11       A.   That's correct.  It's showing the-- the three

12   subpopulation sites that can be selected.  The only

13   other thing I would-- I would like to add here in

14   response to your preceding question, is if this entry

15   screen is used for things other than privatizing

16   numbers.

17            For example, if the facility wanted to make

18   numbers free, they would go in and do it here.  That can

19   also be used to block calls to a particular number at

20   the request of the called party.  And there's a few

21   other minor things, but those are-- it's used for more

22   than just privatizing calls.

23       Q.   So you've defined "facility."  You've defined

24   "site."  I think you mentioned "global list."

25       A.   Yes.

1      Q.    Could you again define what that means?

2      A.    Global list is a terrible misnomer and it gives

3  me headaches, because it suggests to a layperson that

4  the changes here are globally applicable.  And they are,

5  but only on a limited basis based on the population

6  that's selected.

7          What the global list does is it allows a facility

8  customer to make exceptions to otherwise generally

9  applicable rules.  So, for example, if the default is

10 "record," you would check "private" to make a call not

11 recorded.  If the default is "do not record," you would

12 check "record" to-- to make it recorded.

13         So the changes are globally applicable in the

14 sense that they apply to calls to that number, but

15 they're not universally applicable in terms of the

16 eligible inmate population.

17     Q.    I note that there's also a box that says

18 "active."  Can a number be deemed inactive?

19     A.    I do not know.

20     Q.    All right.  Can a number be deprivatized?

21     A.    Yes.

22     Q.    All right.  Let's-- is that the last page of this

23 exhibit?

24         All right.  Let's look at 568 and let's talk

25 about some actual instances of privatization.  You

1   received this subpoena from me?

2      A.  I did.

3      Q.  And I'm requesting privatization reports of

4   certain numbers, limited numbers.  Right?

5      A.  Yes.

6              MS. BRANNON:  And, Your Honor, for the

7   record, yesterday we filed a stipulation that identified

8   these numbers as the three primary numbers for our three

9   offices and our three (800) numbers.

10             THE COURT:  Yes.

11  BY MS. BRANNON:

12     Q.  So if we flip over a couple of pages and look to

13  the actual privatization log.  Let's go back to that

14  first page.  All right.  So if we look at that first

15  column and blow that up a little bit, let's just walk

16  kind of quickly through this.

17          The dialed number, is that the number to be

18  privatized?

19     A.  It is.

20     Q.  Modified field, what does that mean?

21     A.  That was captured in the preparation of this

22  report to demonstrate that that's what this report

23  reflects, our privatization transactions within the

24  various global lists, not other transactions.

25     Q.  The blank column "Before."

1      A.  Is a null value.  It means that this number did

2   not previously exist on the global list or had not

3   previously-- yeah, that's correct.

4      Q.  Okay.  "After" just means that it was actually

5   privatized and that was the modification?

6      A.  Correct.

7      Q.  The date?

8      A.  The date and time that the transaction occurred.

9      Q.  So this would represent that that number was

10  privatized on October 14th, 2009?

11     A.  Correct.

12     Q.  Go over to site name.  What does that tell you

13  about the privatization in this case?

14     A.  That will tell the inmate subpopulation, if

15  applicable, for which this number was made private.

16     Q.  And in that case it was county?

17     A.  Correct.

18     Q.  Which means Wyandotte County inmates would have

19  private calls, but United States Marshals Service would

20  not?

21     A.  Correct.

22     Q.  And looking at this internal description, that

23  refers to Federal Public Defender numbers should be free

24  and not recorded as required by USMS?

25     A.  I see that.

1      Q.   Was this before your time at Securus?

2      A.   Oh, it was.  It was.

3      Q.   All right.  Let's drop down to the third row.

4  The 9828, for the record, is the main number at our

5  Topeka office.  When does it show that that number was

6  privatized?

7      A.   October 26th of 2011.

8      Q.   And the site that was privatized?

9      A.   The default site, which is applicable to United

10 States Marshals Service inmates.

11     Q.   So Wyandotte County inmates' calls to that number

12 would still be recorded?

13     A.   Yes.

14     Q.   Okay.  And we can see this on the callout.  The

15 next row references Jason Shidiskis, I don't know if I'm

16 saying that right.  Do you know who that is?

17     A.   Not directly, but-- I've never personally met

18 him, but Mr. Shidiskis is an employee of an entity

19 called Praeses, spelled P-R-A-E-S-E-S.  And Praeses is--

20 functions as-- the best way I can think to describe

21 them, as a third-party administrator for facilities who

22 have inmate telephone services.

23          They assist in things like preparation of

24 requests for a proposal, describing mandatory

25 requirements, evaluating responses.  And then they

1   generally assist in the administration of the account on

2   behalf of their customer, in this case CCA.

3       Q.  This is still addressing on this row the 9828

4   number was modified to private.  Why would there be a

5   subsequent modification to private?

6       A.  I wouldn't characterize it necessarily as a

7   modification, but rather a new privatization event

8   because we do have those four separate lists.  So the

9   first transaction we looked at is the transaction on the

10  default list.  The subsequent transaction, excuse me,

11  the site name field is blank, which tells us that this

12  was privatized for all inmates.  As to why Mr. Shidiskis

13  went in and did that at that time, I do not know.

14      Q.  So the change that would affect the 9828 number

15  is that all inmates at CCA, their calls would not be

16  recorded to that number?

17      A.  Correct.  The privatization would no longer be

18  limited to marshals service inmates.

19      Q.  All right.  Let's look at Exhibit 564.  This is

20  another subpoena from the FPD to you.  And in this we

21  asked for specifically - if we can go down a couple - a

22  call detail report to all of our numbers; is that right?

23      A.  I don't know that those are all of your numbers.

24      Q.  Fair enough.

25      A.  But certainly for all of the numbers that were

1    listed in your subpoena.

2      Q.  And your system allows you to run specific

3    numbers through to see when all of those numbers

4    would've been privatized?

5      A.  No.  The data exists within the platform.  It can

6    be extracted using a canned or pre-programmed reporting

7    functionality only on a limited basis.  It's very

8    difficult to do, for privatization events.  So it's

9    necessary to go in through the back end of the database

10   and obtain that data.

11     Q.  All right.  Let's look at 567.  And if we flip

12   over, there was an occasion that I asked for--

13         I'm sorry, I-- I missed something on 564.  If we

14   could go back to that.  So I was asking for call detail

15   reports to these numbers.  If we flip down to the call

16   detail report itself, what did this show?

17     A.  This appears to be an excerpt from one of the

18   call detail reports that we produced.  The data was

19   provided in Excel format, which it allows-- the

20   formatting can be manipulated.

21         So, for example, this has certain columns that

22   appear hidden.  It goes A, B, E, for example.  But this

23   reflects certain portions of the call detail report

24   associated with the numbers-- at least some of the

25   numbers in your subpoena.

1      Q.  If we look at row 22-- 22, and I'm sorry this is

2  so small.  But if we look at 22, CCA-Leavenworth is the

3  default.  Does that mean that inmate is a USMS?

4      A.  In row 22 or 23?

5      Q.  Let's look at 22 first.

6      A.  Okay.  Yes, that-- the default listing there

7  tells us that this was an inmate associated with the

8  marshal service by CCA.

9      Q.  The call was to 9828.  Correct?

10     A.  Yes.

11     Q.  It has the date and time?

12     A.  I see that.

13            THE COURT:  Can I ask something for

14  clarification?  I'm sorry.  So when-- so default

15  signifies only USMS inmates or does it signify all

16  inmates?

17            THE WITNESS:  Only United States Marshals

18  Service inmates, Your Honor.

19            THE COURT:  Okay.

20  BY MS. BRANNON:

21     Q.  If you look across this row, Mr. Davis' call to

22  the 9828 number, was that recorded?

23     A.  Yes.  There is no "X" in the private field, which

24  tells me that it was recorded.

25     Q.  If we look at row 23, the number to 6712, which

1   is, for the record, our main number in Kansas City,

2   Raymond Hickman, when he dialed that number, even though

3   it was incomplete, was that call recorded?

4       A.  No.

5       Q.  If we go down to the next row to that same

6   number, 6712, on that same date by a different inmate,

7   the call was complete.  Was that call recorded?

8       A.  It was.

9       Q.  Can you explain why one call to our front desk

10  would be recorded and one would not on the same day?

11      A.  Because of the reasons we've previously

12  discussed.  The call reflected in row 22 was placed by

13  an inmate associated by CCA with county inmates, and

14  that call was marked as private.

15          The subsequent call was placed by an inmate

16  associated by CCA with the default, or United States

17  Marshals Service, and that call was recorded, which

18  tells me that this number could only have been

19  privatized at the county level and perhaps the Maryland

20  Department of Corrections level at the time it was made

21  and was not privatized at the default level.

22      Q.  The 6712 on that date was privatized for

23  Wyandotte County inmates but not for United States

24  Marshal inmates?

25      A.  Yes.

1      Q.  Okay.  Thank you.

2           SPECIAL MASTER COHEN:  Excuse me, I don't

3      have the screen, so I'm not looking at what you're

4      doing.  Are the two numbers that you just talked about

5      going to the-- one was-- were they the same number?

6           MS. BRANNON:  Yes.

7           SPECIAL MASTER COHEN:  To the front desk?

8           MS. BRANNON:  Yes.

9           SPECIAL MASTER COHEN:  Exact same number on

10     the same day?

11          MS. BRANNON:  Yes.

12          THE COURT:  The number was (913) 551-6712.

13          MS. BRANNON:  Correct.

14     BY MS. BRANNON:

15     Q.  And, in fact, those two calls were less than an

16     hour apart.  Right?

17     A.  It appears that way, yes.

18     Q.  So if we look at the next exhibit, 567, after you

19     provided me with the call detail reports of the FPD

20     offices, FPD office numbers, I gave you a subpoena

21     asking for the call detail reports of three specific

22     people; is that right?

23     A.  Yes.

24     Q.  And for the record, these are all my clients, my

25     personal clients.  I have the names listed two different

1   ways.  Why is that?

2       A.  Based on what you told me, to avoid the

3   Brenda-Wood, Wood-Brenda situation we faced earlier in

4   the year.

5       Q.  I asked for call detail reports and the actual

6   call recordings; is that right?

7       A.  You did.

8       Q.  The actual call recordings are just that, it

9   would've been the substantive conversation between me

10  and that client if there was a substantive conversation?

11      A.  Yeah, it would've been audio of the conversation

12  between the called party and the receiving party.

13      Q.  In that instance, the calls to the 6712 that were

14  not privatized, do you know if there would've been a

15  preamble on those calls?

16      A.  Yes, the-- by preamble, do you mean the

17  admonishments?

18      Q.  Yes.

19      A.  Yes, the admonishment plays for all non-private

20  calls.

21      Q.  So the first call to the six-- the-- that one

22  number that was privatized would not have had the

23  admonishment, the one less than an hour later would've

24  had the admonishment?

25      A.  Yes.

1     Q.  All right.

2     A.  The difference between the two would be:  "This

3   call is subject to recording and monitoring," would've

4   been played for the non-private call but not the-- but

5   not for the private call.  I think the remainder of the

6   preamble would've been the same.  "This is a collect

7   call from an inmate at Leavenworth Detention Center."

8     Q.  All right.  Let's look over and see what you

9   discovered when you ran this request.  Did you find any

10  actual recordings?

11    A.  I don't recall.

12    Q.  Do you recall having a conversation with me about

13  when your-- when Securus actually purged recorded calls?

14    A.  Yes.  Yes, I do.  So, no, there were no call

15  recordings responsive to this subpoena.

16    Q.  Does that mean no call recordings ever existed?

17    A.  No.

18    Q.  What happened to those recordings?

19    A.  Securus retains call recordings for a period of

20  time that is specified in the contract with our

21  particular customer, and it can vary.  CCA's recording

22  retention period was five years.  And although purging

23  of calls was suspended in 2016 for certain internal

24  business reasons and had not resumed at the time a

25  litigation hold was put in place in connection with the

1    issues that came to light here, those call recordings

2    would have been purged from the system, at which point

3    they are irrevocably gone.

4        Q.   Available-- actual call recordings are available

5    for five years in this instance and not available after

6    that?

7        A.   That's correct.

8        Q.   Did you have other data that confirmed that the

9    calls were actually recorded?

10       A.   The CDR itself confirms that the call was

11   recorded by virtue of the values in Column T.  If the

12   private field is blank, the call was recorded.  If it is

13   "X"'ed, it is not.

14       Q.   And so looking at this, this is a call detail

15   report for those three clients.  Correct?

16       A.   Yes.

17       Q.   And it indicates that none of those calls were

18   privatized?

19       A.   That's correct.  None of those numbers were

20   private at the time the call was placed, or at least not

21   private at the default/United States Marshals Service

22   level.

23       Q.   If we look over-- the first column, site default,

24   all of these are marked as "default," meaning that they

25   are USMS clients?

1     A.   Meaning that CCA has designated them as such

2     within the platform.

3     Q.   And none of the United States Marshal Service

4     clients' calls to our offices were privatized?

5     A.   That's correct.  None of these numbers appear to

6     have been private at the time the calls were made.

7     Q.   That doesn't mean that those numbers-- well, let

8     me ask it this way:  Those numbers could've been

9     privatized as to the Maryland populus, for example?

10    A.   Maryland DOC or county inmates, yes.

11    Q.   Okay.  Let's look at the next page.  If you look

12    in-- the term "category," it requires positive

13    acceptance?

14    A.   Yes.

15    Q.   So that means we have to push a button to get the

16    call?

17    A.   Correct.

18    Q.   All right.  Let's talk about user access

19    accounts.  You defined "access" earlier.  Can you tell

20    us what you mean by "user access accounts"?

21    A.   I don't know that user access account is a term

22    that I would use.  Are you referring to user accounts?

23    Q.   Okay.

24    A.   So a user account would be an account created by

25    a facility for an authorized user of the platform, or

1   their-- their aspect of the platform.

2      Q.  And my confusion comes from a user account can

3   access calls on the Securus platform?

4      A.  If they have the appropriate privileges, yes.

5      Q.  If a user account is set up through CCA, can that

6   user access all calls on the Securus platform?

7      A.  No, only those associated with the-- with

8   CCA-Leavenworth.

9      Q.  So a user account set up at CCA, they couldn't

10  access federal detainees housed at Sedgwick County, for

11  example?

12     A.  No.

13     Q.  Okay.  You testified earlier that generally it is

14  the facility that sets up these user accounts.  Does

15  Securus limit the number of user accounts that a

16  facility can have?

17     A.  Not to my knowledge, no.

18     Q.  Do you set any sort of parameters or restrictions

19  on user accounts?

20     A.  User accounts created by facilities?

21     Q.  Uh-huh.

22     A.  We do not.

23     Q.  So a facility could create a user account for

24  anyone that facility chose to do so?

25     A.  Yes.

1      Q.  All right.  Let's look at Exhibit 594.  This was

2   previously admitted by Captain Schechter at Sedgwick

3   County.  This particular exhibit, was that generated

4   from the Securus platform?  Do you recognize that as

5   being generated from the Securus platform?

6      A.  I do.

7      Q.  Throughout this, when I've talked about a user

8   account showing up on access logs, I think you've

9   corrected me a couple of times that it's not necessarily

10  the person with that user account that's accessing the

11  logs; you can only tell that it's that user account?

12     A.  That's correct.  The credentials associated with

13  that user account.

14     Q.  So if someone had given their user account

15  credentials to someone else to access, there's no way

16  Securus would know that?

17     A.  No, although we strongly encourage them to be

18  responsible with their user accounts.  But, no, if they

19  had shared it, we would be unaware.

20     Q.  If you look over in the e-mail, those e-mails are

21  the e-mails associated with the user name?

22     A.  Those would be the e-mail addresses that were

23  entered at the time the-- this-- these user accounts

24  were created.

25     Q.  All right.  If we could go over another page.

```
 1                MR. BELL:  I'm sorry?
 2                MS. BRANNON:  One more page.  All right.  I
 3    was just looking for something.  If I could have just a
 4    moment, Your Honor?
 5                THE COURT:  Yes.
 6                MS. BRANNON:  And one more page, please,
 7    Branden.  And one more, please.  Two more.  I'm trying
 8    to get down to the Ms in the last name-- in the last
 9    name column.  One more page.
10    BY MS. BRANNON:
11       Q.  All right.  I'm not finding it.  Let's go ahead
12    and switch to Exhibit 599.  So, Mr. Martin, when you
13    have a user account, can you run a report that says this
14    user accessed the Securus platform when and what they
15    obtained?
16       A.  I believe so.
17       Q.  You can run a report just for that particular
18    user account; is that right?
19       A.  Actually, I do not know that for sure.  Although
20    it appears from this document, if I'm looking at the
21    search criteria, those-- if the format here is similar
22    to other Securus reports that I'm familiar with, those
23    reflect the search criteria that was used to generate
24    this report.  And the format of this document tells me
25    that it is a pre-- pre-generated report, that is a
```

1  canned report.

2     Q.  Right.

3     A.  And so it looks like a report was run here for a

4  user with the last name O'Neal, all activity type, over

5  a specified date range.  So I would assume that that is

6  a standard reporting functionality.

7     Q.  All right.  Give me just one moment.

8        Securus doesn't control who has a user account,

9  but your record does show what user accounts were set up

10 for a particular facility.  Correct?

11    A.  Absolutely.

12    Q.  And that's why in that last exhibit Securus-- a

13 Securus report is run showing everyone who has a user

14 account through Sedgwick County?

15    A.  I'm assuming that that was the criteria used to

16 generate that report, yes.

17    Q.  All right.  Did you run a similar report for me

18 for CCA?

19    A.  Yes.

20    Q.  Okay.  Let's just go ahead and go to 569, please.

21 Is that the report?  Branden, if we could go to 569.

22    A.  Yes.

23    Q.  When we look at the-- when we compare the e-mails

24 to the user names for CCA, does it appear that almost

25 all of the users-- user accounts are CCA employees?

1      A.   Can you expand or zoom in on that column?  I

2    can't quite read it on the screen.

3      Q.   On the e-mail column?

4      A.   Yes.

5      Q.   ██████████████████ is listed; is that right?

6      A.   Correct.

7      Q.   There's one for Praeses.  Right?

8      A.   Correct.

9      Q.   And I think there's one for Securus, would that

10   be right?

11     A.   I don't see it on this page unless I'm missing

12   it, but I would not be surprised in the least to see

13   Michael Kenyon as having an account.

14     Q.   When a user account is set up, different users

15   have different authorities as shown by advanced user,

16   full access and so forth; is that right?

17     A.   That's correct.  The system, excuse me, includes

18   a variety of-- they're called security templates, that

19   are pre-generated consistent with what we found to be

20   the kind of user profiles that our customers require.

21   Those can be customized.

22          For example, Mr. Cohen's, he has a template

23   called Special Master.  I wager his is the only one of

24   those in our platform.  But, yes, it's very granular in

25   the types of privileges that can be granted to an

1    individual user either based on standard or custom

2    complex.

3        Q.   Right under Mr. Cohen's name is Matthew Collins,

4    and it says "full access"?

5        A.   I see that.

6        Q.   Would Mr. Collins be able to access the Securus

7    platform to get recorded phone calls?

8        A.   I don't know.  I don't know exactly what is meant

9    by "full access."  It's I think a reasonable conclusion

10   that that's the case, but I don't know for sure.

11       Q.   Let's switch over to some other documents that

12   you produced for our office.  Exhibit 566.  At some

13   point-- that last page, please.

14            At some point I asked for all recording access

15   logs made between 2010 and 2018.  Is that a lot of

16   documents?

17       A.   It is.

18       Q.   Okay.  Based on our conversations, what did you

19   initially provide me instead?

20       A.   I provided you-- I believe you provided me with a

21   list of FPD detainees at CCA-Leavenworth, and then I

22   identified for you those that had their call recordings

23   accessed.  You can tell from my tone of voice I'm not

24   100 percent confident in that answer.

25       Q.   You gave us a list of 1,600 names of people whose

1   calls had been accessed.  Does that refresh your memory?

2      A.  Yes, that's correct.  Yes.  Thank you.

3      Q.  And after you provided that, did I send a smaller

4   list of names back to you?

5      A.  You did, in ten consecutive sets or batches.

6      Q.  And for those names in those ten batches, what

7   did you return to us?

8      A.  We returned excerpts from the master recording

9   access log produced by Securus in the *Crane* and *Huff*

10  litigations, excerpts that were associated with the

11  detainees identified by you in those ten lists.

12     Q.  For every name that we provided, you provided a

13  spreadsheet of calls accessed for that detainee?

14     A.  Correct.

15     Q.  All right.  Let's look at an example on Page 3 of

16  this exhibit.  If we could blow that up.

17         All right.  Name, William Mitchell.  Let's walk

18  across these columns.  Access time means what?

19     A.  The date and time at which this particular

20  recording was accessed.

21     Q.  Recording usage.  Tell us the categories of

22  recording usage available.

23     A.  There are four that I'm aware of.  Playback,

24  which is just that, someone listening to the call.  Save

25  to folder, which refers to the ability to save call

1    recordings to a folder within the call platform itself.

2    For example, if I am investigating-- conducting an

3    investigation associated with a particular court case, I

4    may have a folder with that court case name.  And when I

5    find calls of interest, I copy them into the folder.

6    That's usually, I'm guessing, done as an act either so

7    that you can find them again easier, more easily in the

8    future, or as an act prefatory to burning a CD.

9        Downloading is also an option, which I believe--

10   I believe it's downloading the call-- the call recording

11   on your local computer.

12       Q.   The first category you mentioned, call playback,

13   does that mean that a user can call directly-- or tap

14   directly into Securus' platform and listen to a call

15   without downloading it and burning it or saving it to a

16   folder?

17       A.   Yes.  A user with the appropriate credentials

18   could search for a call recording based on any number of

19   criteria and then listen to that call without taking any

20   other action.

21       Q.   The access to Mr. Mitchell's phone calls, it

22   shows both CD burning and save to folder.  Can it be

23   that a call-- one call was both burned to a CD and saved

24   to a folder?

25       A.   Yes.  In my experience, the two normally go

 1    together, similar to what we see here where we have-- I

 2    don't want to assume, but a lot of times you will see

 3    ten transactions that are saved to a folder.  And then

 4    following shortly thereafter in time, ten transactions

 5    for the same calls for CD burning.

 6        Q.  Every line of data does not represent a different

 7    unique phone call?

 8        A.  No.  Every line of data with the same recording

 9    usage flag would represent the same phone call, but you

10    could have ten calls with CD burning, followed by the

11    same ten calls with saved to folder.

12        Q.  All right.  Let's look at-- well, you mentioned

13    this access time was 6-19 of 2013.  Let's flip over to

14    Page 4.  When we blow that up, we're still looking at

15    William Mitchell.  Right?

16        A.  Yes.

17        Q.  Go over another page, please, Branden.  All of

18    these 6-19-- all these calls were accessed on 6-19; is

19    that right?

20        A.  Yes, 6-19 of 2013.

21        Q.  It includes call start time, call end time.  The

22    user, what does the user tell you?

23        A.  That tells me who-- which user account's

24    credentials were used to access this call recording.

25        Q.  Last column, obvious, the number that was dialed?

1     A.   Correct.

2     Q.   And, therefore, the number that was recorded?

3     A.   Yes.

4     Q.   The call would not be listed on the access log if

5  it was not recorded?

6     A.   That's correct.  Recording access logs

7  transactions require an underlying recording to be

8  accessed.

9     Q.   All right.  Let's go through another couple of

10  pages.  Okay.  If we blow this page up.

11         If you look down towards the bottom of the page,

12  it shows access on April 2nd of 2014?

13     A.   I see that.

14     Q.   What does that represent?

15     A.   That tells me that on April 2nd of 2014, a

16  variety of calls here related to William Mitchell were

17  accessed by the M. Collins CCA user account.

18     Q.   Just walking through the mechanics, if you know,

19  when someone is accessing calls in this manner, how did

20  they gain access to the Securus platform?

21     A.   They would have to have appropriate credentials,

22  and then they would access-- they would log in.  And

23  then, presumably, they would-- the landing page for any

24  facility is the call detail report search page.  They

25  would have to input their criteria for whatever calls

1   they were looking for, and there's a variety of ways to

2   do it.  And then they would hit search, and that would

3   generate an on-screen call detail record.

4          And then from there, there are additional steps

5   that would need to be taken in order to do any of these

6   transactions.  I can't speak to what those are because I

7   do not have access-- my template does not give me access

8   to call recordings.

9   Q.   If we look at Exhibit 607, down to Page 7.  Okay.

10  This particular exhibit, can you explain what this is?

11  A.   This looks generally consistent with an-- an

12  automated e-mail that can be generated, I believe but am

13  not certain, through the download access event that

14  sends an e-mail to a recipient specified by the user,

15  which contains a link that can allow the user to

16  download a CD image, an ISO image of whatever calls were

17  selected by the user who initiated the e-mail.

18  Q.   Whoever receives this link can download those

19  calls from Securus?

20  A.   Yes, for a limited period of time.

21  Q.   When Mr. Hall at the top received this e-mail,

22  can he forward this e-mail to someone else who can then

23  use that link?

24  A.   I am certain that the e-mail could be forwarded.

25  I do not know if the system prevents access from someone

1    other than the e-mail's original recipient.

2        Q.   Let's flip over to Exhibit 486.  Generally, if a

3    request is submitted for all recorded-- you know, all

4    calls from a particular inmate without specifying any

5    numbers, what is then provided?

6        A.   Request is submitted to whom?

7        Q.   So all recorded calls for that inmate would be

8    available and provided.

9        A.   Are you talking about if Securus received a

10   request?

11       Q.   Yes.

12       A.   So, for example, yes, if we received a request

13   from your office that said you would like all calls

14   placed by Brenda Wood or Wood Brenda, then assuming we

15   intended to comply with the subpoena, we would provide

16   you with all call recordings that existed, as well as a

17   complete CDR for all calls within the specified time

18   period.

19       Q.   If we look at this particular e-mail, it says

20   something about purged phone number and asking

21   essentially to exclude calls to a certain number.

22   Securus can do that in producing phone calls; is that

23   right?

24       A.   Yes.

25       Q.   Does excluding a certain phone number mean that

1   that number is privatized going forward?

2       A.  Merely by the act of Securus excluding it from a

3   production?

4       Q.  Yes.

5       A.  No.

6           MS. BRANNON:  If I could have just one

7   moment, Your Honor.

8   BY MS. BRANNON:

9       Q.  Mr. Martin, let me clarify one thing.  If a

10  number is privatized, is a call to that number not

11  recorded at all, or is it recorded but unavailable in

12  any of the databases?

13      A.  It's actually a third option.

14      Q.  Okay.

15      A.  If a call is-- if a call is set to private, no

16  portion of the call that occurs post-connection is

17  recorded.  In some instances, the-- a recording will

18  automatically be generated of the admonitions or

19  messages that are playing to the inmate.  I tend to

20  refer to it as a stub recording.  And those are

21  generated also for incomplete calls.  And those

22  recordings will exist for a very limited period of time,

23  about 30 days is my understanding, before they are

24  automatically purged from the system.

25          But to answer I think the-- the thrust of your

1   question, if a call-- if an inmate calls a number set to

2   private, there is no recording of the conversation that

3   takes place, not a recording is generated that is

4   somehow unavailable.

5                  MS. BRANNON:  Thank you, Mr. Martin.

6                  THE WITNESS:  You're welcome.

7                  SPECIAL MASTER COHEN:  Thank you, Judge.

8                          CROSS EXAMINATION

9   BY SPECIAL MASTER COHEN:

10    Q.  Hi, Josh.  We've had dozens of phone calls

11  together.

12    A.  We have.  It's nice to meet you in person.

13    Q.  Likewise.  Thank you.

14    A.  Sure.

15    Q.  And we usually refer to each other as David and

16  Josh, but today I guess I'll call you Mr. Martin.

17    A.  I understand, Mr. Cohen, and I will return the

18  courtesy.

19    Q.  Thank you.  So I want to go over just a little

20  bit of what Ms. Brannon discussed to make sure that I

21  understand it as well as clarify a few things.

22         First of all, there is a difference between a

23  number that is blocked and a number that is privatized.

24  Correct?

25    A.  Yes.  A number that is blocked is one that cannot

1   be called.

2      Q.  Okay.  So sometimes people have used the term

3   blocked, but privatized means the number can be called

4   but isn't recorded, as opposed to a number that is

5   blocked, which means the number cannot be called by the

6   inmate at all; is that right?

7      A.  Correct.  They're very different contexts.

8      Q.  Okay.  And at CCA, there were references by folks

9   who worked there and in e-mails and documents and so on

10  about numbers that were restricted or privileged, but

11  those are not terms that you use; is that right?  You

12  would use privatized?

13     A.  Yes.  I don't think I-- I certainly would not use

14  the term "privileged," if only because a number can be

15  privatized for any number of reasons, not necessarily

16  attorney numbers; clergy, medical professionals, things

17  like that.

18         Restricted in my mind has a general connotation,

19  not specific to CCA, of a number that, for example,

20  can't be called-- can only be called during certain

21  periods of the day or only on certain days.  But that

22  is, at least in my experience, a relatively limited

23  occurrence.

24     Q.  Okay.  And as far as you know, did CCA have the

25  ability to restrict a number in that way?

1      A.  I do not know.

2      Q.  Okay.  You-- you were looking at Exhibit-- I

3   think it was 524 with Ms. Brannon.  And there were two

4   numbers that were the same number but one was recorded

5   and one was not.  Do you recall that?

6      A.  I do.

7      Q.  It had to be the case for that to occur that that

8   number was privatized only for one of the sites and not

9   for the entire CCA facility; is that right?

10     A.  That's correct.  If a number has been privatized

11  at the "all inmate" level, then no call to it would've

12  been recorded, regardless of the site level.

13     Q.  And if the Federal Public Defender had requested

14  that that number be privatized - I don't know if this is

15  a question you can answer - would it have been fair for

16  them to assume that it would've been privatized for the

17  entire facility and not just certain sites?

18     A.  I would think that would depend on what sort of

19  information was conveyed to them about the scope of the

20  privatization by CCA.

21     Q.  If the Federal Public Defender believed that

22  having made a privatization request for a given number,

23  that it would be privatized for the entire facility and

24  not just certain sites, and then - as they did - they

25  received some calls from the facility where there was

1  the admonition and some calls from the facility where

2  there was no admonition, what-- what do you suppose

3  might've been a fair understanding then by the Federal

4  Public Defender, if you can answer that?

5         MR. CLYMER:  I'm going to object as both

6  speculative and beyond this witness' knowledge.

7         THE COURT:  I'll overrule.  You can answer

8  it if you can.

9         THE WITNESS:  If I, as a practicing

10 attorney, requested that my number be made private at a

11 facility and I received a call where the admonishment

12 played, I would assume that that call was being recorded

13 and I would contact the facility to obtain further

14 clarification and information.  That's just how I would

15 have responded, and that's really the only way I can

16 answer the question.

17 BY SPECIAL MASTER COHEN:

18 Q.  Okay.  There are attorneys who have testified

19 that they believed they privatized their number,

20 believed that having done so, all numbers from that

21 facility would not be recorded, nonetheless, got phone

22 calls with the admonition.  Do you think it would have

23 been an unfair conclusion by those attorneys that the

24 system just was sometimes-- sometimes played it and

25 sometimes didn't, the admonition, that it was

1    inconsistent?

2            MR. CLYMER:  Objection, speculate-- calls

3    for speculation.

4            THE COURT:  Overruled.  You can answer it if

5    you can.

6            THE WITNESS:  I would-- were I receiving

7    that call, and that's the only way I can answer this

8    question, I would've assumed that my number was not

9    private for that call and that there was some other

10   issues that would've required further investigation on

11   my part.

12   BY SPECIAL MASTER COHEN:

13     Q.  Okay.  That's fair.  And, of course, you know

14   that there is the option of privatizing for less than

15   facility-wide sites?

16     A.  Yes.

17     Q.  You mentioned the admonishment.  Are you aware

18   that sometimes the admonishment is different depending

19   on, for example, whether the call is prepaid or collect?

20     A.  When I use the term "admonishment," I focus on

21   the portion of the admonishment that talks about the

22   call being recorded-- subject to recording and

23   monitored.

24          To my knowledge, that is consistent regardless of

25   the type of-- how the call is being paid for.  But the

1   portions that-- of the preamble, to use Ms. Brannon's

2   term, may be different depending on whether or not it's

3   a free call or a prepaid call.

4       Q.  Have you ever been in a facility and actually

5   used the Securus phones to call out to different

6   numbers?

7       A.  No.

8       Q.  I did and heard different admonishments,

9   depending on the number that I was calling.  Can you

10  explain that to me?

11      A.  I cannot.

12      Q.  Just so that I understand different facilities.

13  If I were to privatize my own phone number at Sedgwick

14  County, that has nothing to do with whether my number is

15  privatized at CCA; is that correct?

16      A.  That's correct.  Each facility maintains its own

17  list of private numbers.

18      Q.  And am I correct that Securus is no longer the

19  provider at CCA right now?

20      A.  That's correct.

21      Q.  Ms. Brannon asked you a question, I just want to

22  give you a concrete example.  And this is completely

23  hypothetical, I'm not saying this happened, but I just

24  want to know if it could happen.

25      A.  Understood.

1    Q.  So Ken Lajiness is a fellow who had an account at
2    CCA at one time.  Do you recall that name?
3    A.  The name is familiar to me, yes.
4    Q.  Okay.  And so he had access to phone calls.  If
5    he gave his security credentials to Joe Smith, Joe Smith
6    could use those credentials to do whatever it is Ken
7    Lajiness could do?
8    A.  That's correct.
9    Q.  And that would include, for example, if Ken
10   Lajiness could do it, monitoring phone calls or
11   downloading and-- downloading recordings of phone calls?
12   A.  Under the scenario you've just described, that's
13   correct.
14   Q.  If a phone number isn't marked private, it is
15   recorded; is that right?
16   A.  If the facility is set to record by default, yes.
17   Q.  And CCA was?
18   A.  CCA at Leavenworth was, yes.  I don't know about
19   other CCA facilities.
20   Q.  If a phone number is marked private after some
21   time, all of the previously recorded numbers [sic] are
22   still in the system, could be downloaded and listened
23   to; is that correct?
24   A.  Assuming the facility did not instruct Securus to
25   purge those calls, correct.

1    Q.   Are you aware of CCA having done anything like

2    that, asking Securus to purge calls?

3    A.   Not to my knowledge, no.

4         I'd like to clarify my previous answer.  The

5    better answer is I do not know.

6    Q.   Okay.  Thank you.

7         As I think you know, having read my reports, I

8    found examples of instances where a call that was-- a

9    call to a number that had been marked private was,

10   nonetheless, recorded and accessed, not merely recorded

11   but also accessed.  And I was speculating as to

12   different reasons that might've occurred.  One was, as

13   we just talked about, it was recorded before the number

14   was privatized.  That's one way that could've happened?

15   A.   That is one possibility.

16   Q.   Another is that the number had been marked

17   private for less than the entire facility, as we saw

18   with Ms. Brannon's example earlier; is that right?

19   A.   That is another possibility, yes.

20   Q.   Another possibility is that the private number

21   request that had gone to CCA was input incorrectly so

22   that even though the attorney had asked for calls to be

23   privatized, it simply didn't work because the number,

24   for example, was keyed in wrong.  Is that possible?

25   A.   That's possible.  The system can only react to

1    data with which it is provided.

2       Q.  Is another possibility that the list at CCA was

3    deleted somehow or modified?

4       A.  When you say "the list"?

5       Q.  I guess what I'm asking is whether the numbers

6    that had been privatized by CCA somehow got

7    unprivatized?

8       A.  To my knowledge, that could only occur based on

9    an affirmative act within the platform, i.e., a

10   deprivatization event.

11       The call processing platform exists in two

12   physically independent but redundant data centers.  And

13   I struggle to envision a scenario under which it would

14   be accidentally deleted due to a system error at both.

15   And the-- the number of people who would have the

16   ability to go into the system without leaving a trail

17   and do something like that, to my knowledge, is two.

18      Q.  Okay.  And I didn't mean to suggest something

19   that nefarious or that complicated.  I just meant that a

20   number could be deprivatized?

21      A.  Yes.  And a person could go into the applicable

22   list and find the number and untick the private box and

23   save it.

24      Q.  You mentioned an entity called Praeses?

25      A.  Yes, sir.

1    Q.   Can you explain to me what they are and how they

2    interacted with you and with CCA?

3    A.   I've had no direct interactions with Praeses

4    other than contract negotiations with them prior to my

5    current position with Securus.

6         My understanding, though, is they-- they assist

7    with kind of the things that I've described.  They will

8    help a customer of theirs prepare a bid for inmate

9    telephone service and then put that bid to market,

10   evaluate responses, negotiate the ensuing contract, and

11   then assist in the administration of the account on a

12   going-forward basis.

13        The examples of administration that I am most

14   familiar with would be in the contract space.  The

15   customer would like some new products or functionality,

16   and Praeses will assist them in negotiating an amendment

17   to their contract with us.

18        I assume they can also provide more direct

19   hands-on help.  I think we saw from one of the exhibits

20   we looked at earlier, Mr. Shidiskis at Praeses was

21   privatizing numbers, which tells me that-- I strongly

22   doubt he was doing that on his own.  Right?  So he was

23   apparently responding to a request from CCA for that

24   kind of assistance.

25   Q.   Okay.  So you're aware then that in this case,

1    Praeses was helping CCA do things like privatize numbers

2    on the Securus platform?

3        A.  I've seen at least one example of that, yes.

4        Q.  Do you know whether Praeses may have ever

5    deprivatized numbers on the Securus platform?

6        A.  I do not know.  I will say that the records we

7    have produced in the *Crane* litigation, the privatization

8    history reports showed no deprivatization transactions.

9        Q.  Okay.  You've described a very-- what I would

10   call a very sophisticated system with incredible

11   recording capacity and recording-- the ability for

12   people really around the country, if they have the right

13   credentials, I suppose anywhere in the world with a web

14   connection, to monitor and-- monitor calls live or to

15   obtain recordings of calls made between inmates and

16   whatever numbers they're calling; is that right?

17       A.  Generally, yes.

18       Q.  And some of the other services or capacities that

19   the Securus system have include, as I recall, an ability

20   for the system to notify, for example, a law enforcement

21   agent that an inmate is making a call so that it

22   actually can notify an agent that an inmate is making a

23   call.  On that agent's cell phone, he can connect and

24   listen to that call live.  Do I have that right?

25       A.  Yes.  That is a product functionality that's

1    referred to as covert alert.

2        Q.   Did CCA have that?

3        A.   No.

4        Q.   Did Sedgwick County have that?

5        A.   I do not know.

6        Q.   Do you know if any of the other jails which are

7    using the Securus platform in Kansas or Missouri have

8    that?

9        A.   I do not know.

10       Q.   And am I correct that there's also within the

11   Securus platform a voice recognition capacity?

12       A.   I would characterize it as a voice biometric

13   capacity that is used when-- and it's called

14   Investigator Pro.

15            When an inmate enrolls at a facility with an

16   IPro, as it's referred to, deployed, the system will

17   capture a voice print.  And that is used to validate the

18   identity of the inmate whose account and/or PIN number

19   is being used to place the call.

20            As you might imagine, PIN theft and account theft

21   or coercion occurs from time to time.  And so that is a

22   feature that would allow the-- the system to validate

23   that the person whose credentials are being used to

24   place the call is, in fact, the person who is placing

25   the call.

 1    Q.  So if, for example, one inmate is using another
 2  inmate's PIN, you can still tell which Inmate A-- the
 3  Securus system using that biometric voice pattern can
 4  tell usually that the-- who the inmate really is, not
 5  maybe the one whose PIN has been borrowed?
 6    A.  No, not to my knowledge.  It's a pass/fail test.
 7  So when the inmate is using the-- putting in the other--
 8  Inmate A is putting in Inmate B's credentials and then
 9  he has to say his name, if the voice print doesn't
10  match, the call will not continue.
11    Q.  Understood.
12        During our tenure of talking together, you
13  actually got a promotion, as I recall?
14    A.  I did.
15    Q.  And that was partly because you were working so
16  hard and doing such a good job on this case; is that
17  right?
18    A.  I would like to think so, yes.
19    Q.  I'm happy for that.  Thank you very much.
20    A.  I appreciate it.
21                    CROSS EXAMINATION
22  BY MR. CLYMER:
23    Q.  Good morning, Mr. Martin.  How are you?
24    A.  I'm well, sir.  How are you?
25    Q.  Now, I haven't had the privilege like my

1   colleagues of speaking to you before, have I?

2      A.   No, you have not.

3      Q.   So if I mess up the terminology or get something

4   wrong, I'll just ask you to be a little patient with me.

5      A.   Absolutely.

6      Q.   Would it be-- is it accurate to say that the

7   services that your company provides to detention

8   facilities are essential for the operation of the

9   criminal justice system?

10     A.   Without question.

11     Q.   And on one hand, your company provides the

12  ability for inmates to speak with their attorneys while

13  they're incarcerated, which is necessary for them to be

14  effectively represented at trial; is that right?

15     A.   I don't know that I would agree with the second

16  part of it, the conclusion part it.  But on the first

17  part, yes.

18     Q.   The attorney could go visit them as well.

19  Correct?

20     A.   Yes.

21     Q.   So the use of the phones may not be essential,

22  but it's certainly an important component in effective

23  representation.  Correct?

24     A.   I would agree, generally so, yes.

25     Q.   And at the same time, people who are in detention

1   facilities often are in the facilities for good reason.

2   Correct?

3       A.   Yes.

4       Q.   And sometimes those people are dangerous to the

5   community?

6       A.   Yes.

7            MS. BRANNON:  Objection, speculative and I

8   think outside his knowledge.

9            THE COURT:  Overruled.  You can answer if

10  you can.

11  BY MR. CLYMER:

12      Q.   And there are known instances where people in

13  detention facilities try to have witnesses killed; is

14  that correct?

15      A.   I'm anecdotally familiar with those, yes.

16      Q.   And the covert alert system you described under

17  the right circumstance might save a witness' life.

18  Correct?

19      A.   Yes.

20      Q.   So the trick is to balance the inmates' interests

21  in having effective representation with the need for

22  effective law enforcement.  Right?

23      A.   Yes.  Without being glib, life is all about

24  tradeoffs, and we have to make the right compromises,

25  yes.

1    Q.   And in order to give inmates the ability to speak

2    to their attorneys privately, Securus has a

3    privatization function in its software.   Correct?

4    A.   Yes.

5    Q.   And based on everything you have learned during

6    the course of this litigation and the other litigation

7    you've been involved in, there's nothing to suggest that

8    the Securus privatization function is faulty in any way,

9    is there?

10   A.   Based on all the data that was produced by us in

11   the *Crane* case, I have found no instance where a call

12   that was set to private for the inmate that was placing

13   the call was recorded.

14   Q.   But Securus' platform can only be as good as the

15   data that's given to it.   Correct?

16   A.   Absolutely.

17   Q.   And so if the wrong phone number is submitted as

18   part of a privatization request, only that wrong phone

19   number will be privatized.   Correct?

20   A.   Yes.   The system only knows the ten digits, not

21   whether it's right or wrong.

22   Q.   And if the inmate-- if the subset of the inmate

23   population designated in a privatization request is

24   listed a certain way, that's what the platform does.

25   Correct?

1    A.   Yes.   It responds to the data with which it is

2  provided.

3    Q.   And if someone forgets to forward a privatization

4  request to Securus, that doesn't go into the Securus

5  platform either, does it?

6    A.   Generally speaking, we do not process

7  privatization requests.   So if someone failed to

8  internally forward it to the appropriate person in that

9  facility, that would cause a number not to be

10  privatized.   But by and large, privatization

11  transactions are handled by our facility customers.

12    Q.   If a phone-- if an attorney phone number is not

13  privatized for any particular reason, when the inmate

14  makes the call there is a warning on the call; is that

15  correct?

16    A.   There is a warning that the call is subject to

17  recording and monitoring, yes.

18    Q.   And if it's not-- if the call is not privatized,

19  that warning is on every such call used on the-- made on

20  the Securus platform.   Correct?

21    A.   Yes.

22    Q.   So that warning that the call is subject to

23  recording and monitoring gets heard by the caller every

24  time he makes that call.   Correct?

25    A.   To my knowledge, yes.

1    Q.  And it's heard by the recipient every time the

2    recipient receives that call.  Correct?

3    A.  To my knowledge, yes.

4    Q.  So every time this happens, both the caller and

5    the recipient is given notice that that particular call,

6    that specific call is subject to recording and

7    monitoring.  Correct?

8    A.  Yes.

9    Q.  And that alone puts someone on notice that

10   perhaps a privatization request was ineffective; is that

11   right?

12   A.  I can only speak to what my personal reaction

13   would be to hearing that admonishment after submitting a

14   privatization request, but that is absolutely how I

15   would take it.

16   Q.  You would take it as a suggestion-- or an

17   indication that the privatization request didn't work.

18   Correct?

19   A.  Yes.

20   Q.  Now, let's suppose you had two sets of inmate

21   populations calling you.  And for one set of inmate

22   calls you heard that warning, and for another set you

23   didn't hear that warning.  And that happened after you

24   submitted a privatization request.  In other words, that

25   difference between the two sets.

1      A.   Understood.

2      Q.   Would that give you additional notice that

3    something may have been wrong with that privatization

4    request?

5      A.   It would tell me that, for whatever reason, the

6    request had not been fulfilled for at least one of my

7    inmate clients.  And me personally, it would cause me to

8    follow up with the facility and, of course, not to

9    discuss anything substantive with my client on the call

10   at which I heard the admonishment.  And, frankly, I

11   probably, until I received additional assurances from

12   the facility, wouldn't have substantive discussions with

13   my clients even if I did not hear the admonishment.

14             MR. CLYMER:  I'll need a moment, Your Honor,

15   to find an exhibit.  Could I have Exhibit 564 put up,

16   please?  If you could flip down to the subpoena return,

17   I would appreciate it.  Go up just to the page where

18   Line 23 and 24 are located.  That's good.  Thank you

19   very much.

20   BY MR. CLYMER:

21     Q.   Can you see that screen, Mr. Martin?

22     A.   If we could zoom in on rows 23 and 24, I would

23   appreciate it.

24             MR. CLYMER:  I think he wants you to zoom in

25   if you could.

1             THE WITNESS:  Thank you.  I can see it now.

2    BY MR. CLYMER:

3        Q.  Do you see those rows?

4        A.  I do.

5        Q.  And those are the rows, 23, 24, were the rows

6    where the same phone number at the Public Defender's

7    Office was privatized as to one-- excuse me, that may

8    not be the right one.

9             MR. CLYMER:  Could I have a moment, Your

10   Honor?

11            THE COURT:  Yes.

12            MR. CLYMER:  I'm sorry, could you go to

13   Page 6 of that exhibit?  Could you-- is that

14   Exhibit 564?

15            MR. BELL:  Yes.

16            MR. CLYMER:  Could you go to the one at the

17   bottom that says Page 1 of 199, please?  Thank you.

18   Now, could you go to Lines 23 and 24 of that page?

19            THE WITNESS:  That's-- that zoom level was

20   sufficient for me to be able to read it.

21   BY MR. CLYMER:

22       Q.  That's the exhibit that Ms. Brannon-- that's the

23   page of the exhibit Ms. Brannon showed you before; is

24   that correct?

25       A.  It is.

1    Q.  Okay.  And does that line indicate that, in fact,

2  in this case or in the call related to this case, the

3  Federal Public Defender's Office received both the

4  preamble with the warning on a non-privatized call and

5  the preamble without the monitoring and recording

6  warning on an unprivatized call?

7    A.  Yes.

8    Q.  To the same telephone number?

9    A.  Yes.

10    Q.  So over time, there may have been other calls to

11  the same number, both privatized and non-privatized

12  calls.  Correct?

13    A.  That's possible.

14    Q.  Okay.  Now, if a user of your service-- well,

15  strike that.

16      In addition to the warning that you talked about

17  about recording and monitoring, there's also a series of

18  choices a recipient has to make about whether to accept

19  the call or reject the call.  Correct?

20    A.  I don't know that I would characterize it as a

21  series of choices, but they would need to decide whether

22  or not they were going to accept or not accept the call.

23    Q.  And they-- so they actually have to press a

24  button and do something affirmative.  Correct?

25    A.  Yes.

1      Q.   So that suggests that every time that warning is

2   given, a human being has to hear it before the call can

3   be accepted; is that right?

4      A.   I would assume so, yes.

5      Q.   Because somebody has to press a button to

6   continue the process?

7      A.   Yes.

8      Q.   Now, if a user requests a call and the call has

9   that warning on it, is there anything on that call that

10  would notify the user who's requested the call that

11  there had been a privatization request with respect to

12  that number?

13     A.   By user, you're referring to user at CCA?

14     Q.   Yes.

15     A.   And they're-- they're listening to the recording

16  of the call?

17     Q.   Let me give you a better example.

18     A.   Please.

19     Q.   If an Assistant United States Attorney asks CCA

20  to get telephone calls made on a certain inmate's PIN

21  number--

22     A.   Okay.

23     Q.   -- and CCA makes the request and obtains those

24  calls and gives them to the Assistant U.S. Attorney, is

25  there anything on those calls that the Assistant U.S.

1   Attorney receives that tells the Assistant U.S. Attorney

2   that there's been a privatization request as to that

3   number?

4       A.  No.

5       Q.  Is there anything in the call detail records that

6   accompanies that request that tells the Assistant U.S.

7   Attorney that there's been an unsuccessful privatization

8   request as to that number?

9       A.  No.

10      Q.  So the only person who would have notice of the

11  failure of a privatization request would be the person

12  who made the request and then hears calls later with the

13  warning on it or the person at CCA who made the mistake;

14  is that correct?

15      A.  Yes.

16      Q.  And if the attorney told the inmate, I've had

17  your calls to me privatized, and the inmate subsequently

18  heard the warning, the inmate would have notice as well.

19  Correct?

20      A.  Potentially, yes.

21      Q.  If the warning played on the calls.  Correct?

22      A.  It's hard for me to answer that question

23  without-- without assessing the relative sophistication

24  of the inmates.

25      Q.  But if the privatization request failed, the

1   inmate would still hear that warning.  Correct?

2       A.  Yes.

3       Q.  Every single call.  Correct?

4       A.  Yes.  And were I detained or incarcerated and

5   calling my attorney and had previously submitted a

6   privatization request and not heard the admonishment for

7   a period of time and then began to hear the

8   admonishment, my personal reaction would be the same as

9   if I were in the attorney's shoes.  I would be

10  concerned, and I would assume that the call was-- that

11  the privatization was unsuccessful or had subsequently

12  failed.

13      Q.  I'm going to show you what's been marked as

14  Government Exhibit 38.  And I'll represent to you that

15  this is the Special Master's report regarding other

16  issues related to recordings at CCA-Leavenworth, Docket

17  No. 214 in this case.

18      A.  Understood.

19          MR. CLYMER:  Your Honor, I move 214 into

20  evidence.

21          THE COURT:  Exhibit 38 admitted.

22          MS. BRANNON:  It's already in the record.

23  BY MR. CLYMER:

24      Q.  If you look at the page I directed you to there,

25  could you tell us what page I pulled up?

1      A.   Page 19.

2      Q.   And on Page 19, is there a description by the

Special Master of the admonishment that is on the

recording at CCA-Leavenworth from Securus?

5      A.   There is.

6      Q.   And can you read the line that gives the inmate

and the attorney notice that the call is being monitored

and recorded?

9      A.   "This call is subject to recording and

10     monitoring."

11     Q.   And is that your understanding of the recording

12     that Securus puts on all unprivatized calls made by

13     inmates?

14     A.   The admonishment predates my time.  And so-- and

15     I, frankly, just haven't done the investigation to

16     understand quite how-- how frequently it is used, but

17     let me-- sorry, my answer is getting confused.

18          An admonishment plays for all non-private calls.

19     It is either this one, which I would characterize as the

20     standard or routine admonishment, or in the case of

21     certain facilities, it can be a custom admonishment

22     that, for example, provides guidance about contacting

23     the facility to request that a number be privatized.

24     Q.   Do you have any reason to believe that the

25     Special Master's characterization of the admonishment in

1    that exhibit is incorrect?

2       A.  I believe the Special Master has accurately

3    quoted the admonishment that played for calls from

4    CCA-Leavenworth for non-private calls.

5               MR. CLYMER:  May I have Exhibit 568 put on

6    the screen?  And if you could zoom in on-- if you go

7    back down to the page you were on, thank you, and zoom

8    in on that.  Actually zoom in on the last four columns.

9    Thank you.  Actually-- right there is good, where you

10   had it is fine.  Thank you.

11   BY MR. CLYMER:

12      Q.  I notice in the last column here--

13              MR. CLYMER:  Could you scroll up so we see

14   the heading on that column?  Thank you, counsel.

15   BY MR. CLYMER:

16      Q.  The last column here says "passive status."  And

17   sometimes there's an "N" in this column and sometimes

18   there's a "Y."  Can you explain to us what that means?

19      A.  I believe this is associated with the passive

20   acceptance option that's contained within the four lists

21   that we discussed earlier.  If it is an "N" for no, the

22   call requires positive acceptance.  If it is a yes, I

23   assume - but do not know for certain - that that means

24   the call can be completed without positive acceptance.

25      Q.  That means nobody would have to push a button on

1    the other end.  Correct?

2      A.  That's correct.

3      Q.  If that was the case and if these telephone

4    numbers that are listed here to the Public Defender's

5    Office on this Exhibit 568 were in passive status, does

6    that mean that a call on the Securus system that went to

7    voicemail would be listed as a completed call?

8      A.  Potentially.

9      Q.  Okay.  And can you tell us for these rows - where

10   the last column has a "Y" in it as in passive status -

11   the dates on which there was a change to the system, and

12   as of the date of that change, the system-- or that line

13   was in passive status?

14     A.  The data exists within the system.  There is no

15   easy way to get to it.  So as I sit here today, no, I

16   cannot.

17     Q.  If you look at the privatization data date--

18     A.  Yes.

19     Q.  -- that simply shows the date that the change to

20   privatization was made.  Correct?

21     A.  Yes.

22     Q.  So as a result of that date, would the system

23   have been in passive status or can we just not tell when

24   it was moved to passive status?

25     A.  I don't know what conclusion we can draw.

1    Q.   Thank you.  Now, the call detail records you

2    described before don't actually show who the inmate is

3    who makes the call, does it?

4    A.   It shows the name of the inmate whose account

5    number and PIN number were used to place the call.

6    Q.   But sometimes inmates will let other inmates use

7    their PIN number.  Correct?

8    A.   Anecdotally I'm aware of that occurring, yes.

9    Q.   And that's one of the reasons why you have the

10   biometric function that Mr. Cohen asked about.  Correct?

11   A.   Yes.

12   Q.   So for any particular call detail record, you

13   cannot tell from that-- any particular call who actually

14   initiated the call from the detention facility?

15   A.   No, we can only tell whose credentials were used.

16   Q.   And the call detail records show the telephone

17   number that the inmate called.  Correct?

18   A.   They do.

19   Q.   It doesn't show who answered the phone, does it?

20   A.   They do not.

21   Q.   And it doesn't show who was on the line during

22   the call, does it?

23   A.   It does not.

24   Q.   And it doesn't show for-- for numbers that are in

25   passive status whether the call just went straight to

1   voicemail, does it?

2     A.  No.

3     Q.  Only the content of the call, the recording

4   itself would provide that kind of information.  Correct?

5     A.  Yes.

6           MR. CLYMER:  Could we have Exhibit 563 up,

7   please?  If you could scroll down to the subpoena.  If

8   you could expand then the-- the data you have there.

9   Thank you.

10  BY MR. CLYMER:

11    Q.  I'd like to now direct your attention to

12  Exhibit 563, which you were shown before.  And of the

13  five calls reflected on the call detail record, one is

14  incomplete.  Do you see that?

15    A.  I do.

16    Q.  And the-- you testified before that a call would

17  be incomplete if it never connected.  Correct?

18    A.  Correct.

19    Q.  Would the recording still play on an incomplete

20  call?

21    A.  Would the recording still play?  Which recording?

22    Q.  The recording that has the warning in it and the

23  instructions about buttons to press.

24    A.  It would depend on how long the called party

25  remained on the line after first picking up.

1   Q.  If you could go over a couple columns to the

2   start and end time for that call, you'll see-- you see,

3   do you not, that the start time of that call appears to

4   have been 1:14 and 41 seconds on November 27, 2014.

5   Correct?

6   A.  I see that, yes.

7   Q.  And the end time is 1:16:17 on the same date.

8   Correct?

9   A.  I see that as well.

10  Q.  So that would suggest that that call lasted

11  roughly a minute-and-a-half.  Correct?

12  A.  That's a difficult question for me to answer

13  because the-- I'm not-- I don't know when the clock

14  starts ticking, in other words when the start time

15  begins.  If it begins when the inmate first takes the

16  handset out of the cradle and begins the dialing

17  process, that could account for some portion of that

18  time.

19  Q.  And the earlier the clock starts running, the

20  longer the call is going to be in terms of the-- based

21  on the call detail records, even if no one is talking to

22  each other.  Correct?

23  A.  Yeah, that's correct.

24  Q.  So a call that never connects here seems to have

25  lasted roughly a minute-and-a-half.  Correct?

1    A.  Well, it depends what you mean by "call."  If

2   we're describing that as the beginning-- at the moment

3   the inmate takes the handset off the hook, then that

4   answer would be correct.

5    Q.  This attempted call seemed to be recorded as

6   lasting roughly a minute-and-a-half in the Securus call

7   detail report.  Correct?

8    A.  Yes, subject to the caveat that I don't know the

9   actual event that begins the clock ticking.

10            THE COURT:  Mr. Clymer, if you're going to

11   be a few more minutes, let's take a break.

12            MR. CLYMER:  Thank you, Your Honor.  That

13   would be helpful.

14            THE COURT:  All right.  Let's take a break

15   for 15 minutes.

16            (Recess).

17            THE COURT:  All right.  You can be seated.

18            MR. CLYMER:  May I proceed, Your Honor?

19            THE COURT:  Yes.

20   BY MR. CLYMER:

21    Q.  Mr. Martin, during the time your company had the

22   contract with CCA-Leavenworth and an attorney wanted to

23   submit a privatization request, did the documentation

24   for that request go to CCA-Leavenworth or did it go to

25   Securus?

1     A.  It did not go to Securus.

2              MR. CLYMER:  Could I get that Exhibit 568 up

3     again?

4     BY MR. CLYMER:

5     Q.  I'm going to show you what's been marked as

6     Exhibit 568.

7              MR. CLYMER:  Bonnie, can we get the screen

8     on?

9              COURTROOM DEPUTY:  Before I was asked not to

10    have them on because they're sealed.

11             MR. CLYMER:  Oh, is this one sealed?  I'm

12    sorry, thank you.

13             THE COURT:  We do have a problem.  The

14    Special Master--

15             COURTROOM DEPUTY:  We have a monitor.

16             MS. VANBEBBER:  We have it.

17             THE COURT:  Now, but you didn't have it

18    before.  So you haven't seen any of these documents that

19    have been admitted under seal?

20             MS. VANBEBBER:  No, Your Honor, we have not

21    until the paper was delivered to us about half an hour

22    ago.

23             THE COURT:  All right.  I'm going to give

24    you leeway if you want to, Mr. Cohen, examine about the

25    documents since you weren't able to see them up until

1    now.  But go ahead and proceed.

2           So you've got it on your monitor, I have it.

3    You now have it on your monitor.  FPD have it on your

4    monitor.  All right.  Mr. Slinkard?

5           MR. SLINKARD:  Yes.

6           THE COURT:  Okay.

7           MR. CLYMER:  Thank you.

8           COURTROOM DEPUTY:  So don't publish it?

9           THE COURT:  Don't publish it.  Mr.

10   Guastello, are you able to see it?

11          MR. GUASTELLO:  I am, Your Honor.

12          THE COURT:  Okay.  Good.

13   BY MR. CLYMER:

14   Q.  Exhibit 568 is a document you already testified

15   about that shows in your system when privatization

16   requests were made to the system; is that right?

17   A.  It shows privatization transactions entered into

18   the system subject to the criteria-- the subpoena, which

19   this document was produced in response to.

20   Q.  And that would be Securus' record of the

21   privatization request; is that right?

22   A.  Of the privatization transactions, not

23   necessarily the request, yes.

24   Q.  The transaction, thank you.

25   A.  Yes.

1     Q.  If somebody deprivatized or unprivatized a

2  telephone number in the Securus system, would your

3  system also maintain a record of that transaction?

4     A.  It would.

5     Q.  And if you were served a subpoena for that

6  information, would you comply with the subpoena?

7     A.  Subject to a potential burden objection, which we

8  can discuss now or later, I mean, it's-- the issue is

9  the data exists within the system, but there is not a

10  reporting function-- standard reporting functionality

11  that allows it to be easily generated.  So it will take

12  some time and person hours to generate that report.

13     Q.  You're not aware, as you sit here right now, of

14  any deprivatization transactions, are you?

15     A.  No.  We produced the privatization-- master

16  privatization log in the *Crane* litigation, which was

17  reflected-- was based on transactions associated with

18  the numbers on Special Master Cohen's known attorney

19  telephone number list.  And of those transactions, there

20  were no deprivatization events.

21            MR. CLYMER:  Nothing further, Your Honor.

22                  REDIRECT EXAMINATION

23  BY MS. BRANNON:

24     Q.  Mr. Martin, does Securus have anything to do with

25  publishing privatization protocol?

1      A.   No.

2      Q.   Do you require your customers or facilities to

3    publish privatization protocol?

4      A.   Not to my knowledge.

5      Q.   Do you know whether CCA ever informed any

6    attorney that there was a difference in privatizing at

7    site levels?

8      A.   I do not know.

9      Q.   If we could look at Exhibit 550.  You looked at

10    this earlier, it was an e-mail to Mr. Bigelow.  If you

11    could go down one I think.  That.  Right.

12         These are instructions from Michael Kenyon to Mr.

13    Bigelow.  And the question was how to privatize.  Is

14    there anything in those instructions that talks about

15    different site levels?

16      A.   Not explicitly.

17      Q.   Is there anything implicitly that talks about

18    site levels?

19      A.   There is no specific instruction regarding

20    selecting a site level.  So were I interpreting this as

21    the recipient, I would take the path of least resistance

22    in terms of steps needed to complete the transaction,

23    which would result in it being privatized.  At the

24    facility level, that is the "all inmate."

25      Q.   Okay.  Let's break that down a little bit.

1   There's nothing in this e-mail that would tell Mr.

2   Bigelow what the differences were in the site levels.

3   Correct?

4       A.   That's correct.

5       Q.   And earlier you pointed out that on the drop-down

6   option-- if you just left that alone and didn't click

7   anything, it would privatize for the entire facility?

8       A.   That is correct.

9       Q.   And in order to choose one of the smaller sites,

10  you have to actually go in and choose that rather than

11  just passively-- or just pass it by?

12      A.   That's correct.  Selection of a site level

13  privatization transaction requires additional steps on

14  the part of the end user.

15      Q.   Is there anything in these instructions to Mr.

16  Bigelow that would tell him that if he just didn't

17  choose anything on the site level, that it would

18  privatize calls to all inmates?

19      A.   No.  This e-mail is silent on the distinction

20  between facility and site level privatization events.

21      Q.   You talked on cross examination about why a

22  number that had been requested to be privatized would

23  still be recorded.  And if we could look at Exhibit 548.

24  And I handed you this exhibit over the break to read

25  through.  Did you get a chance to do that?

1      A.  I did.

2      Q.  Okay.  And if we look at the last page of this,

3  just going up through the e-mail chain.  The first

4  e-mail I think on the next page-- I'm sorry, Branden,

5  one more.

6          This e-mail chain is about Mr. Bigelow having

7  entered numbers-- entered the wrong numbers; is that

8  right?

9      A.  Yes.

10     Q.  And is he asking Mr. Kenyon to fix that for him?

11     A.  In Mr. Bigelow's e-mail dated September 12th,

12  2016, at 11:52 a.m., it appears that he is asking Mr.

13  Michael Kenyon how-- quoting-- quote, "Now how do I

14  delete these-- those incorrect numbers?"

15     Q.  And this is in the context of privatization of

16  those numbers?

17     A.  Yes.

18     Q.  All right.  On cross examination you talked

19  somewhat about what your reaction would be to hearing

20  the admonition.  Now, let me start by asking you, Mr.

21  Martin, have you practiced criminal defense work before?

22     A.  No.

23     Q.  Have you ever represented someone who is locked

24  up in a facility?

25     A.  I have not.

1    Q.  And would it be fair to say that from your

2   position and experience over the last couple of years,

3   you would be particularly sensitive to what the preamble

4   or-- what was the word you used, admonition--

5    A.  Admonition.

6    Q.  -- what that says?

7    A.  Yes.  That is correct.  Although my initial

8   reaction as an individual, as the facts of this case

9   became known to me, you know, that hasn't changed.

10    Q.  To follow up on some of the hypotheticals that

11   the prosecutor posed to you.  If you were a defense

12   attorney and you had asked for your number to be

13   privatized and you had received confirmation from the

14   facility that your number had been privatized, would it

15   be reasonable to expect that call is not recorded, even

16   if there was an admonition that was played?

17    A.  From my perspective, if I heard the admonition, I

18   would assume that something was not working as I had

19   been told it was.

20    Q.  What if they followed up and asked again, is my

21   number privatized, and they received confirmation again

22   that it was privatized.  How many times would that

23   attorney need to go back to the facility?

24    A.  I can't answer that question.

25    Q.  Okay.  If he had received-- if the attorney had

1   received confirmation more than once that his number had

2   been privatized, would it be reasonable to believe that

3   the call was not recorded, despite the preamble?

4        A.  From my perspective, it would depend on my

5   relative interpretation of the credibility of the person

6   making those representations.

7        Q.  Would it depend at all on what the admonition

8   actually said?

9        A.  It might.

10       Q.  The admonition that Securus uses does not say

11  that this call will be recorded.  Right?

12       A.  It does not contain those exact words.  That's

13  correct.

14       Q.  It says that the call is subject to recording.

15  Right?

16       A.  Correct.

17       Q.  And you would agree that that's a lesser degree

18  of assurance-- of information about whether a call would

19  be recorded or not, that it's possible?

20       A.  Yes.

21       Q.  But subject to recording, it's possible that it

22  would be recorded.  So hearing that admonition, if an

23  attorney had been assured that his calls were not

24  recorded, would it be reasonable to assume that they

25  were not recorded, despite the preamble?

1       A.  I can only answer again from my perspective

2    putting myself in those shoes, and my first instinct

3    would be to protect my presumably less-sophisticated

4    detainee client and refrain from discussing anything

5    substantive on the call until I could reach a level of

6    assurance that the call was not being recorded.

7       Q.  Do you know what the preamble says in Spanish?

8       A.  I do not.

9       Q.  So if the Spanish version said the call may be

10   recorded, you would agree that that's an even lesser

11   degree of information about whether a call would be

12   recorded?

13      A.  I would agree that it creates at least a higher

14   amount of uncertainty.

15      Q.  If-- and you talked about the

16   lesser-sophisticated inmate.  If the

17   lesser-sophisticated inmate had been told by his

18   attorney that his calls to the attorney would not be

19   recorded, would it be reasonable for that

20   less-sophisticated inmate to rely on what his attorney

21   said, despite the preamble?

22      A.  Theoretically, yes.

23      Q.  And would that be especially true if he was-- the

24   preamble said that the call may be recorded?

25      A.  That would be a factor.

1    Q.   And still true if it said subject to recording?

2    A.   Yes.

3    Q.   If it said your call will be recorded, that might

4    be a direct contradiction?

5    A.   I agree that the statement "this call will be

6    recorded" is more definitive than "this call may be" or

7    "this call is subject to."  But all I can answer that

8    question with is how I believe I would react in those

9    circumstances, which I have never been in.

10    Q.   Do you know what information the inmate is given

11    about recorded calls in orientation when they arrive at

12    the facility?

13    A.   I believe I was present in the *Crane* case at a

14    deposition of CCA's corporate representatives where the

15    issue was discussed, but I do not recall with

16    specificity the information responsive to your question.

17    Q.   Do you remember-- do you know what information

18    the inmate may be given if they received a handbook?

19    A.   I do not.

20    Q.   Do you know if the inmate receives any

21    information at all about what the preamble means in

22    context of calling their attorney?

23    A.   I do not.

24    Q.   If we could look at-- well, yeah, Exhibit 563,

25    please.  The prosecutor asked you some questions about a

```
 1   call detail report.  If we'd look at this particular
 2   one.
 3        Going back and following up on hypotheticals.  If
 4   an Assistant U.S. Attorney knew a defense attorney's
 5   phone number, would it be possible to look at a call
 6   detail report and determine whether a call was to that
 7   number?
 8   A.  Yes.
 9   Q.  And you could do that without actually listening
10   to the call?
11   A.  Yes.
12   Q.  All right.  And if we look at Exhibit 573, you
13   were asked about the length of certain calls.  These are
14   all calls to the 1000 number.  Correct?
15   A.  That's what's reflected in the document, yes.
16            MS. BRANNON:  And, Your Honor, for the
17   record, the earlier testimony was that this was Mr.
18   Cox's phone number, Ms. Wood's attorney at the time.
19            THE COURT:  The record will so reflect.
20   BY MS. BRANNON:
21   Q.  Some of these calls are quite short, would you
22   agree?
23   A.  It appears that way, yes.
24   Q.  But some of them, like the fourth row down, 9:52
25   to 10:03?
```

1      A.  I see that, yes.

2      Q.  And that's minutes, not seconds.  Correct?

3      A.  Agreed.

4      Q.  Is there a time limit on these phone calls?  Do

5  they cut off at 15 minutes?

6      A.  Facilities generally have a time limit on calls.

7  And 15 minutes is, in my experience, the most commonly

8  applied time limit, but I do not know specifically what

9  was in place at Leavenworth.

10     Q.  Does passive status-- whether it's set at passive

11 status, does that have anything to do with whether a

12 call is recorded or not?

13     A.  It does not.

14     Q.  Does it have anything to do with whether a

15 preamble plays?

16     A.  To my knowledge it does not.

17             MS. BRANNON:  Nothing further.  Thank you.

18             THE COURT:  Go ahead.

19             SPECIAL MASTER COHEN:  Thank you, Judge.

20                     RECROSS EXAMINATION

21 BY SPECIAL MASTER COHEN:

22     Q.  There's one thing that just keeps confusing me I

23 don't understand.  To make a private number less

24 private, that is to make it private for a site only

25 instead of the entire facility, takes at least two

1    additional clicks by whoever it is that is privatizing

2    the number, as I understand it; is that right?

3        A.   That's consistent with my understanding, yes.

4        Q.   And you say that you haven't practiced criminal

5    law, but it's clear that you understand that an attorney

6    who wants to protect communications with his inmate

7    client probably wants to protect communications with all

8    of his inmate clients in the facility, not just one.

9    Right?

10       A.   I would agree.

11       Q.   So here's the thing that just confounds me.  Why

12   would a number ever be set by anybody for less than

13   fully private for the entire facility?  Why would that

14   ever occur?

15       A.   I can only answer as to Securus.  And were such a

16   request made to us by a facility customer, by

17   Leavenworth, we would comply with it because it's

18   their-- that's their list to control.  Why CCA would do

19   it, I do not know.

20       Q.   Right.  So your-- as the supplier of the system

21   to CCA, if they asked for that capacity, you would make

22   it available because you can.  Right?

23       A.   What do you mean by "that capacity"?

24       Q.   The capacity to make a number private for less

25   than the entire facility.  You would provide that

1   capacity if they wanted it?

2       A.   Yes.  And the capacity exists in this instance

3   not, to my knowledge, because they requested it, but

4   because it was a necessary by-product of the way they

5   requested that the inmates be segregated within the

6   platform by agency affiliation.

7       Q.   Is there any reason that you can think of that

8   defense counsel, criminal defense counsel, would know or

9   learn that their number is being privatized for less

10  than the entire facility?

11      A.   Only if they were informed by the facility.

12      Q.   It's not something they would expect, do you

13  think?

14      A.   If I had requested that my number be made private

15  at CCA-Leavenworth and I was told that it was done, I

16  would assume that it was done universally and not in

17  relation to a specific inmate subpopulation.

18           The only way I would think something otherwise

19  would be if CCA had a policy of allowing numbers to be

20  privatized only on an inmate-client-by-inmate-client

21  basis.

22      Q.   And if defense counsel makes a privatization

23  request and understands or believes that the number is

24  made private for the entire facility, and then still

25  hears a recording that says it may be subject to

1    recording-- excuse me, still hears an admonition that it
2    may be subject to recording, that's not inconsistent
3    entirely.  It might give them a heads-up that something
4    is off, but it's not inconsistent.  Would you agree?
5        A.  I don't know that I would agree.  All I can do in
6    answering these questions is speak to how I personally
7    as an individual attorney would've responded to hearing
8    that admonishment.  And my reaction would be the same as
9    that which I previously testified to, I would assume
10   that there was a problem with the privatization process,
11   and I would not discuss anything substantive with my
12   inmate client on that call.
13       Q.  Fair enough.  Mr. Clymer asked you about defense
14   counsel perhaps sometimes from some inmates getting
15   calls with the admonition and sometimes getting calls
16   from inmates without the admonition, and that that could
17   conceivably give them an understanding that there are
18   different populations in the facility.
19       A.  I recall those questions, although I didn't make
20   that mental jump to the conclusion that you just
21   described.
22       Q.  Okay.  That was probably in my own head.  But if
23   defense counsel could make that inference that there is
24   a reason that some inmates' calls are privatized to the
25   same number and some aren't, if defense counsel could

1   get wind of that, United States Attorneys could get wind

2   of that too, because they're actually getting the calls;

3   is that right?

4       A.  I can't answer that question.

5       Q.  You talked about sophistication.  I assume that

6   you meant that most inmates are probably not really very

7   sophisticated with regard to their own Sixth Amendment

8   rights.  Do you recall that?

9       A.  I-- I recall my characterization or reference to

10  the relative sophistication between an inmate client and

11  his attorney, but I don't know that I would extend it

12  that far to knowledge of Sixth Amendment rights.

13      Q.  Okay.  Is it fair to say that an attorney is

14  generally more sophisticated than an inmate client about

15  legal matters and specifically Sixth Amendment rights

16  and attorney-client communications?

17      A.  I would assume so, yes.

18      Q.  And that would include United States Attorneys?

19      A.  Yes.

20      Q.  You understand that the Securus platform is-- the

21  Securus platform allows inmates to call their attorneys,

22  that's one of the things it does?

23      A.  Correct.

24      Q.  As well as their friends and loved ones?

25      A.  That's right.

1      Q.   The fact that it allows them to communicate with

2   their attorneys has implications, you understand, for

3   the attorney-client privilege and the Sixth Amendment;

4   is that right?

5      A.   Generally, yes.

6      Q.   Those are constitutional rights.  Correct?

7   You're an attorney, you know that?

8      A.   I do know that.

9      Q.   So it's pretty important what we're talking

10  about.  We're talking about an inmate's Sixth Amendment

11  rights under the Constitution and his rights to have

12  attorney-client communications kept private.  Would you

13  agree that that's very important?

14     A.   I agree that the issues at play in this

15  proceeding are very important.  Yes.

16     Q.   And so making sure the system works correctly is

17  also important?

18     A.   In this capacity, yes.

19             SPECIAL MASTER COHEN:  Just a moment,

20  please.  Thank you, Mr. Martin.

21             THE WITNESS:  Thank you.

22                  RECROSS EXAMINATION

23  BY MR. CLYMER:

24     Q.   Mr. Martin, I want to ask you about something you

25  just said to Mr. Cohen about the different sites, that

1    you could designate inmates based on sites.

2          Does the division of inmates into different sites

3    have some function in the Securus platform other than to

4    designate privatization requests to-- privatization

5    transactions, excuse me?

6       A.  Yes, it does.

7       Q.  Can you explain that, please?

8       A.  Well, in one sense, the segregation of inmates in

9    the same physical facility into separate sites has

10   implications on reporting.  For example, it would allow

11   CCA to segregate out the number of calls placed by

12   inmates from marshal to county to DOC.  It would also

13   allow them to-- it has financial reporting functions as

14   well, because commissions are paid on calls.  And it's

15   my anecdotal understanding that in some instances CCA's

16   obligations with respect to its agency clients vary from

17   contract to contract and so-- in financial terms.  So

18   that may be an aspect as well.

19         In terms of the call platform itself, the primary

20   differences that I'm aware of, or implications, are

21   those associated with the settings that are contained

22   within the global lists that are applicable to each of

23   the three sites and as well as the facility.  There may

24   be other implications within the platform of which I am

25   unaware.

1      Q.   So the fact that the inmate pool at

2   CCA-Leavenworth is divided into three separate groups of

3   people, each subject to a different contract with a

4   different entity, has implications for the way the

5   Securus platform works; is that right?

6      A.   I would say that their directive to us to

7   segregate the three populations had implications on how

8   the platform works, yes.

9      Q.   Once you do that within the Securus platform,

10   does that drop-down menu that counsel asked you about

11   automatically populate with all three of the client

12   populations?

13      A.   I do not know.

14      Q.   So it's possible that nobody ever set that up for

15   that drop-down menu on that particular page where you

16   privatize a call, that just may happen automatically

17   because of the software code; is that right?

18      A.   I'm speculating, but yes, that is certainly

19   possible.

20      Q.   Mr. Cohen asked you about who would have notice

21   about there being the admonition on some calls and not

22   others.  Do you remember those questions?

23      A.   I do.

24      Q.   If a call is privatized, it has no admonition.

25   Correct?

1      A.  Correct.

2      Q.  If a call is not privatized, it does have the

3  admonition.  Correct?

4      A.  It does.

5      Q.  Privatized calls that don't have the admonition

6  never get accessed and sent out, though, do they?

7      A.  Those calls are not recorded, so there is nothing

8  to be accessed or sent out.

9      Q.  So a federal prosecutor getting a recording would

10  never hear a call that lacks the admonition; is that

11  correct?

12      A.  That's correct.

13      Q.  Only the person who's actually having the live

14  conversation with the inmate when the number has been

15  privatized will hear the warning with no admonition.

16  Correct?

17      A.  Yes.  Those would be the only people who would

18  hear the preamble without the admonition.

19              MR. CLYMER:  Nothing further.

20              THE COURT:  All right.  Anything more?  Oh,

21  go ahead.

22                  REDIRECT EXAMINATION

23  BY MS. BRANNON:

24      Q.  Mr. Martin, how much is Securus worth as a

25  company?

1      A.   I do not know the answer to that question.

2      Q.   Millions?

3      A.   I do know that we recently changed our equity

4    owners, and the valuation of the company in connection

5    with that transaction was north of a billion dollars,

6    but I don't know by how much.

7      Q.   Your company, Securus, is being sued in the

8    *Crane-Johnson* litigation over in the Western District of

9    Missouri; is that right?

10     A.   That's correct.

11     Q.   And you're being sued by defense lawyers.

12   Correct?

13     A.   Yes.  It is a class consisting of defense

14   lawyers.

15     Q.   Criminal defense lawyers who had clients at CCA?

16     A.   Correct.

17     Q.   And one of the allegations in that suit against

18   your company is that Securus recorded attorney-client

19   calls?

20     A.   Correct.

21     Q.   That Securus recorded attorney-client calls after

22   requests for privatization?

23     A.   I believe so.

24     Q.   And one of Securus' defenses rests on the playing

25   of the preamble that the defense attorney may have

1    heard; is that right?

2       A.  That is correct.

3               MS. BRANNON:  Nothing further.

4               THE COURT:  Anything more?

5               SPECIAL MASTER COHEN:  No, Judge.  Thank

6    you.

7               MR. CLYMER:  No, Your Honor.

8               THE COURT:  All right.  May this witness be

9    excused?  Mr. Martin, you're excused.

10              (11:16 a.m., testimony of Josh Martin

11   concluded).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3

4

5        I, Kelli Stewart, a Certified Shorthand Reporter and

6    the regularly appointed, qualified and acting official

7    reporter of the United States District Court for the

8    District of Kansas, do hereby certify that as such

9    official reporter, I was present at and reported in

10   machine shorthand the above and foregoing proceedings.

11       I further certify that the foregoing transcript,

12   consisting of 110 pages, is a full, true, and correct

13   reproduction of my shorthand notes as reflected by this

14   transcript.

15       SIGNED December 14, 2018.

16

17

18

19                   /s/ Kelli Stewart
                    _____
20                   Kelli Stewart, CSR, RPR, CCR, RMR

21

22

23

24

25